No. 23-40671

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————

STATE OF TEXAS; STATE OF MISSISSIPPI; STATE OF LOUISIANA,

Plaintiffs-Appellees,

v.

PRESIDENT JOSEPH R. BIDEN, in his official capacity as President of the United States; DEPARTMENT OF LABOR; JULIE A. SU, Acting Secretary, U.S. Department of Labor, in her official capacity as United States Secretary of Labor; JESSICA LOOMAN, in her official capacity as Administrator of the United States Department of Labor, Wage & Hour Division,

Defendants-Appellants.

————————

On Appeal from the United States District Court
for the Southern District of Texas

————————

## BRIEF FOR APPELLANTS

————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

ALAMDAR S. HAMDANI
  *United States Attorney*

MARK B. STERN
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

# CERTIFICATE OF INTERESTED PERSONS

*Texas v. Biden*

A certificate of interested persons is not required under Fifth Circuit Rule 28.2.1, as appellants are all governmental parties.

/s/ Daniel Winik
Daniel Winik

## STATEMENT REGARDING ORAL ARGUMENT

The federal government respectfully requests oral argument.  The district court permanently enjoined the enforcement against the plaintiff States of an executive order and the Department of Labor rule implementing it.  Oral argument is warranted given the importance of the issue.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................iv

INTRODUCTION ...........................................................................................1

STATEMENT OF JURISDICTION....................................................................2

STATEMENT OF ISSUE .................................................................................2

PERTINENT STATUTORY PROVISIONS.........................................................3

STATEMENT OF THE CASE ..........................................................................3

    A.    Statutory And Administrative Background....................................3

    B.    Prior Proceedings........................................................................8

SUMMARY OF ARGUMENT ....................................................................... 10

STANDARD OF REVIEW............................................................................. 12

ARGUMENT ............................................................................................... 12

THE CHALLENGED EXECUTIVE ORDER IS A VALID EXERCISE OF THE PRESIDENT'S AUTHORITY UNDER THE FEDERAL PROPERTY AND ADMINISTRATIVE SERVICES ACT ............................................................. 12

    A.    The Challenged Executive Order Is Valid Under The Standard Long Applied By Most Courts.....................................................12

    B.    The District Court's Cramped Reading Of The Statute Departs From This Court's Decisions And The Statutory Text ............................20

CONCLUSION ............................................................................................ 33

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                **Page(s)**

*AFL-CIO v. Kahn,*
618 F.2d 784 (D.C. Cir. 1979) ................................................................. 13, 14

*Alabama Association of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ................................................................................30

*Arizona v. Walsh,*
2023 WL 120966 (D. Ariz. Jan. 6, 2023) ...................................................19

*BG Gulf Coast LNG, LLC v. Sabine-Neches Navigation District of Jefferson County,*
49 F.4th 420 (5th Cir. 2022) ...................................................................... 22

*Biden v. Missouri,*
595 U.S. 87 (2022) .....................................................................................29

*Biden v. Nebraska,*
600 U.S. 477 (2023) ...................................................................................30

*Bradford v. U.S. Department of Labor,*
582 F. Supp. 3d 819 (D. Colo. 2022) .........................................................19

*Chamber of Commerce v. Napolitano,*
648 F. Supp. 2d 726 (D. Md. 2009) ....................................................... 15, 18

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) ...............................................................8, 11, 15, 25

*Cooper Industries, Inc. v. Aviall Services, Inc.,*
543 U.S. 157 (2004) ...................................................................................23

*Epic Systems Corp. v. Lewis,*
584 U.S. 497 (2018) ............................................................................. 27, 28

*Farkas v. Texas Instrument, Inc.,*
375 F.2d 629 (5th Cir. 1967) ..............................................................13, 15, 21

*Georgia v. President of the United States,*
46 F.4th 1283 (11th Cir. 2022) .............................................................. 20, 23

*Kentucky v. Biden,*
23 F.4th 585 (6th Cir. 2022) ................................................................. 20, 23

*Lorillard v. Pons*,
434 U.S. 575 (1978).................................................................................16

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) ........... 2, 8, 10, 12, 13, 16, 20, 21, 24, 25, 26, 28, 31, 32

*Mayes v. Biden*,
67 F.4th 921 (9th Cir. 2023) .................................................13, 16, 26

*McGirt v. Oklahoma*,
140 S. Ct. 2452 (2020) ........................................................................23

*Med-Cert Home Care, LLC v. Becerra*,
19 F.4th 828 (5th Cir. 2021) ..............................................................12

*NFIB v. OSHA*,
595 U.S. 109 (2022).............................................................................29

*Oncale v. Sundowner Offshore Services, Inc.*,
523 U.S. 75 (1998)...............................................................................23

*Texas v. EPA*,
983 F.3d 826 (5th Cir. 2020) ..............................................................22

*UAW-Labor Employment & Training Corp. v. Chao*,
325 F.3d 360 (D.C. Cir. 2003)..............................13, 14, 14-15, 18

*United States v. Mississippi Power & Light Co.*,
638 F.2d 899 (5th Cir. Unit A 1981) ......................... 2, 4, 10, 15, 21

*United States v. New Orleans Public Service, Inc.*,
553 F.2d 459 (5th Cir. 1977) ..............................................................15

*Utility Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014)......................................................................12, 28

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022) ........................................................................30

**Statutes:**

Federal Property and Administrative Services Act of 1949,
Pub. L. No. 81-152, 63 Stat. 377 ........................................................3
40 U.S.C. § 101....................................................................... 8, 24
40 U.S.C. § 101(1)................................................................. 2, 3, 13

40 U.S.C. § 111 ...................................................................................22
40 U.S.C. § 121 .....................................................................................8
40 U.S.C. § 121(a) ....................................... 2, 3, 10, 11, 13, 15, 16, 21, 22, 24

Pub. L. No. 107-217, 116 Stat. 1062 (2002) ...........................................16

28 U.S.C. § 1291 ....................................................................................2

28 U.S.C. § 1331 ....................................................................................2

40 U.S.C. § 486(a) ................................................................................15

41 U.S.C. § 3301 *et seq.* ......................................................................26
41 U.S.C. § 3306(a)(2)(B) .....................................................................27

**Regulatory Materials:**

Exec. Order No. 11,246,
    30 Fed. Reg. 12,319 (Sept. 28, 1965) ................................................3

Exec. Order No. 12,800,
    57 Fed. Reg. 12,985 (Apr. 14, 1992) ..................................................3

Exec. Order No. 13,201,
    66 Fed. Reg. 11,221 (Feb. 22, 2001) ........................................... 14, 18

Exec. Order No. 13,465,
    73 Fed. Reg. 33,285 (June 11, 2008) ................................................18

Exec. Order No. 13,658,
    79 Fed. Reg. 9851 (Feb. 20, 2014) ....................................................4

Exec. Order No. 13,706,
    80 Fed. Reg. 54,697 (Sept. 10, 2015) .............................................3-4

Exec. Order No. 13,838,
    83 Fed. Reg. 25,341 (June 1, 2018) ..........................................4-5, 5, 19

Exec. Order No. 14,026,
    86 Fed. Reg. 22,835 (Apr. 30, 2021) ....................... 5, 6, 7, 10, 17

Establishing a Minimum Wage for Contractors,
    79 Fed. Reg. 60,634 (Oct. 7, 2014) ....................................................4

Increasing the Minimum Wage for Federal Contractors,
    86 Fed. Reg. 67,126 (Nov. 24, 2021)................. 6, 7, 10, 17, 18, 19, 27, 29, 30, 31

Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff
    Vaccination, 86 Fed. Reg. 61,555 (Nov. 5, 2021)............................................................30

Minimum Wage for Contractors; Updating Regulations to Reflect
    Executive Order 13838, 83 Fed. Reg. 48,537 (Sept. 26, 2018) ....................................5

Minimum Wage for Federal Contracts Covered by Executive Order 14026,
    Notice of Rate Change in Effect as of January 1, 2024,
    88 Fed. Reg. 66,906 (Sept. 28, 2023)................................................................................7

**Other Authorities:**

Order, *Bradford v. U.S. Department of Labor*,
    No. 22-1023 (10th Cir. Feb. 17, 2022)....................................................................... 7, 19

*Oxford English Dictionary* (online ed. rev. 2021),
    https://doi.org/10.1093/OED/1003574638 (last visited Jan. 16, 2024)............21-22

## INTRODUCTION

For nearly a decade, across three presidential administrations, executive orders have required a minimum-wage clause to be inserted in certain contracts with the federal government. President Obama issued the first such order; President Trump maintained it, with a limited carveout for contracts in connection with seasonal recreational services on federal lands; and President Biden rescinded that carveout and increased the amount of the wage to be required.

The function of these orders is limited. They do not set a nationwide minimum wage for all employees. They are directives to federal agencies, issued under the President's statutory authority to promote economy and efficiency in contracting by the Executive Branch, instructing agencies to enter certain contracts only with companies that will agree to pay their workers at or above the prescribed level for work on or in connection with those contracts. The orders reflect a determination that the federal government benefits when its contractors' employees are sufficiently paid for the work that they do under federal contracts, because higher pay enhances their productivity and increases the quality of their work.

The district court erred in concluding that the order at issue here, the most recent of the three, exceeds the President's authority under the Federal Property and Administrative Services Act (FPASA or the Act). The Act authorizes the President to "prescribe policies and directives that [he] considers necessary to carry out" the statutory objective of "provid[ing] the Federal Government with an economical and efficient

system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. §§ 101(1), 121(a). Courts "generally" have applied "a lenient standard" for reviewing such directives, upholding them as long as they bear "a sufficiently close nexus" to "the values of economy and efficiency." *Louisiana v. Biden*, 55 F.4th 1017, 1026 (5th Cir. 2022) (quotation marks omitted). That understanding of the President's authority is reflected, for example, by this Court's decision in *United States v. Mississippi Power & Light Co.*, 638 F.2d 899 (5th Cir. Unit A 1981). And the order here passes muster under that longstanding test: It reflects the President's reasonable view, consistent with that of his predecessors, that the federal government benefits when its contractors pay their employees sufficiently for work on federal contracts.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. ROA.16 ¶ 14. The district court entered final judgment in plaintiffs' favor on September 26, 2023. ROA.785-786. The federal government timely appealed from that judgment on November 22, 2023. ROA.787-788; *see* Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUE

Whether the challenged executive order, directing federal agencies to enter into covered contracts only with companies willing to pay their employees at or above a

prescribed wage for work on or in connection with those contracts, is a lawful exercise of the President's authority under FPASA.

## PERTINENT STATUTORY PROVISIONS

Pertinent statutory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory And Administrative Background

1.    Congress enacted the Federal Property and Administrative Services Act of 1949, Pub. L. No. 81-152, 63 Stat. 377 (codified as amended at 40 U.S.C. § 101 *et seq.*), or FPASA, "to provide the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. § 101(1). The Act empowers the President to "prescribe policies and directives that the President considers necessary to carry out" those objectives. *Id.* § 121(a).

Presidents have used this power to issue a wide range of directives. Many such directives have concerned contractors' hiring, payment, and management of their employees. For example, presidents have directed agencies to include in their contracts provisions forbidding contractors from discriminating on the basis of race, creed, color, or national origin with respect to their employees, Exec. Order No. 11,246, 30 Fed. Reg. 12,319 (Sept. 28, 1965); requiring contractors to inform their employees that they have a right not to pay union dues, Exec. Order No. 12,800, 57 Fed. Reg. 12,985 (Apr. 14, 1992); and requiring contractors to provide their employees with paid sick leave, Exec.

Order No. 13,706, 80 Fed. Reg. 54,697 (Sept. 10, 2015).  Courts have upheld directives concerning contractors' relationships with their employees as valid exercises of the President's authority.  *See, e.g.*, *United States v. Mississippi Power & Light Co.*, 638 F.2d 899 (5th Cir. Unit A 1981) (Exec. Order No. 11,246); *infra* pp. 14-16.

2.a.    In 2014, President Obama exercised his authority under the Act by issuing Executive Order 13,658, 79 Fed. Reg. 9851 (Feb. 20, 2014).  That order directed agencies to include, in covered contracts entered on or after its effective date, clauses requiring contractors to pay their employees at least $10.10 per hour (with subsequent increases according to a formula) for work in the performance of the contracts.  *Id.* at 9851.  The order reflected President Obama's determination that "[r]aising the pay of low-wage workers increases their morale and the productivity and quality of their work, lowers turnover and its accompanying costs, and reduces supervisory costs."  *Id.*  After public notice and comment, the Department of Labor implemented the executive order through a final rule.  Establishing a Minimum Wage for Contractors, 79 Fed. Reg. 60,634 (Oct. 7, 2014).

b.    In 2018, President Trump issued Executive Order 13,838, which excluded from the requirements of the 2014 executive order any "contracts or contract-like instruments entered into with the Federal Government in connection with seasonal recreational services," such as "river running, hunting, fishing, horseback riding, camping, mountaineering activities, recreational ski services, and youth camps," "or seasonal recreational equipment rental for the general public on Federal lands."  83 Fed. Reg. 25,341,

25,341 (June 1, 2018).  That order expressly maintained the minimum-wage requirement for "lodging and food services associated with seasonal recreational services," *id.*, and left the 2014 order intact in all other respects as well.  The Department of Labor issued a rule implementing the order.  Minimum Wage for Contractors; Updating Regulations To Reflect Executive Order 13838, 83 Fed. Reg. 48,537 (Sept. 26, 2018).

c.    In April 2021, President Biden issued Executive Order 14,026, which effectively maintained the prior minimum-wage requirement for federal contracts while increasing the amount of the prescribed wage.  86 Fed. Reg. 22,835 (Apr. 30, 2021). The order directs agencies to include in certain federal contracts a clause requiring contractors to pay their employees at least $15 per hour (with subsequent increases according to a formula) for hours spent working on or in connection with the contract.  *Id.* at 22,835.  The requirement applies to several categories of new "contract[s]" or "contract-like instrument[s]," as well as "extension[s] or renewal[s]" of existing contracts or contract-like instruments.  *Id.* at 22,837.  The order reflected President Biden's determination that "[r]aising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs."  *Id.* at 22,835.

Like the 2014 executive order, the 2021 order applies to a variety of contracts for which workers' wages "are governed by the Fair Labor Standards Act, the Service Contract Act, or the Davis-Bacon Act"—namely (1) "procurement contract[s] or contract-like instrument[s] for services or construction"; (2) "contract[s] or contract-like

instrument[s] for services covered by the Service Contract Act"; (3) "contract[s] or con-tract-like instrument[s] for concessions"; and (4) "contract[s] or contract-like instru-ment[s] entered into with the Federal Government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public." 86 Fed. Reg. at 22,837. In addition to increasing the amount of the contractually required minimum wage, the order rescinded the 2018 exemption for sea-sonal recreational services and equipment rentals. *Id.* at 22,836.

After public notice and comment, the Department of Labor issued a final rule implementing the executive order. Increasing the Minimum Wage for Federal Contrac-tors, 86 Fed. Reg. 67,126 (Nov. 24, 2021). In issuing the rule, the Department explained that it expected the minimum-wage requirement to benefit the government in numer-ous ways. For example, it noted that "higher-paying contractors may be able to attract higher quality workers who are able to provide higher quality services, thereby improv-ing the experience of citizens who engage with these government contractors." *Id.* at 67,212. And it explained that a higher minimum wage for contractors' employees could make them more productive, reduce their rate of turnover, and reduce absenteeism, citing various studies for those propositions. *Id.* at 67,213-67,214.

The Department acknowledged that the government's "expenditures" in procur-ing goods or services could rise if the minimum-wage provision in contracts "in-crease[d] employers' costs (beyond offsetting productivity gains and cost-savings), and contractors pass[ed] along part or all of the increased cost to the government in the

form of higher contract prices." 86 Fed. Reg. at 67,206. It explained, however, that "benefits" to the government "attributable to the Executive order are expected to accompany any such increase in expenditures, resulting in greater value to the Government" overall, and "that any potential increase in contract prices" would likely "be negligible." *Id.*

Both the 2021 executive order and the implementing rule contain a severability provision stating that "[i]f any provision … , or the application of any provision … to any person or circumstance, is held to be invalid," the rest should remain in place. 86 Fed. Reg. at 22,837 (order); *see* 86 Fed. Reg. at 67,228 (rule).

The rule took effect on January 30, 2022.[1] 86 Fed. Reg. at 67,126. Currently, the inflation-indexed hourly wage required under contract provisions pursuant to the 2021 order is $17.20. Minimum Wage for Federal Contracts Covered by Executive Order 14026, Notice of Rate Change in Effect as of January 1, 2024, 88 Fed. Reg. 66,906 (Sept. 28, 2023).

---

[1] Several weeks after the rule took effect, the Tenth Circuit enjoined the enforcement of the minimum-wage requirement, pending an appeal from the denial of a preliminary injunction, solely "in the context of contracts or contract-like instruments entered into with the federal government in connection with seasonal recreational services or seasonal recreational equipment rental for the general public on federal lands." Order, *Bradford v. U.S. Dep't of Labor*, No. 22-1023 (10th Cir. Feb. 17, 2022). The appeal in *Bradford* remains pending.

### B.     Prior Proceedings

Shortly after the rule implementing the 2021 executive order took effect, the States of Texas, Louisiana, and Mississippi brought this challenge to the rule and the executive order.  ROA.14-45.

The district court entered partial summary judgment and a permanent injunction in plaintiffs' favor.  ROA.749-784.  After determining that plaintiffs established standing, the court addressed plaintiffs' claim that the challenged executive order exceeded the President's authority under FPASA.  The court "decline[d]" to apply "the close-nexus test" that most courts have long applied in determining the validity of presidential directives under FPASA.  ROA.760.  Instead, the court read this Court's decision in *Louisiana v. Biden*, 55 F.4th 1017 (5th Cir. 2022), to call the longstanding standard "into question."  ROA.760.  The court proceeded to determine that 40 U.S.C. §§ 101 and 121, "read together, unambiguously limit the President's power to the supervisory role of buying and selling goods."  ROA.761.

Although the court described its analysis as "textual," ROA.760, it focused on "historical context" and "purpose" in interpreting § 121(a)'s grant of authority to issue directives "consistent with" the "subtitle," ROA.762-765.  The court described FPASA's historical purpose as "centralizing" procurement to eliminate "inefficiencies" that had become apparent during the Second World War.  ROA.763.  From that analysis of history and purpose, and from a footnote to the Supreme Court's decision in *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 n.34 (1979), the district court drew the conclusion that the

challenged executive order would be "consistent with" the statute only if the statute contains "a 'specific reference' … that give[s] President Biden the ability to raise, lower, or otherwise alter the wages of the employees of federal contractors." ROA.765. It found no such provision in the statute.

The district court believed that its interpretation was bolstered by the major questions doctrine. The court reasoned that the challenged executive order "has 'vast economic and political significance,'" ROA.772, because it "commands federal contractors to comply with a heightened requirement" that "does not have broad support in the regulations and will cost federal contractors and the United States billions of dollars," ROA.775-776.

Having concluded that the challenged executive order exceeded the President's authority under FPASA, the district court did not reach plaintiffs' claims that the implementing rule was invalid under the Administrative Procedure Act, that FPASA would be inconsistent with the nondelegation doctrine to the extent that it authorized the executive order, and that the executive order and implementing rule constitute an unlawful exercise of Congress's spending power. ROA.776-780.

The district court found injunctive relief appropriate but declined plaintiffs' invitation "to grant it on a nationwide basis," including because doing so would "encroach[] upon the jurisdiction of other courts" that have upheld the challenged executive order. ROA.782-783. The court instead determined that it was appropriate to "grant the narrowest injunction possible that will afford Plaintiffs full relief as to" the

claim on which they prevailed.  ROA.784.  It entered a permanent injunction barring defendants "from enforcing" the challenged executive order and implementing rule "against the States of Texas, Louisiana, and Mississippi and their agencies."  ROA.784.

## SUMMARY OF ARGUMENT

A.     Courts have long understood 40 U.S.C. § 121(a) to authorize the President to issue procurement directives that bear "a sufficiently close nexus" to the statutory objectives "of economy and efficiency."  *Louisiana v. Biden*, 55 F.4th 1017, 1026 (5th Cir. 2022) (quotation marks omitted).  That understanding of the statute is reflected, for example, in decisions of this Court upholding an executive order "impos[ing] on government contractors the obligation to take affirmative action to achieve … equal opportunity goals."  *United States v. Mississippi Power & Light Co.*, 638 F.2d 899, 901, 905 (5th Cir. Unit A 1981).

The executive order here falls well within the authority conferred by the plain text of the statute and its established understanding.  The order directs federal agencies to enter covered contracts only with entities willing to pay their workers a prescribed wage for work on or in connection with those particular contracts, on the basis of the President's judgment that "[r]aising the minimum wage" for work on federal contracts would "bolster economy and efficiency in Federal procurement" because a higher minimum wage "enhances worker productivity and generates higher-quality work."  86 Fed. Reg. at 22,835.  The implementing rule provides extensive support for the reasonableness of that determination.  86 Fed. Reg. at 67,212-67,215.  The order and rule do not

set a minimum wage for all employees of all companies that contract with the federal government.

B.     The district court reached the conclusion that the minimum-wage requirement was invalid by reading a footnote in this Court's decision in *Louisiana* to signal that this Court has abandoned the generally accepted framework in favor of a narrow construction of FPASA, previously adopted only by the Sixth Circuit and by a single judge of the Eleventh Circuit.  On the contrary, however, the Court in *Louisiana* expressly declined to adopt that narrow interpretation.  It held the order in question (the same one addressed by the Sixth Circuit) invalid on the basis of the major questions doctrine, reasoning that the order—which directed agencies to contract only with companies that required their employees to be vaccinated against COVID-19—was "'strikingly unlike' … any" prior exercises of FPASA authority.  55 F.4th at 1030.

The district court equally misread the broad text of FPASA's operative provision, 40 U.S.C. § 121(a), which allows the President to "prescribe" all "policies and directives that [he] considers necessary to carry out" the relevant "subtitle," so long as the policies are "consistent with th[at] subtitle."  Although the district court characterized its analysis as "textual," it relied heavily on extratextual evidence of FPASA's historical purpose.  And rather than following the interpretation of FPASA's text long adopted by nearly all courts and impliedly ratified by Congress, the district court focused on a footnote in *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 n.34 (1979), which it read to declare that every

exercise of presidential authority under the Act must be justified by a specific statutory reference—a reading this Court explicitly rejected in *Louisiana*, 55 F.4th at 1023 n.17.

The district court also erred in invoking the major questions doctrine. The challenged executive order is not "vast" or "transformative" in its consequences, *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). It reflects a longstanding view of the statute and builds on the foundation of the minimum-wage requirement adopted in 2014 and maintained in relevant part by successive Administrations of both parties. And its economic effects are far more limited than those that the Supreme Court has held to implicate the doctrine.

## STANDARD OF REVIEW

The district court's permanent injunction presents issues of law that this Court reviews de novo. *Med-Cert Home Care, LLC v. Becerra*, 19 F.4th 828, 830 (5th Cir. 2021).

## ARGUMENT

### THE CHALLENGED EXECUTIVE ORDER IS A VALID EXERCISE OF THE PRESIDENT'S AUTHORITY UNDER THE FEDERAL PROPERTY AND ADMINISTRATIVE SERVICES ACT

#### A.   The Challenged Executive Order Is Valid Under The Standard Long Applied By Most Courts

1.    FPASA authorizes the President to "prescribe policies and directives that [he] considers necessary to carry out" the statutory objective of "provid[ing] the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including

contracting." 40 U.S.C. §§ 101(1), 121(a). That "broad language … purposefully gives the President both 'necessary flexibility and broad ranging authority' in setting procurement policies." *Mayes v. Biden*, 67 F.4th 921, 941 (9th Cir. 2023) (quoting *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003)) (some quotation marks omitted), *vacated as moot*, 2023 WL 8942212 (9th Cir. Dec. 28, 2023); *see Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967) (FPASA gives the President "broad authority"). In particular, "the Act leaves room for the President's discretion by directing the President to 'prescribe policies and directives that the President *considers* necessary' to carrying out the purposes of the Act," *Mayes*, 67 F.4th at 941, whether or not a court (or Congress) would independently have considered the directives necessary.

Courts therefore "have generally landed on a 'lenient' standard" for determining whether a given executive order constitutes a valid exercise of the President's authority under the Act. *Louisiana v. Biden*, 55 F.4th 1017, 1026 (5th Cir. 2022) (quoting *Chao*, 325 F.3d at 367). Under that standard, an executive order is valid if it bears "a 'sufficiently close nexus'" to FPASA's objectives "'of economy and efficiency.'" *Id.* (quoting *AFL-CIO v. Kahn*, 618 F.2d 784, 792 (D.C. Cir. 1979) (en banc)) (some quotation marks omitted). Courts also have recognized that "'[e]conomy and efficiency are not narrow terms; they encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions.'" *Mayes*, 67 F.4th at 940 (quoting *Kahn*, 618 F.2d at 789) (some quotation marks omitted).

In *Kahn*, for example, the en banc D.C. Circuit upheld an executive order direct-ing agencies "to require that all contractors certify … compliance with" recent "wage and price standards" created to reduce inflation. 618 F.2d at 785-786. The court noted that the order could cause contracts to be "diverted from low bidders who [were] not in compliance with the wage and price standards to higher bidders" who were in com-pliance, potentially causing "an unwarranted drain on the public fisc." *Id.* at 792; *see Chao*, 325 F.3d at 367 (observing that, "in the short run," the order at issue in *Kahn* would "plainly" have "increase[d] procurement costs"). But the D.C. Circuit deferred to the President's judgment that "if the voluntary restraint program [were] effective in slowing inflation in the economy as a whole," the government would "face lower costs in the future than it would have otherwise," and that those lower costs would "more than offset" any short-run "higher costs." 618 F.2d at 793.

In *Chao*, the D.C. Circuit similarly upheld an executive order requiring federal contractors to post notices of certain labor rights, on the basis of President George W. Bush's judgment that "'[w]hen workers are better informed of their rights, … their productivity is enhanced,'" and that "'[t]he availability of such a workforce from which the United States may draw facilitates the efficient and economical completion of its procurement contracts.'" 325 F.3d at 366 (quoting Exec. Order No. 13,201, 66 Fed. Reg. 11,221, 11,221 (Feb. 22, 2001)). The court did so even as it recognized that "[t]he link" asserted by the President might "seem attenuated" and that one could "with a straight face advance an argument claiming opposite effects or no effects at all." *Id.* at

366-367. For similar reasons, the court in *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009), upheld an executive order by President George W. Bush requiring that federal contractors use the E-Verify system to determine employment eligibility. The court held that the President's justification for the order was sufficient as long as it was "reasonable and rational," whether or not the court agreed with it. *Id.* at 738.

This Court's decisions in *Farkas*, in *United States v. New Orleans Public Service, Inc.* (*NOPSI*), 553 F.2d 459 (5th Cir. 1977), *vacated*, 436 U.S. 942 (1978), and in *United States v. Mississippi Power & Light Co.*, 638 F.2d 899 (5th Cir. Unit A 1981), reflect a similar understanding of the statute. In *NOPSI* and *Mississippi Power & Light*, the Court upheld an executive order "impos[ing] on government contractors the obligation to take affirmative action to achieve … equal opportunity goals." *Mississippi Power & Light*, 638 F.2d at 901. In its initial review (in *NOPSI*), the Court identified as one "source[] of legislative authorization for the Executive Order" the provision now codified in 40 U.S.C. § 121(a). 553 F.2d at 466 & n.7 (citing 40 U.S.C. § 486(a)). After the Supreme Court vacated that ruling for reconsideration on other grounds, this Court reaffirmed—in the wake of *Chrysler Corp. v. Brown*, 441 U.S. 281 (1979)—its conclusion that the affirmative-action order "was a proper exercise of congressionally delegated authority." *Mississippi Power & Light*, 638 F.2d at 905. And in *Farkas*, this Court determined that FPASA authorized a related executive order directing agencies to require federal contractors to comply with certain antidiscrimination requirements, albeit in a case where the validity of that order was not directly challenged. 375 F.2d at 632 n.1 ("We would

be hesitant to say that the antidiscrimination provisions … are so unrelated to the establishment of 'an economical and efficient system for … the procurement and supply' of property and services that the order should be treated as issued without statutory authority." (citation omitted)); *see Louisiana*, 55 F.4th at 1023-1024 (discussing *Farkas*).

Both the Judiciary and the Executive Branch have thus interpreted FPASA as granting the President broad and flexible authority to determine what contracting practices promote the interests of economy and efficiency in federal contracting. Congress, moreover, has impliedly ratified that interpretation. Congress "is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), and Congress did exactly that when, in 2002, it recodified both FPASA's statement of purpose and the operative provision (authorizing the President to set contracting policies to achieve the statute's goals). *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("[T]his Act makes no substantive change in existing law[.]"). In reenacting the relevant language without substantive change, Congress acted in light of the many decisions that "had interpreted the President's [FPASA] authority and the statutory terms 'economy' and 'efficiency' broadly," and its reenactment of the statute reflects its "affirmation of the broad understandings of those terms." *Mayes*, 67 F.4th at 938.

2.    The executive order challenged here falls well within the broad statutory text and the longstanding understanding of the authority it confers.  The order directs federal agencies to enter covered contracts only with entities willing to pay their workers a prescribed wage for work on or in connection with those particular contracts, on the basis of the President's judgment that "[r]aising the minimum wage" for work on federal contracts would "bolster economy and efficiency in Federal procurement."  86 Fed. Reg. at 22,835.  The President reached that judgment on the view that a higher minimum wage "enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs."  *Id.*

The implementing rule provides extensive support for the reasonableness of the President's determination.  86 Fed. Reg. at 67,212-67,215.  The rule notes, for example, that "higher-paying contractors may be able to attract higher quality workers who are able to provide higher quality services, thereby improving the experience of citizens who engage with these government contractors"—a view supported by empirical research.  *Id.* at 67,212.  And it explains, again citing numerous studies, that a higher minimum wage for employees working on federal contracts could make them more productive, reduce their rate of turnover, and reduce absenteeism.  *Id.* at 67,213-67,214.

Those effects of a higher wage rate—particularly the expected increase in the quality of work performed by employees working on federal contracts—inure to the benefit of the government.  The rule recognizes that the government's expenditures in

procuring goods or services from covered contractors could rise if the minimum-wage provision in contracts "increase[d] employers' costs (beyond offsetting productivity gains and cost-savings), and contractors pass[ed] along part or all of the increased cost to the government in the form of higher contract prices." 86 Fed. Reg. at 67,206.  The rule explains, however, that "benefits" to the government "attributable to the Executive order are expected to accompany any such increase in expenditures, resulting in greater value to the Government" overall, and "that any potential increase in contract prices" would likely "be negligible." *Id.*

This rationale accords with those that courts have accepted as sufficient to sustain prior executive orders under FPASA.  As noted above, for example, the order sustained in *Chao*—President George W. Bush's directive for contractors to post notices of labor rights—reflected the President's judgment that "'[w]hen workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced.'" 325 F.3d at 366 (quoting 66 Fed. Reg. at 11,221).  And President Bush's order requiring contractors to use the E-Verify system was sustained on the basis of his judgment that "'[c]ontractors that adopt rigorous employment eligibility confirmation policies are much less likely to face immigration enforcement actions, because they are less likely to employ unauthorized workers, and they are therefore generally more efficient and dependable procurement sources.'" *Chamber of Commerce*, 648 F. Supp. 2d at 738 (quoting Exec. Order No. 13,465, 73 Fed. Reg. 33,285, 33,285 (June 11, 2008)).

It was likewise reasonable for the President to conclude that the government would benefit from the payment of a higher minimum wage to the employees of contractors—like lessors, licensees, and permittees—from whom the government does not directly procure items or services. The implementing rule explains as much, observing that a higher minimum wage can (among other benefits) "increase the quality of services provided to the Federal Government and the general public" and thus "attract more customers and result in increased sales." 86 Fed. Reg. at 67,153. Notably, although President Trump reached a different conclusion as to wilderness guides and outfitters, he expressly maintained the preexisting requirement for "lodging and food services associated with seasonal recreational services," and also left it in place as to other types of lessors, licensees, and permittees. 83 Fed. Reg. at 25,341.[2]

The challenged executive order thus falls within the President's FPASA authority under the understanding of that authority long adopted by courts and the Executive Branch and impliedly ratified by Congress. *See Arizona v. Walsh*, 2023 WL 120966, at *4-9 (D. Ariz. Jan. 6, 2023) (holding as much), *appeal pending*, No. 23-15179 (9th Cir.).

---

[2] As noted above (at 7 n.1), the Tenth Circuit enjoined enforcement of the minimum-wage requirement "in the context of contracts or contract-like instruments entered into with the federal government in connection with seasonal recreational services or seasonal recreational equipment rental for the general public on federal lands," pending an appeal from the denial of a preliminary injunction. Order, *Bradford v. U.S. Dep't of Labor*, No. 22-1023 (10th Cir. Feb. 17, 2022); *see Bradford v. U.S. Dep't of Labor*, 582 F. Supp. 3d 819 (D. Colo. 2022) (preliminary-injunction ruling). That appeal remains pending.

**B.      The District Court's Cramped Reading Of The Statute Departs From This Court's Decisions And The Statutory Text**

The district court adopted a cramped interpretation of the President's procurement authority, rejecting the understanding long shared by all branches of government and relying instead on the Sixth Circuit's decision in *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022), and on a single judge's opinion in *Georgia v. President of the United States*, 46 F.4th 1283 (11th Cir. 2022), which was not joined in relevant part by the other members of the panel, *see id.* at 1308 (Edmondson, J., concurring in the result); *id.* (Anderson, J., concurring in part and dissenting in part). The district court concluded that this Court had approved the narrow reading of the statute in a footnote in *Louisiana* and then held that the statute's history compelled its adoption. The court was incorrect on both counts.

1.      As an initial matter, this Court in *Louisiana* did not adopt the reasoning of the Sixth Circuit or the single-judge opinion in *Georgia*. Like the Sixth Circuit in *Kentucky* and the Eleventh Circuit in *Georgia*, this Court in *Louisiana* addressed an executive order that, as implemented, generally required the employees of covered contractors to be fully vaccinated against COVID-19 unless legally entitled to an accommodation. The decision in *Louisiana* included a footnote describing the single-judge opinion in *Georgia* as having "made a compelling case that the text and structure of" FPASA "are inconsistent with" the "'lenient' standard" that "courts have generally" applied in reviewing FPASA directives. 55 F.4th at 1026 & n.25. But the Court expressly declined to adopt

the standard articulated by the *Georgia* opinion. *Id.* at 1026 n.25. Rather, it concluded that a novel extension of the general grant of authority to the realm of vaccine requirements implicated the major questions doctrine. *Id.* at 1027-1033.

The district court's narrow interpretation is also inconsistent with this Court's decisions in *NOPSI*, *Mississippi Power & Light*, and *Farkas*. In the first two of those cases, as discussed above, the Court concluded that an executive order "impos[ing] on government contractors the obligation to take affirmative action to achieve … equal opportunity goals," *Mississippi Power & Light*, 638 F.2d at 901, "was a proper exercise of congressionally delegated authority," *id.* at 905. And in *Farkas*, the Court determined (albeit in dicta) that FPASA authorized a related executive order directing agencies to require federal contractors to comply with certain antidiscrimination requirements. 375 F.2d at 632 n.1; *see Louisiana*, 55 F.4th at 1023-1024.

2. Aside from its inconsistency with this Court's precedent, the district court's reasoning is textually unsound and provides no basis for departing from the understanding of the statute generally shared among all three branches for decades.

a. The text of the operative provision affords the President considerable discretion: It allows him to "prescribe" all "policies and directives that [he] considers necessary to carry out this subtitle," so long as the policies are "consistent with this subtitle." 40 U.S.C. § 121(a). The phrase "to carry out," as relevant here, means "to put … into action or practice," "to cause … to be implemented," or "to undertake." *Oxford English Dictionary* (online ed. rev. 2021), https://doi.org/10.1093/OED/1003574638

(last visited Jan. 16, 2024).  The word "necessary" has a range of meanings in various contexts, but it can mean simply "'convenient, useful, appropriate, suitable, or conducive to the end sought.'"  *BG Gulf Coast LNG, LLC v. Sabine-Neches Navigation Dist. of Jefferson Cty.*, 49 F.4th 420, 428 (5th Cir. 2022) (quoting *Black's Law Dictionary*), *cert. denied*, 143 S. Ct. 2577 (2023).  That interpretation is particularly appropriate here given Congress's authorization for the President to act as he "*considers* necessary," 40 U.S.C. § 121(a) (emphasis added).  In *Texas v. EPA*, 983 F.3d 826 (5th Cir. 2020), for example, this Court explained that because a statute provided that the EPA "'may' make changes that it 'deems necessary,'" it was "clear that Congress ha[d] delegated discretionary authority to EPA to determine when adjustments should be made."  *Id.* at 837.  Finally, "this subtitle"—defined by 40 U.S.C. § 111 to include most provisions of Division C of Subtitle I of Title 41, as well as all of Subtitle I of Title 40—includes the federal government's basic authorities for procurement and the management of federal property.  The plain text of § 121(a) thus allows the President to prescribe policies and directives that he considers appropriate to carry out contracting and property-management functions and that are "consistent with this subtitle."  40 U.S.C. § 121(a).

b.    The district court focused exclusively on § 121(a)'s proviso that "policies" issued under FPASA "must be consistent with this subtitle," 40 U.S.C. § 121(a).  *See* ROA.762.  The court recognized that the Act "does not define 'consistent,'" and it cited several dictionary definitions making clear the breadth of that term—"'agreeable,' 'con-

- 22 -

gruous,' or 'compatible.'" ROA.762. Yet the court concluded from the "historical con-
text" of FPASA's enactment—in particular, concerns regarding administrative effi-
ciency in wartime procurement—"that the President's authority is limited to the super-
visory role of buying and selling of goods." ROA.763. On that basis, the court held
that the challenged executive order is valid only if FPASA makes "a 'specific reference'"
to prescribing "the wages of the employees of federal contractors," ROA.765, which
the court found that it does not.

   The district court's reasoning—like that of the *Kentucky* and *Georgia* opinions on
which the district court relied, *see Kentucky*, 23 F.4th at 605-606; *Georgia*, 46 F.4th at
1293—was deeply flawed. Courts can properly "consult extratextual sources," such as
historical evidence of the purposes for which Congress enacted a statute, only "to help
'clear up,'" and not to "'create[,]' ambiguity about a statute's original meaning." *McGirt
v. Oklahoma*, 140 S. Ct. 2452, 2469 (2020). Concerns regarding the sorts of "procure-
ment-based inefficiencies" that became evident in the wake of World War II may have
informed Congress's enactment of FPASA. ROA.763. But as the Supreme Court has
repeatedly emphasized, "'[i]t is ultimately the provisions of our laws rather than the
principal concerns of our legislators by which we are governed.'" *Cooper Indus., Inc. v.
Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75, 79 (1998)). The authority specified by FPASA's text extends well beyond
the narrow scope that would have been sufficient to address Congress's asserted con-
cerns.

- 23 -

Had the district court properly focused on FPASA's text and structure, rather than on extrastatutory evidence of the purposes for which Congress enacted FPASA, it would have found that the text and structure point toward a natural interpretation of the proviso that presidential directives must be "consistent with this subtitle," 40 U.S.C. § 121(a).  As this Court explained in *Louisiana*, the statement of statutory objectives in 40 U.S.C. § 101 "acts as a set of guidelines within which" presidentially determined "policies must reside." 55 F.4th at 1023 n.17.  If a directive is reasonably understood to advance the purposes set forth in § 101—as relevant here, the provision of "an economical and efficient system for … [p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting"—then it is "consistent with this subtitle," 40 U.S.C. § 121(a), whether or not the statute makes any "'specific reference,'" ROA.765, to the subject of the directive.

Indeed, the statutory text refutes the proposition that a directive is "consistent with this subtitle" only if it effectuates a "'specific'" provision of the statute.  If the President's authority under § 121(a) were limited to issuing directives necessary to carry out specific statutory provisions, then it would have made no sense for Congress to specify that the President's directives must be "consistent with" the statute, because that would have been surplusage:  A directive that carries out a statute's express terms is necessarily consistent with the statute.  The "consistent with" language implies that the President has authority to issue directives *not* limited to effectuating the statute's express terms, so long as they advance the articulated objectives of economy and efficiency.  By

focusing on extrastatutory evidence of FPASA's historical purpose rather than on the statutory text and structure, the district court reached a conclusion at odds with the statutory text.

c.    The district court equally erred in reading a footnote to the Supreme Court's decision in *Chrysler* as evidence that "the Supreme Court has interpreted a president's grant of authority under Section 121(a) narrowly" and has required that there "be a 'specific reference' in [FPASA] as the source of authority upon which a president's executive order is based," ROA.764. The question in *Chrysler* was whether a disclosure of information pursuant to a FPASA directive would violate a criminal statute, the Trade Secrets Act. The answer turned on whether the regulation requiring the disclosure was "law," such that the disclosure was "authorized by law." 441 U.S. at 285, 295. In addressing that issue, the Supreme Court concluded that it was "not necessary to decide whether" the executive order was authorized by FPASA or by other statutes. *Id.* at 304. It then observed in the cited footnote that "[l]ower courts ha[d] suggested that" FPASA "was the authority for predecessors of" the executive order in question, but it noted that "these suggestions were dicta" and observed that FPASA contains no "specific reference to employment discrimination." *Id.* at 304 n.34. This Court expressly held in *Louisiana* that the *Chrysler* footnote's "'specific reference'" language—which, the Court recognized, was itself "dicta"—cannot be read as "a narrowing instruction for interpretation of" FPASA. 55 F.4th at 1025-1026, 1026 n.24.

The district court equally misunderstood the relevance of § 101's statement of the statutory objectives of economy and efficiency. The district court was correct that § 101 "is not a substantive grant of authority," ROA.766 (emphasis omitted)—but that does not mean it is irrelevant, as this Court explained in *Louisiana*. There, the Court recognized that it is § 121(a)—not § 101—that supplies the operative authority for "the President to prescribe policies and directives concerning contracting," and that § 101 simply provides "a set of guidelines within which those policies must reside." 55 F.4th at 1023 n.17. The Ninth Circuit reached the same conclusion in *Mayes*, explaining that § 101 supplies "a clear textual limiting principle" for the authority codified in § 121(a), ensuring that "the President can *only* prescribe policies and directives that he 'considers necessary' to ensure 'an economical and efficient system' for procurement and contracting." 67 F.4th at 942.

The district court was also incorrect to believe that the broad presidential authority long recognized by most courts "would conflict with the overall purpose of the statute, as shown by [FPASA's] operative sections," ROA.767. The provisions set forth in 41 U.S.C. § 3301 *et seq.*, on which the district court relied, promote "'full and open competition' using 'competitive procedures' in 'fulfill[ing] the Federal Government's [procurement] requirements,'" ROA.767. But rather than cabining the President's authority to issue directives for Executive Branch contracting, those provisions specify the process that *agencies* are to follow in conducting individual procurements—for ex-

ample, by providing that a solicitation issued by an agency may "include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the … agency or as authorized by law," 41 U.S.C. § 3306(a)(2)(B).  The provisions are in no way inconsistent with the longstanding view across branches as to the President's broad authority under § 121(a).

Finally, the district court erred in relying on the fact that FPASA differs from "two federal statutes," the Davis-Bacon Act and the Walsh-Healey Public Contracts Act, "in which Congress unambiguously enable[d] an agency to set wages."  ROA.768-769.  It is hardly surprising that, in recognizing the President's broad power to issue directives for federal contracting, FPASA does not speak to the subject matter of this particular executive order in the same level of detail as do statutes that actually regulate wage-setting.  And there is no inconsistency between those statutes and the requirement at issue here:  As the Department explained in the implementing rule, those statutes "establish 'minimum' wage rates," not maximum wage rates, so it is "not inconsistent" with the statutes "to establish a higher minimum wage rate" through a FPASA directive. 86 Fed. Reg. at 67,129.  By the same token, States routinely enact minimum-wage requirements exceeding those of the federal statutes on which plaintiffs rely; plaintiffs presumably do not believe those state requirements are preempted by federal law. "When confronted with two Acts of Congress allegedly touching on the same topic," courts are "not at liberty to pick and choose among congressional enactments"; they must "strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018)

(quotation marks omitted).  Here, "harmoniz[ing]" the statutes, *id.*, is straightforward: A contractor can comply both with the provisions required by the challenged executive order and with the statutes on which plaintiffs rely.  And in the absence of any conflict, there is no basis to read the minimum-wage laws as creating an unwritten exception to the broad statutory authority at issue here.

3.     The district court equally erred in invoking the major questions doctrine. That doctrine is inapplicable to an exercise of procurement authority consistent with a longstanding statutory interpretation that does not impose "vast" or "transformative" consequences, *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014).

In invoking the major questions doctrine in *Louisiana*, this Court stressed "the dramatic difference between" the COVID-19 vaccination requirement and prior FPASA directives, namely that the vaccination requirement "purport[ed] to govern the conduct of *employees*," rather than that "of *employers*."  55 F.4th at 1030.  The Court regarded the vaccination requirement as "'strikingly unlike' … any" prior exercise of FPASA authority.  *Id.*  In contrast, the executive order challenged here is wholly in line with prior FPASA directives.  It builds on the foundation of the minimum-wage requirement adopted in 2014 and maintained in relevant part by successive Administrations of both parties.  And it falls well within the historical practice, across Administrations of both parties, of directing agencies to contract only with companies that adopt certain labor practices with respect to their own employees.  *See supra* pp. 3-4, 14-16.

Nothing about this executive order marks a "transformative" shift away from prior exercises of FPASA authority.

Nor does this executive order have "vast" economic consequences. The minimum-wage requirement applies only to a subset of the employees of companies that contract with the federal government—namely those who work on or in connection with covered federal contracts entered or renewed after the requirement's effective date—and only for the hours that they spend doing so. In the implementing rule, the Department determined that roughly 1.8 million workers were "potentially affected" by the requirement (because they work on covered contracts) and that, of those, "327,300 [would] be affected and see an increase in wages" during the first year of the requirement's existence, including because many of the workers in question already earned more than the specified wage. 86 Fed. Reg. at 67,200. That figure (327,300) is roughly one-thirtieth of the number of employees affected by the COVID-19 vaccination requirement for healthcare workers, which the Supreme Court upheld without discussion of the major questions doctrine, *see Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam); *id.* at 98 (Thomas, J., dissenting) (noting the requirement's application to "10 million healthcare workers"). By contrast, the worker safety standard to which the Supreme Court applied the major questions doctrine in *NFIB v. OSHA*, 595 U.S. 109 (2022) (per curiam), "applie[d] to roughly 84 million workers." *Id.* at 113.

The district court emphasized that the minimum-wage requirement would cause the transfer of approximately $1.7 billion per year from contractors to their employees.

ROA.744.  But as noted in the implementing rule, that does not mean contractors' net costs would actually increase by $1.7 billion per year, because the payment of a higher minimum wage would be expected to lead to "productivity gains" and "cost[] savings" (for example, from decreased employee turnover).  86 Fed. Reg. at 67,206.  Even if this requirement actually did cost contractors $1.7 billion per year, moreover, that degree of economic significance would not cause the requirement to implicate the major questions doctrine.  *Cf. Biden v. Nebraska*, 600 U.S. 477, 494 (2023) (action in question "cancel[ed] $430 billion of student loan principal"); *West Virginia v. EPA*, 142 S. Ct. 2587, 2604 (2022) (Energy Information Administration projected that the Clean Power Plan "would reduce GDP by at least a trillion 2009 dollars by 2040"); *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam) ("$50 billion" was "a reasonable proxy of the … economic impact" of the eviction moratorium at issue).  Notably, the COVID-19 vaccination requirement for healthcare workers—which the Supreme Court upheld in *Biden v. Missouri* without discussion of the major questions doctrine—was expected to cost a comparable $1.3 billion for one year.  Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61,555, 61,613 (Nov. 5, 2021).  And aside from the $1.7 billion in estimated annual transfers, the other costs imposed by the minimum-wage requirement—regulatory familiarization and implementation costs—are far smaller in magnitude.  *See* ROA.774 (district court's discussion of regulatory familiarization costs amounting to "$13.4 million in the first year" and implementation costs of "$3.8 million in the first year").

Finally, the district court emphasized that the Department's estimates of the effect of the minimum-wage requirement did not attempt to quantify the requirement's so-called "spillover effects"—*i.e.*, the fact that some contractors might voluntarily increase wages for workers already earning more than the specified wage or for those working on non-covered contracts.   ROA.774-775.   But the implementing rule explained that the "inclusion of potential spillover effects" was "unlikely to drastically change the Department's findings."   86 Fed. Reg. at 67,211.   The Department based that conclusion on an independent analysis conducted by the Economic Policy Institute, which included "spillover costs for workers earning up to $17.25 per hour."   *Id.*   That analysis projected that "390,000 workers would receive pay raises, compared with the Department's estimate of 327,000," and "estimated annual transfers of $1.2 billion per year, which is actually lower than the Department's estimate of $1.7 billion."   *Id.*

The focused effect of this executive order reflects in part its nature as an exercise of procurement authority rather than regulatory power.   That distinction may not always be determinative.   In *Louisiana*, the Court found that the distinction was not meaningful because the vaccination requirement in question was not limited to employees working on or in connection with federal contracts; it applied to any of a contractor's employees who shared a workplace with employees working on or in connection with a federal contract.   55 F.4th at 1032.   The Court found "little internal about a mandate which encompasses even employees whose sole connection to a federal contract is a

cubicle in the same building as an employee working 'in connection with' a federal contract." *Id.* at 1032-1033 (footnote omitted).  And elsewhere in its opinion, the Court observed that the requirement "purport[ed] to govern the conduct of *employees*," rather than that "of *employers*," because—unlike most conditions of employment that an employer might impose—"[a] vaccination … cannot be undone at the end of the workday." *Id.* at 1030 (quotation marks omitted).

The Court recognized, however, that the distinction between exercises of proprietary and regulatory authority could "carry more weight" as to a more limited requirement, *Louisiana*, 55 F.4th at 1032-1033, and the requirement here is limited in precisely the way that the Court found the requirement in *Louisiana* was not.  The requirement here does not apply to all of a contractor's employees.  Nor does it even apply to all of the hours worked by employees who spent at least some of their time working on or in connection with federal contracts.  Much less does it apply to their non-working hours.  Rather, it simply requires contractors to pay at least the specified wage for the hours that their employees spend working on or in connection with the particular federal contracts covered by the requirement.  It is difficult to see how that sort of specification for the work done on government contracts could be any more "internal," *id.* at 1032-1033, to the government's proprietary functions.

## CONCLUSION

The district court's judgment should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

ALAMDAR S. HAMDANI
*United States Attorney*

MARK B. STERN

/s/ Daniel Winik
DANIEL WINIK
*Attorneys, Appellate Staff*
*Civil Division, Room 7245*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-8849*
*daniel.l.winik@usdoj.gov*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,159 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Garamond, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik

**ADDENDUM**

# TABLE OF CONTENTS

40 U.S.C. § 101 ..................................................................................................A1

40 U.S.C. § 121 ..................................................................................................A1

**40 U.S.C. § 101**

## § 101. Purpose

The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting, inspection, storage, issue, setting specifications, identification and classification, transportation and traffic management, establishment of pools or systems for transportation of Government personnel and property by motor vehicle within specific areas, management of public utility services, repairing and converting, establishment of inventory levels, establishment of forms and procedures, and representation before federal and state regulatory bodies.

(2) Using available property.

(3) Disposing of surplus property.

(4) Records management.

**40 U.S.C. § 121**

## § 121. Administrative

(a) Policies prescribed by the President.—The President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle.

…