

# KEN PAXTON
#### ATTORNEY GENERAL OF TEXAS

Aaron L. Nielson                                              Aaron.Nielson@oag.texas.gov
Solicitor General                                                            (512) 463-2100

November 12, 2024

**VIA CM/ECF**

Mr. Lyle W. Cayce, Clerk
Court of Appeals for The Fifth Circuit

  Re: *State of Texas v. Biden*, No. 23-40671 (argued August 6, 2024)

Dear Mr. Cayce:

  Counsel provides notice under Rule 28(j) of *Nebraska v. Su*, No. 23-15179, 2024 WL 4675411 (9th Cir. Nov. 5, 2024)—a parallel case respecting the Wage Mandate.

  *Nebraska* holds that the federal government exceeded its authority under the Procurement Act. As the district court did in this case, the Ninth Circuit explained why combining the Act's statement of purpose (40 U.S.C. §101) with its "carry out" clause (40 U.S.C. §121) does not create authority because "the President can only use § 121 to implement one of the [Act]'s operative sections." 2024 WL 4675411, at *4. The Ninth Circuit followed "other circuits which have not construed the [Act's] purpose statement as operative." *Id.* at *5 (following, *inter alia*, *Commonwealth v. Biden*, 57 F.4th 545 (6th Cir. 2023)).

  The Ninth Circuit also explained why the federal government's view leads to absurdity. It would permit "the President to impose any regulation on the industrial sector he deems necessary to promote national security." *Id.* (discussing 50 U.S.C. §§4502(a)(1), 4554(a)). It would also "allow the President to require that 'all federal contractors certify that their employees take daily vitamins, live in smoke-free homes, exercise three times a week, or even, at the extremity, take birth control in order to reduce absenteeism relating to childbirth and care.'" *Id.* at *7 (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1032 (5th Cir. 2022)).

Letter to Mr. Cayce, Clerk
Page 2

The Ninth Circuit separately explained why the Wage Mandate fails under the federal government's *own* interpretation of the Act because "the rule cannot be deemed to promote economy and efficiency." *Id.* Additionally, the Ninth Circuit demonstrated why the Wage Mandate is arbitrary and capricious, *id.* at *10-12—an issue the States here have also preserved.[1]

Respectfully submitted,

/s/ Aaron L. Nielson

Aaron L. Nielson
*Counsel for the State of Texas*

cc: All counsel of record (via CM/ECF)

---

[1] The Ninth Circuit rejected application of the major-questions doctrine. This Court, however, has already applied the major-questions doctrine to the Procurement Act. *See Louisiana*, 55 F.4th at 1033. As Texas previously has explained, this is a major-questions case under circuit precedent. The Ninth Circuit also addressed (and rejected the relevance of) additional arguments that the federal government forfeited by not raising to this Court.

2024 WL 4675411
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

STATE of Nebraska; State of Idaho; State of Indiana;
State of South Carolina, Plaintiffs-Appellants,
and
State of Arizona; Mark Brnovich, Attorney
General, in his official capacity as
Attorney General of Arizona, Plaintiffs,
v.
Julie A. SU, in her official capacity as U.S.
Secretary of Labor; U.S. Department of Labor,
Wage & Hour Division; Joseph R. Biden, in his
official capacity as President of the United States;
Jessica Looman, in her official capacity as Acting
Administrator of the U.S. Department of Labor,
Wage & Hour Division, Defendants-Appellees.

No. 23-15179
|
Argued and Submitted February
6, 2024 San Francisco, California
|
Filed November 5, 2024

**Synopsis**
**Background:** States brought action alleging that executive order directing federal agencies to include clause in federal contracts requiring contractors to pay employees $15 minimum wage and Department of Labor's (DOL) implementing rule violated Federal Property and Administrative Services Act (FPASA) and major questions doctrine, and that implementing rule violated Administrative Procedure Act (APA). The United States District Court for the District of Arizona, John J. Tuchi, J., 2023 WL 120966, dismissed complaint and denied states' motion for preliminary injunction. States appealed.

**Holdings:** The Court of Appeals, R. Nelson, Circuit Judge, held that:

[1] executive order and DOL's rule exceeded authority granted to President and DOL in Federal Property and Administrative Services Act (FPASA)

[2] executive order did not violate major questions doctrine;

[3] APA applied to DOL's final rule; and

[4] DOL acted arbitrarily and capriciously when it overlooked alternatives before adopting final rule.

Reversed in part, vacated in part, and remanded.

R. Nelson, Circuit Judge, concurred and filed opinion.

Sanchez, Circuit Judge, dissented and filed opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim; Motion for Preliminary Injunction.

West Headnotes (12)

**[1]    Federal Courts** 🔑

Court of Appeals reviews de novo district court's grant of motion to dismiss for failure to state claim, taking all allegations of fact as true and construing them in light most favorable to nonmoving party.

**[2]    Federal Courts** 🔑

Denial of motion for preliminary injunction is reviewed for abuse of discretion while underlying interpretations of law are reviewed de novo.

**[3]    United States** 🔑

Executive order directing federal agencies to include clause in federal contracts requiring contractors to pay employees $15 minimum wage and Department of Labor's (DOL) implementing rule exceeded authority granted to President and DOL in Federal Property and Administrative Services Act (FPASA); executive order did not carry out any of FPASA's operative provisions, and administrative record did not establish that DOL's rule served interests of economy and efficiency. 40 U.S.C.A. §§ 101, 121; 41 U.S.C.A. §§ 3101(a),



3306(a), 3703(c); 29 CFR §§ 10.1, 10.2, 10.4, 10.5(c), 23.10, 23.20, 23.30, 23.40, 23.50, 23.60, 23.70, 23.80, 23.110, 23.120, 23.210, 23.220, 23.230, 23.240, 23.250, 23.260, 23.270, 23.280, 23.290, 23.410, 23.420, 23.430, 23.440, 23.510, 23.520, 23.530, 23.540, 23.550, 23.560, 23.570, 23.580; Executive Order 14026.

**[4]    United States**

Federal Property and Administrative Services Act's (FPASA) statement of purpose does not authorize President to prescribe policies that he considers necessary to ensure economical and efficient procurement system; rather, President can only issue policy that carries out one of FPASA's operative provisions. 40 U.S.C.A. §§ 101, 121.

**[5]    Statutes**

It is commonplace of statutory construction that the specific governs the general, particularly where Congress has enacted comprehensive scheme and has deliberately targeted specific problems with specific solutions.

**[6]    Statutes**

When statute limits thing to be done in particular mode, it includes negative of any other mode.

**[7]    Administrative Law and Procedure**

To analyze major questions doctrine, court must first ask whether agency action is unheralded and represents transformative expansion in agency's authority in vague language of long-extant, but rarely used, statute, and then ask if regulation is of vast economic and political significance and extraordinary enough to trigger doctrine; if both prongs are met, major questions doctrine applies, and court should greet agency's assertion of authority with skepticism and require agency to identify clear congressional authorization for its action.

**[8]    Administrative Law and Procedure**

Executive order directing federal agencies to include clause in federal contracts requiring contractors to pay employees $15 minimum wage was not transformative expansion of Executive's authority, and thus did not violate major questions doctrine; previous Presidents had used FPASA to issue federal contractor minimum wage and to maintain minimum wage requirement excepting recreational services, and relevant provisions of FPASA had been regularly invoked. 40 U.S.C.A. §§ 101, 121; Executive Order 14026.

**[9]    Administrative Law and Procedure**

Administrative Procedure Act (APA) applied to Department of Labor's (DOL) rule implementing executive order directing federal agencies to include clause in federal contracts requiring contractors to pay employees $15 minimum wage, even though executive order itself was not reviewable under APA. 5 U.S.C.A. § 704; 29 CFR §§ 10.1, 10.2, 10.4, 10.5(c), 23.10, 23.20, 23.30, 23.40, 23.50, 23.60, 23.70, 23.80, 23.110, 23.120, 23.210, 23.220, 23.230, 23.240, 23.250, 23.260, 23.270, 23.280, 23.290, 23.410, 23.420, 23.430, 23.440, 23.510, 23.520, 23.530, 23.540, 23.550, 23.560, 23.570, 23.580.

**[10]    United States**

Department of Labor (DOL) acted arbitrarily and capriciously, in violation of Administrative Procedure Act (APA), when it overlooked alternatives before adopting final rule requiring federal contractors to pay their employees $15 minimum wage, even though rule was adopted to implement President's executive order; executive order directed Secretary of Labor to "issue regulations" to implement executive order, which "shall include both definitions of relevant terms and, as appropriate, exclusions from the requirements of this order."

 5 U.S.C.A. § 706(2)(A); 29 CFR §§ 10.1, 10.2, 10.4, 10.5(c), 23.10, 23.20, 23.30, 23.40, 23.50, 23.60, 23.70, 23.80, 23.110, 23.120, 23.210, 23.220, 23.230, 23.240, 23.250, 23.260, 23.270, 23.280, 23.290, 23.410, 23.420, 23.430, 23.440, 23.510, 23.520, 23.530, 23.540, 23.550, 23.560, 23.570, 23.580; Executive Order 14026.

**[11]    Administrative Law and Procedure** 🔑

As Administrative Procedure Act (APA) requires that agencies engage in reasoned decisionmaking, agency has obligation to consider its other obligations and any alternatives, even if it could properly end up rejecting them. 5 U.S.C.A. § 551 et seq.

**[12]    Administrative Law and Procedure** 🔑

Agency's obligation under Administrative Procedure Act (APA) to consider alternatives includes duty to give reasoned explanation for its rejection of such alternatives. 5 U.S.C.A. § 706(2)(A).

**West Codenotes**

**Held Invalid**

 29 CFR §§ 10.1, 10.2, 10.4, 10.5(c), 23.10, 23.20, 23.30, 23.40, 23.50, 23.60, 23.70, 23.80, 23.110, 23.120, 23.210, 23.220, 23.230, 23.240, 23.250, 23.260, 23.270, 23.280, 23.290, 23.410, 23.420, 23.430, 23.440, 23.510, 23.520, 23.530, 23.540, 23.550, 23.560, 23.570, 23.580

Appeal from the United States District Court for the District of Arizona John Joseph Tuchi, District Judge, Presiding, D.C. No. 2:22-cv-00213-JJT

**Attorneys and Law Firms**

Eric J. Hamilton (argued), Solicitor General; Lincoln J. Korell, Assistant Attorney General; Michael T. Hilgers, Nebraska Attorney General; Office of the Nebraska Attorney General, Lincoln, Nebraska; Alan M. Hurst, Deputy Attorney General; Douglas A. Werth, Lead Deputy Attorney General; Joshua N. Turner, Deputy Solicitor General; Raul Labrador, Idaho Attorney General; Idaho Office of the Attorney General, Boise, Idaho; James A. Barta, Deputy Solicitor General; Todd Rokita, Indiana Attorney General; Office of the Indiana Attorney General, Indianapolis, Indiana; Thomas T. Hydrick, Assistant Deputy Solicitor General; Alan Wilson, South Carolina Attorney General; Office of the South Carolina Attorney General, Columbia, South Carolina; for Plaintiffs-Appellants.

Daniel L. Winik (argued) and Mark B. Stern, Appellate Staff Attorneys, Civil Division; Gary M. Restaino, United States Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Caleb Kruckenberg and Aditya Dynar, Pacific Legal Foundation, Arlington, Virginia; for Amici Curiae Pacific Legal Foundation and the National Federation of Independent Business Small Business Legal Center, Inc..

Elizabeth B. Wydra, Brianne J. Gorod, and Brian R. Frazelle, Constitutional Accountability Center, Washington, D.C.; for Amicus Curiae Constitutional Accountability Center.

Sarah A. Hunger, Deputy Solicitor General; Jane E. Notz, Solicitor General; Kwame Raoul, Illinois Attorney General; Illinois Attorney General's Office, Chicago, Illinois; Rob Bonta, California Attorney General, Office of the California Attorney General, Sacramento, California; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Anne E. Lopez, Hawaii Attorney General, Office of the Hawaii Attorney General, Honolulu, Hawaii; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea J. Campbell, Massachusetts Attorney General, Office of the Massachusetts Attorney General, Boston, Massachusetts; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Raul Torrez, New Mexico Attorney General, Office of the New Mexico Attorney General, Santa Fe, New Mexico; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Joshua H. Stein, North Carolina Attorney General, Office of the North Carolina Attorney General, Raleigh, North Carolina; Ellen F. Rosenblum, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Michelle A. Henry, Pennsylvania Attorney General, Office of the Pennsylvania Attorney General, Pittsburgh, Pennsylvania; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Robert W. Ferguson, Washington Attorney General, Office of the Washington Attorney General, Seattle, Washington; Joshua L. Kaul, Wisconsin Attorney General, Office of the Wisconsin Attorney General, Madison, Wisconsin; for Amici Curiae Illinois, California, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin.

Jeffrey Dubner and Brooke Menschel, Democracy Forward Foundation, Washington, D.C., for Amici Curiae National Employment Law Project, Communications Workers of America, Service Employees International Union, National Women's Law Center, and Economic Policy Institute.

Before: Ryan D. Nelson, Danielle J. Forrest, and Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge R. Nelson;

Concurrence by Judge R. Nelson;

Dissent by Judge Sanchez

## OPINION

R. NELSON, Circuit Judge:

**\*2** In 2021, President Biden issued ⚑ Executive Order 14026 which directed federal agencies to include a clause in federal contracts requiring contractors to pay employees a $15 minimum wage. Following notice and comment, the Department of Labor issued a rule implementing the executive order.

Five states challenged enforcement of the minimum wage mandate. Four of those states argue on appeal that the executive order and implementing rule violate the Federal Property and Administrative Services Act and the major questions doctrine, and that the implementing rule violates the Administrative Procedure Act. We conclude that the Plaintiff States have stated legally sufficient claims and therefore reverse the district court's order dismissing the complaint. We also vacate the district court's order denying the Plaintiff States a preliminary injunction and remand for further proceedings consistent with this opinion.

I

A

Congress enacted the Federal Property and Administrative Services Act of 1949 (FPASA) "to provide the Federal Government with an economical and efficient system for ... [p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. § 101(1).

In 2014, President Obama invoked the FPASA to issue an executive order requiring federal contractors to pay employees a $10.10 per hour minimum wage. Exec. Order No. 13658, 79 Fed. Reg. 9851 (Feb. 12, 2014). Following notice and comment, the Department of Labor (DOL) issued a rule implementing the executive order. *Establishing a Minimum Wage for Contractors*, 79 Fed. Reg. 60,634 (Oct. 7, 2014). The rule was not challenged.

In 2018, President Trump issued an executive order that excluded contracts related to seasonal recreational services from the minimum wage requirements of President Obama's 2014 executive order. Exec. Order No. 13838, 83 Fed. Reg. 25,341 (May 25, 2018). But President Trump's executive order maintained the minimum wage requirement for "lodging and food services associated with seasonal recreational services." *Id.* DOL again issued an implementing rule following notice and comment. *Minimum Wage for Contractors; Updating Regulations to Reflect Executive Order 13838*, 83 Fed. Reg. 48,537 (Sept. 26, 2018). This rule was also unchallenged.

About three months after taking office, President Biden issued Executive Order 14026 which required federal contractors to pay employees a $15 minimum wage. 86 Fed. Reg. 22,835 (Apr. 27, 2021). President Biden also rescinded President Trump's 2018 exemption for seasonal recreational services. *Id.* at 22,836. The executive order noted that "[r]aising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." *Id.* at 22,835.

Following notice and comment, DOL issued a final rule implementing President Biden's executive order. *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126 (Nov. 24, 2021). DOL acknowledged that government expenditures may rise if the increased cost to contractors is passed along to the government. *Id.* at 67,206. But it concluded that increased productivity, reduced turnover, and reduced absenteeism would offset some of those costs. *See*

*id.* at 67,212–14. DOL estimated that federal contractors would pay $1.7 billion annually in extra expenses because of the rule. *Id.* at 67,194. It did not quantify any cost savings resulting from increased productivity, reduced turnover, and reduced absenteeism. *Id.* at 67,212.

B

**\*3** Five states challenged the wage mandate immediately after it took effect. The states alleged that the wage mandate violated the FPASA, the Administrative Procedure Act (APA), the major questions doctrine, the non-delegation doctrine, and the Spending Clause. They sought to enjoin and vacate both the executive order and DOL's implementing rule. The states sought a preliminary injunction, and the Government sought dismissal or summary judgment.

The district court denied a preliminary injunction and granted Defendants' motion to dismiss. *Arizona v. Walsh*, No. CV-22-00213, 2023 WL 120966, at \*13 (D. Ariz. Jan. 6, 2023). It concluded that the wage mandate did not violate the FPASA, and the major questions doctrine did not apply because the economic impact was too small. *Id.* at \*4–8. The district court also reasoned that the rule was not subject to arbitrary-or-capricious review because DOL had to adopt the policy by executive order. *Id.* at \*9–11. The district court concluded that the FPASA provided an adequate "intelligible principle" and did not violate the non-delegation doctrine. *Id.* at \*11–12. Finally, it concluded that the rule did not violate the Spending Clause. *Id.* at \*12–13. The district court did not evaluate Defendants' motion for summary judgment and instead concluded that Plaintiffs did not state legally sufficient claims. *Id.* at \*13.

Four of the five states (Appellants) appealed. They assert that the executive order and implementing rule violate the FPASA and the major questions doctrine, and that the implementing rule violates the APA. They did not raise the non-delegation or Spending Clause claims on appeal.

Nebraska, Idaho, and Indiana had minimum wages of between $7.25 and $9.00 per hour when the mandate took effect. Arizona had a minimum wage of $12.80 per hour. And South Carolina lacked a state-specific minimum wage. In January 2024, the mandated minimum wage increased to $17.20 because of inflation, which exceeded the minimum

wage in every Plaintiff State. *Compare* 🚩 Minimum Wage for Federal Contracts Covered by Executive Order 14026, Notice of Rate Change in Effect as of January 1, 2024, 88 Fed. Reg. 66,906 (Sept. 28, 2023), *with* State Minimum Wage Laws, U.S. Dep't of Labor, https://perma.cc/3L6L-HE4J (last accessed Sept. 7, 2024).

Appellants are affected by the wage mandate because they sometimes act as federal contractors. For example, Idaho State University and the Idaho Department of Fish and Game (both arms of the State of Idaho) contract with the federal government to provide various services, such as improving fisheries and researching energy and resource security. Appellants thus had to cover the cost of increased wages with funds marked for other expenses.

## II

**[1]** **[2]** We review de novo a district court's grant of a motion to dismiss for failure to state a claim, "tak[ing] all allegations of fact as true and constru[ing] them in the light most favorable to the nonmoving party." 🚩 *Sinclair v. City of Seattle*, 61 F.4th 674, 678 (9th Cir. 2023). The denial of a motion for a preliminary injunction is reviewed for abuse of discretion while the underlying interpretations of law are reviewed de novo. *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

## III

Appellants raise three main arguments on appeal. First, Appellants argue that the district court erred in concluding that the executive order and DOL's implementing rule did not exceed the authority granted under the FPASA. Second, they argue that the minimum wage mandate violates the major questions doctrine because the FPASA lacks a clear statement, and the minimum wage mandate is economically and politically significant. Third, they argue that the district court erred in concluding that the rule is not subject to arbitrary-or-capricious review under the APA.

### A

**\*4** The Government points to two provisions of the FPASA that plausibly provide the President with the authority to issue the minimum wage mandate:

§ 101. Purpose

The purpose of this subtitle is to provide the Federal Government with an economical and efficient system for the following activities:

(1) Procuring and supplying property and nonpersonal services, and performing related functions including contracting ....

40 U.S.C. § 101.

§ 121. Administrative

(a) Policies prescribed by the President. – The President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle.

40 U.S.C. § 121(a). The Government argues that these two provisions, read together, provide the President with broad authority to implement any policy he "considers necessary" to carrying out the FPASA so long as the policy bears some nexus to the statutory goals of economy and efficiency. The minimum wage mandate, the Government argues, has the requisite nexus to economy and efficiency.

Appellants argue that the congressional purpose stated in § 101 does not authorize the President to impose a wage mandate absent other operative language in the FPASA. Thus, § 101 is not a hook for the President's exercise of authority under the FPASA and § 121 does not authorize the President to "carry out" the FPASA's purpose. Rather, the President can only use § 121 to implement one of the FPASA's operative sections.[1] And Appellants assert that no operative section authorizes the minimum wage mandate.

**[3]** We conclude that the minimum wage mandate exceeds the authority granted to the President and DOL in the FPASA.

### 1

**[4]** Section 121 does not authorize the President to "carry out" any actions he deems necessary to accomplish the

purposes of the FPASA. 40 U.S.C. § 121(a). Instead, the President can only rely on § 121 to issue a policy that otherwise carries out an operative provision of the FPASA. The Government relies heavily on the FPASA's statement of purpose, arguing that § 101 authorizes the President to prescribe policies that he considers necessary to ensure an economical and efficient procurement system. For the reasons discussed below, we disagree.

The Sixth Circuit recently considered the President's authority under the FPASA to mandate that employees of federal contractors be vaccinated against COVID-19. *See* *Kentucky v. Biden*, 23 F.4th 585, 589 (6th Cir. 2022). It noted that "[s]tatements of purpose may be useful in construing enumerated powers later found in a statute's operative provisions." *Id.* at 604 (citing *Sturgeon v. Frost*, 587 U.S. 28, 55–57, 139 S.Ct. 1066, 203 L.Ed.2d 453 (2019)). But they are not operative and "cannot confer freestanding powers upon the President unbacked by operative language elsewhere in the statute." *Id.* (citing *Gundy v. United States*, 588 U.S. 128, 142, 139 S.Ct. 2116, 204 L.Ed.2d 522 (2019) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 218 (2012))). In short, the purpose clause "does not limit or expand the scope of [an] operative clause" like § 121. *District of Columbia v. Heller*, 554 U.S. 570, 578, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008).

**\*5** We do not have binding precedent addressing the scope of the President's authority under the FPASA. We recently vacated as moot our opinion in *Mayes v. Biden*, which addressed the lawfulness of the federal contractor COVID-19 vaccine mandate under the FPASA. 67 F.4th 921 (9th Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023). *Mayes* construed the § 101 purpose statement as operative and concluded that the FPASA provided the President with the authority to issue the COVID-19 vaccine mandate. *Id.* at 940. We do not find the *Mayes* analysis persuasive. The better analysis is that the President can only issue a policy that carries out an operative provision of the FPASA.

The statutory text makes this clear. By authorizing the President to "prescribe policies and directives ... to carry out [the FPASA]," the President can make rules for the Executive Branch's implementation of the Act's many operative provisions. 40 U.S.C. § 121(a). "The phrase 'carry out' requires a task to be done—something 'to put into practice or effect.' " *Commonwealth v. Biden*, 57 F.4th 545, 552 (6th Cir. 2023) (quoting *Carry Out*, American Heritage Dictionary of the English Language (1969)). But the President cannot "carry out this subtitle" by "exerting a power the subtitle never actually confers." *Kentucky*, 23 F.4th at 606.

True, the President "may enjoy a modest valence of necessary and proper powers surrounding those powers enumerated" in the statute. *Id.* But before he can wield this necessary and proper power, he must show that it derives from an enumerated power. *Id.*

We are persuaded by the analysis from other circuits which have not construed the FPASA's purpose statement as operative. Like the Sixth Circuit, an Eleventh Circuit judge, in assessing the legality of the COVID-19 vaccine mandate, reasoned that executive orders "cannot rest merely on the 'policy objectives of the [FPASA].' " *Georgia v. President of the U.S.*, 46 F.4th 1283, 1298 (11th Cir. 2022) (Grant, J.) (quoting *Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 235 (8th Cir. 1975)). Rather, "[s]tatements of purpose are 'in reality as well as in name *not* part of the congressionally legislated or privately created set of rights and duties.' " *Id.* (quoting Scalia & Garner, *supra*, at 217). The Fifth Circuit also held that the FPASA's purpose statement was not a broad grant of authority for the COVID-19 vaccine mandate. *Louisiana v. Biden*, 55 F.4th 1017, 1023 n.17 (5th Cir. 2022). And it agreed that such a broad interpretation was "in violation of Supreme Court precedent." *Id.*

Relevant tools of statutory interpretation reinforce this conclusion. For example, the Supreme Court avoids "interpreting any statutory provision in a manner that would render another provision superfluous." *Bilski v. Kappos*, 561 U.S. 593, 607–08, 130 S.Ct. 3218, 177 L.Ed.2d 792 (2010). Elsewhere in the FPASA, Congress directed agencies to promote economy and efficiency in specific ways. For example, agencies must keep furniture when they move to a new office unless "the Administrator determines ... that it would not be more economical and efficient to make suitable replacements." 40 U.S.C. § 588(c). And agencies may "repair, alter, or improve rented premises if the Administrator

determines that doing so is advantageous to the Government in terms of economy, efficiency, or national security." *Id.* § 581(c)(4); *see also, e.g., id.* §§ 501(a)(1)(A), 506(b), 582(b), 590(a), 603(b)(1). Under the Government's preferred interpretation, these sections contain superfluity.

The Government's preferred interpretation would wildly expand the President's authority from other statutes that contain both the "carry out" language and a congressional statement of purpose. For example, under the Defense Production Act, "the President may prescribe such regulations and issue such orders as the President may determine to be appropriate to carry out this chapter." 50 U.S.C. § 4554(a). A purpose section in the referenced chapter adds that "the security of the United States is dependent on the ability of the domestic industrial base to supply materials and services for the national defense." *Id.* § 4502(a)(1). The two statutes combined surely do not authorize the President to impose any regulation on the industrial sector he deems necessary to promote national security.

**\*6** The Supreme Court endorsed this interpretive approach when addressing whether § 121 authorized the President to issue an executive order prohibiting employment discrimination by federal contractors. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 304, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). The Court determined that it was not necessary to decide whether the FPASA authorized the executive order. *Id.* But it suggested that the executive order lacked authority under the FPASA because § 121(a) "authorizes Executive Orders 'necessary to effectuate [its] provisions' " and "nowhere in the Act is there a specific reference to employment discrimination." *Id.* at 304 n.34, 99 S.Ct. 1705.

In short, § 121 does not give the President unrestrained authority to issue any procurement policy that he desires. The President can only use § 121 to issue a policy that carries out an operative provision of the FPASA.

The dissent does not seriously dispute this point. It identifies the same three operative provisions as the Government. Dissent at —— (citing 41 U.S.C. §§ 3101(a); 3306(a); 3703(c)). It then explains that the FPASA authorizes the President to " 'carry out' the Act's subtitles—including the above-mentioned provisions authorizing agencies to specify

the terms of federal contracts." Dissent at —— (quoting 40 U.S.C. § 121(a)). But the dissent would then have us hold that executive action under the FPASA is "consistent with" the Act's subtitles so long as it has some nexus to economy and efficiency. Dissent at ——. That is the law in three other circuits, and it is the view that we applied in *Mayes,* 67 F.4th at 940, *vacated as moot,* 89 F.4th 1186.[2]

The D.C. Circuit, for example, requires a "sufficiently close nexus" between a policy issued under the FPASA and economy and efficiency. *UAW-Lab. Emp. & Training Corp. v. Chao,* 325 F.3d 360, 366 (D.C. Cir. 2003) (quoting *AFL-CIO v. Kahn,* 618 F.2d 784, 792 (D.C. Cir. 1979) (en banc)). In *Chao,* the D.C. Circuit upheld President George W. Bush's executive order requiring contractors to post notices informing employees of their right to not join a union because the policy enhanced worker productivity and had a "sufficiently close nexus" to economy and efficiency. *Id.* at 362, 366–67. The Fourth Circuit only requires a policy to be "reasonably related to the [FPASA's] purpose of ensuring efficiency and economy in government procurement." *Liberty Mut. Ins. Co. v. Friedman,* 639 F.2d 164, 170 (4th Cir. 1981). But neither court has grappled with the interpretive analysis set out above—the Fourth Circuit addressed this issue more than 40 years ago. And it largely ignored any analysis using the tools of statutory interpretation which, as explained, undermines its conclusions.

The Tenth Circuit recently addressed a slightly different scenario: whether the DOL minimum wage mandate rule is permissible as applied to recreational services permittees. *See Bradford v. U.S. Dep't of Lab.,* 101 F.4th 707, 732 (10th Cir. 2024), *petition for cert. filed,* No. 24-232 (U.S. Aug. 28, 2024). The Tenth Circuit majority held that the FPASA authorizes the President to implement policies he considers necessary to promote an economic and efficient procurement system, pointing to § 101 as the only source for this authority. *Id.* at 721.[3] The majority then upheld the rule because it "advances the statutory objectives of economy and efficiency." *Id.* at 714.

**\*7** For the reasons explained above, we disagree with this interpretive approach. The circuits that have taken this view ignored principles of statutory construction by relying on the statement-of-purpose section to locate unfettered authority

for the President. Their rule would give the President the authority to implement any procurement policy he considers necessary so long as it has some relation to economy and efficiency. But there is no real limiting factor in this interpretation. It would allow the President to require that "all federal contractors certify that their employees take daily vitamins, live in smoke-free homes, exercise three times a week, or even, at the extremity, take birth control in order to reduce absenteeism relating to childbirth and care." *Louisiana*, 55 F.4th at 1032. A statutory purpose statement alone cannot bear that weight.

Even under this faulty interpretation, the administrative record does not establish that DOL's rule serves the interests of economy and efficiency. DOL recognizes that its rule will cost federal contractors $1.7 billion and that this cost will likely be passed onto the government. 86 Fed. Reg. at 67,194, 67,206, 67,209. DOL asserts that there are benefits in the form of "improved government services, increased morale and productivity, reduced turnover, reduced absenteeism, increased equity, and reduced poverty and income inequality for Federal contract workers." *Id.* at 67,212. But DOL admits that the empirical research offered to support those claims "does not directly consider [an equivalent] change in the minimum wage" and is largely "based on voluntary changes made by firms." *Id.* Any increases in productivity and reductions in turnover are only expected to "help offset the costs" of the rule—not to outweigh the costs. *Id.* at 67,207. If benefits from improved productivity and reduced turnover were expected to create enough benefit to outweigh the costs, then government procurement costs would fall. But DOL confesses that expenditures will likely rise. *See id.* Thus, on net, the rule cannot be deemed to promote economy and efficiency.

The Tenth Circuit majority ignored this reality. This undermines that court's conclusion because the court simply rubber-stamped the DOL rule. Under the Tenth Circuit's view, the President has the authority to act under §§ 101 and 121 if he merely *thinks* the rule promotes economy and efficiency —despite an administrative record that shows the opposite. The Tenth Circuit's broad interpretation of the FPASA would promote perverse incentives that lack any statutory basis.

For these reasons, we conclude that § 101 is not a source of the President's authority. We must find that authority, if it exists, in other operative sections of the FPASA.

2

We next look at whether the FPASA's operative sections authorize the minimum wage mandate.[4] The Government argues that three provisions authorize the President to issue an executive order instructing agencies to carry out the minimum wage mandate: 41 U.S.C. §§ 3101(a), 3703(c), and ⚑ 3306(a). None of these sections give the President authority to issue the minimum wage mandate.

Section 3101 states that "[a]n executive agency shall make purchases and contracts for property and services in accordance with this division and implementing regulations of the Administrator of General Services." 41 U.S.C. § 3101(a). This text simply requires agencies to comply with two authorities in executing contracts: (1) Division C of Subtitle I of Title 41, and (2) regulations issued by the Administrator under ❓ § 121(c). The Government does not argue that § 3101(a) provides independent authority for a minimum wage mandate. It argues that two provisions referenced in § 3101(a)—§§ 3703(c) and ⚑ 3306(a) (both in Division C)—authorize the mandate.

**\*8** According to the Government, § 3703(c) gives agencies wide discretion to choose vendors who provide the best value. Section 3703(c) states that agencies shall award contracts "to the responsible source whose proposal is most advantageous to the Federal Government, considering ... [the] cost or price" of the contract "and the other factors included in the solicitation." *Id.* § 3703(c). Under this provision, "agencies are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." ⚑ *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993) (internal quotation marks and citation omitted). But § 3703(c) does not provide any authority for adopting a nationwide minimum wage rule. It dictates only how agencies *determine* which bid on an individual solicitation is most advantageous. It does not speak to the policies or terms that the agency may impose in any resulting contract.

⚑ Section 3306(a) is similarly inapplicable. It gives agencies the authority to "specify [their] needs" when preparing a solicitation for a specific procurement. ⚑ 41 U.S.C. § 3306(a)(1)(A). In doing so, agencies can impose "restrictive

provisions or conditions" which, the Government implies, can include a minimum wage rate. *Id.* § 3306(a)(2)(B). That authority is not nearly as broad as the Government (and dissent) claims. *See* Dissent at ——. An agency may only impose restrictive provisions or conditions "to the extent necessary to satisfy the needs of the executive agency or as authorized by law." 41 U.S.C. § 3306(a)(2)(B). And even when an agency imposes a restrictive provision, the solicitation still must "permit full and open competition." *Id.* § 3306(a)(2)(A); *see also id.* § 3306(a)(3) (specifications "shall depend on the nature of the needs of the executive agency and the market available to satisfy those needs").

The minimum wage mandate flouts these requirements. To invoke § 3306(a) as a grant of authority, the Government must maintain that minimum wage rates for federal contractors are "restrictive provisions or conditions" that still "permit full and open competition." *Id.* § 3306(a)(2)(A), (B). But minimum wage rates invariably impair competition in the market for federal contracting services.

*See Legal Aid Soc. of Alameda Cnty. v. Brennan,* 608 F.2d 1319, 1341 (9th Cir. 1979) (looking at the market in a "contractor's labor area" to consider the application of federal contractor regulations). By imposing a uniform minimum wage mandate on all federal contractors, the Government strips federal contract bidders of a key way to differentiate their services—labor cost. And the wage mandate does the opposite of accounting for "the market available." 41 U.S.C. § 3306(a)(3). Setting a price control on labor disregards worker supply and demand, geographic price differentials on costs for federal contracting services, and local market realities.

The FPASA's text can be contrasted with the three statutes in which Congress *did* authorize a minimum wage for various federal contractors. The Davis-Bacon Act, the Walsh-Healey Public Contracts Act, and the McNamara-O'Hara Service Contract Act all require payment of the local "prevailing" wage rather than a fixed nationwide wage. *See* 40 U.S.C. § 3142(b); 41 U.S.C. §§ 6502(1), 6703(1). Each statute has its own regulatory scheme designed for a particular context (laborers and mechanics, contractors engaged in furnishing goods, and contractors which mainly provide services, respectively).

The wage rates for laborers and mechanics "shall be based on the wages the Secretary of Labor determines to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the civil subdivision of the State in which the work is to be performed." 40 U.S.C. § 3142(b).

**\*9** For contractors who furnish goods, employees must be paid "not less than the prevailing minimum wages ... for individuals employed in similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under the contract." 41 U.S.C. § 6502(1).

And for contractors who mainly provide services, Congress directed agencies to include a provision in each contract stating that "the minimum wage to be paid to each class of service employee ... [is] in accordance with prevailing rates in the locality." *Id.* § 6703(1).

Each statute authorizes a minimum wage mandate. This is exactly the kind of statutory language we look for to determine whether Congress authorized such a policy. And this is the kind of language that does not exist in the FPASA.

**[5]**    **[6]**    Further, the Government's preferred interpretation would effectively nullify these statutes. "It is a commonplace of statutory construction that the specific governs the general. That is particularly true where ... Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. 639, 645, 132 S.Ct. 2065, 182 L.Ed.2d 967 (2012) (cleaned up). And "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974) (quotation marks omitted). Congress made a specific determination about the minimum wage for federal contractors in these three prior statutes, and this determination should govern. It belies logic that Congress adopted the FPASA as a wholesale override of these long-standing statutes governing specific sectors of federal contracts.

The district court held (and the dissent agrees) that the minimum wage mandate does not conflict with these

three statutes because they set minimum wage rates, not maximum wage rates, and they do not impose "unambiguous commands" that wages cannot be set at a higher rate by other federal laws. 🚩 *Arizona*, 2023 WL 120966, at *8.

This is faulty logic. When Congress unambiguously commanded that the minimum wages paid to federal contractors be at the local prevailing wage, it recognized that wage rates drastically vary across states. For example, it does not make sense to require federal contractors in Pocatello, Idaho to pay the same minimum wage as federal contractors in San Francisco. *Cf.* 🚩 *S. Packaging & Storage Co. v. United States*, 618 F.2d 1088, 1092 (4th Cir. 1980). The wage mandate effectively nullifies the statutes that consider local market realities because the nationwide floor exceeds the minimum wage in every Appellant State. *See* State Minimum Wage Laws, *supra*. Congress chose not to force contractors to pay wages above the local prevailing rates, perhaps because of negative economic consequences.

In sum, the President cannot issue an executive order instructing agencies to carry out the minimum wage mandate by pointing to any of the FPASA's operative sections. And DOL similarly cannot issue a minimum wage rule under any of the FPASA's operative sections. [5]

## B

**\*10**  Appellants contend that the minimum wage mandate violates the major questions doctrine because the FPASA lacks a clear statement, and the minimum wage mandate is economically and politically significant.

"Where the statute at issue is one that confers authority upon an administrative agency," there are certain " 'extraordinary cases' that ... provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." 🚩 *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721, 142 S.Ct. 2587, ––– L.Ed.2d ––––– (2022) (quoting 🚩 *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)). In such cases, the agency "must point to 'clear congressional authorization' " for the proposed regulation. 🚩 *Id.* at 723 (quoting 🚩 *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 324, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014)).

**[7]**  The Supreme Court has adopted a two-prong framework to analyze the major questions doctrine. First, we ask whether the agency action is "unheralded" and represents a "transformative expansion" in the agency's authority in the vague language of a long-extant, but rarely used, statute. 🚩 *Id.* at 724–25 (citations omitted). Second, we ask if the regulation is of "vast economic and political significance" and "extraordinary" enough to trigger the doctrine. 🚩 *Id.* at 716, 721 (citations omitted). If both prongs are met, the major questions doctrine applies, and we should greet the agency's assertion of authority with "skepticism" and require the agency to identify "clear congressional authorization" for its action. 🚩 *Id.* at 724 (citation omitted).

**[8]**  Here, we conclude that the first prong of this analysis is not met because the Executive's reliance on the FPASA for the wage authority is not a "transformative" expansion of its authority. *See* 🚩 *id.* President Obama used the FPASA to issue a federal contractor minimum wage, and President Trump issued an executive order that maintained the minimum wage requirement excepting recreational services. 🚩 Exec. Order No. 13658, 79 Fed. Reg. 9851; 🚩 Exec. Order No. 13838, 83 Fed. Reg. 25,341. And the relevant provisions of the FPASA have been regularly invoked. *See* 🚩 *West Virginia*, 597 U.S. at 725, 142 S.Ct. 2587. For example, Presidents have used the FPASA to direct agencies to include contract provisions prohibiting discrimination, requiring contractors to inform employees that they have a right to not pay union dues, and requiring contractors to provide employees with paid sick leave. 🚩 Exec. Order No. 11246, 30 Fed. Reg. 12,319 (Sept. 28, 1965); 🚩 Exec. Order No. 12800, 57 Fed. Reg. 12,985 (Apr. 13, 1992); Exec. Order No. 13706, 80 Fed. Reg. 54,697 (Sept. 7, 2015). [6]

## C

Appellants' third main argument on appeal is that the district court erred in concluding that DOL's implementing rule is not subject to arbitrary-or-capricious review under the APA. The APA requires courts to "hold unlawful and set aside agency action ... found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 🚩 5 U.S.C. § 706(2)(A). We conclude that DOL's implementing

rule is subject to arbitrary-or-capricious review and that DOL acted arbitrarily or capriciously when it failed to consider alternatives.

1

**\*11**  **[9]**  The district court erroneously held that the APA does not apply to DOL's rule implementing President Biden's executive order. The district court reasoned that because the President's actions are not reviewable under the APA, a court cannot review an agency's implementing rule when the executive order gives agencies no policy discretion. *Arizona*, 2023 WL 120966, at \*9–11 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 800–01, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992)). But the district court's holding defies fundamental principles of administrative law. It also conflicts with the plain language of the APA and existing precedent.[7] And it would shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen.

First, the APA's language is plain. The APA applies to any "final agency action." 5 U.S.C. § 704. No language in the APA prevents or excepts review of an agency action that implements a presidential action. *See, e.g., id.* Thus, as a textual matter, final agency actions, even if implementing an executive order, are subject to judicial review under the APA.

In *Franklin*, the Supreme Court held that the President's actions are not reviewable under the APA because the President does not meet the definition of "agency." 505 U.S. at 800–01, 112 S.Ct. 2767. The Court reasoned that although the President is not explicitly excluded from the definition of "agency" in 5 U.S.C. §§ 701(b)(1) and 551(1), his unique constitutional position is enough to overcome this "textual silence." *Id.* at 800, 112 S.Ct. 2767. The Government encourages us to extend *Franklin* to cover final agency actions that adopt policy decisions issued by the President in executive orders. But expanding *Franklin* to cover such actions—taken by an agency—contradicts the text of the APA. Even a purposive approach to interpreting the APA undermines such an expansion. *Cf.* Kathryn E. Kovacs, *Constraining the Statutory President*, 98 WASH. U. L. REV. 63, 86–88 (2020) (arguing that even the

exclusion of the President from "agency" under *Franklin* conflicts with the history of the APA).[8]

Second, such an expansion of *Franklin* is not supported by existing precedent. The Supreme Court has never accepted a final rule from APA review because it carried out a presidential directive. Nor have we—or any other circuit. The Government points only to two district court cases in support of its argument. *Feds for Med. Freedom v. Biden*, 581 F. Supp. 3d 826, 835 n.6 (S.D. Tex. 2022), *vacated and remanded on other grounds*, 30 F.4th 503 (5th Cir. 2022); *Tulare County v. Bush*, 185 F. Supp. 2d 18, 29 (D.D.C. 2001). These decisions, like the district court's decision in this case, misapprehend the APA.

The D.C. Circuit has noted that just because an agency's regulations are based on an executive order, this "hardly seems to insulate them from judicial review under the APA, even if the validity of the [executive order] were thereby drawn into question." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). And we have subjected agency actions that incorporate a presidential directive to APA review (and specifically to arbitrary-or-capricious review). *See E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773 (9th Cir. 2018) ("The Rule [incorporating the presidential Proclamation] together with the Proclamation is arbitrary and capricious ...."); *Hawaii v. Trump*, 878 F.3d 662, 681 (9th Cir. 2017) (per curiam) ("[B]ecause these agencies have 'consummat[ed]' their implementation of the Proclamation, from which 'legal consequences will flow,' their actions are 'final' and therefore reviewable under the APA." (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997))), *vacated in part on other grounds by Trump v. Hawaii*, 585 U.S. 667, 682, 138 S.Ct. 2392, 201 L.Ed.2d 775 (2018).

**\*12**  Third, the district court's reasoning appears to rest chiefly on the policy justification that agencies would be put in the "untenable position" of having to follow mandatory executive orders and engage in APA-required deliberation about whether to choose a policy alternative unavailable under the executive order. *See Arizona*, 2023 WL 120966, at \*10. Of course, policy justifications cannot supersede statutory text. There is also nothing untenable about analyzing

the impacts, costs, and benefits of alternative policy options when issuing a rule that implements an executive order. And the district court's reasoning ignores the dynamic reality of executive branch policy development, which often involves back-and-forth debate between the President and his agents. For example, DOL could have complied with the APA's requirements to consider alternatives by analyzing the economic impacts of issuing a *higher* minimum wage. If the rule's productivity benefits are as large as DOL estimates, why not raise the federal contractor minimum wage to $20 an hour? Or $50 an hour? It is plausible to imagine that the Secretary of Labor, after analyzing the benefits and costs of this policy alternative, could persuade the President to adopt an even higher minimum wage. Detailing alternatives provides the President with a better understanding of the policy outcomes, gives him a chance to change his mind, and informs future decisions. In other words, it does exactly what the APA is designed to do: encourage reasoned and informed policymaking.

Indeed, countervailing policy justifications caution against exempting rules implementing an executive order from APA review. To hold as the Government urges would allow presidential administrations to issue agency regulations that evade APA-mandated accountability by simply issuing an executive order first. Agencies would be permitted to implement regulations without the public involvement, transparency, and deliberation required under the APA.

In sum, "courts should hesitate to disturb the legislative bargain embodied in the APA." Kovacs, *supra*, at 84. This is especially true where the best justification for departing from the text of the APA is a policy reason that does not withstand scrutiny.

2

**[10]** **[11]** **[12]** DOL acted arbitrarily and capriciously when it overlooked alternatives to the $15 per hour minimum wage mandate. "As the APA requires that agencies engage in reasoned decisionmaking, the agency had an obligation to consider its other obligations and any alternatives, even if it could properly end up rejecting them." *Nat'l Urb. League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020). An agency's obligation to consider alternatives "is well settled" and includes "a duty ... to give a reasoned explanation for its rejection of such alternatives." *City of Brookings Mun. Tel.*

*Co. v. F.C.C.*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

DOL admits that it did not consider "modify[ing] the amount of the ... minimum wage rate, chang[ing] the effective date for the wage rate, or phas[ing] in the wage rate over a number of years" despite receiving comments with these suggestions. *See* 86 Fed. Reg. at 67,130. The dissent counters that DOL did not act arbitrarily or capriciously by declining to consider such alternatives "because those choices would have contravened the President's clear directive." Dissent at ——. But that "clear directive" gives DOL considerable discretion. The Secretary of Labor must "issue regulations" to implement the executive order, which "shall include both definitions of relevant terms and, as appropriate, exclusions from the requirements of this order." 86 Fed. Reg. 22,836. Thus, the executive order does not exempt DOL from basic APA requirements of reasoned decisionmaking. And as we have explained, considering alternatives would not necessarily restrict DOL's conclusion. Because the Government acknowledges DOL did not consider alternatives, the DOL rule violates the APA. We therefore vacate the rule under the APA.

IV

In light of our conclusion that 🚩Executive Order 14026 and its implementing regulations exceeded the authority Congress granted the Executive Branch under the FPASA and that the implementing regulations are arbitrary and capricious under the APA, we also conclude that the district court abused its discretion in denying Appellants a preliminary injunction. *Assurance Wireless USA, L.P.*, 100 F.4th at 1031. Thus, we reverse the district court's order granting the Government's motion to dismiss, vacate the district court's order denying the injunction, and remand for further proceedings.

**\*13  REVERSED IN PART, VACATED IN PART, AND REMANDED.**

R. NELSON, Circuit Judge, concurring:
As the majority concludes, the minimum wage mandate does not violate the major questions doctrine because it is not a "transformative expansion" of the President's authority under the Federal Property and Administrative Services Act (FPASA). 🔶 *West Virginia v. Env't Prot. Agency*, 597

U.S. 697, 724, 142 S.Ct. 2587, ––– L.Ed.2d –––– (2022)
(quoting *Util. Air Regul. Grp. v. Env't Prot. Agency
(UARG)*, 573 U.S. 302, 324, 134 S.Ct. 2427, 189 L.Ed.2d
372 (2014)). I write separately to explore a more fundamental
question: Does the major questions doctrine apply to statutes
that delegate authority to the President? The answer, in
my view, is yes. The Supreme Court has never suggested
that the President is exempt from major questions analysis.
And it makes little sense to think that he is. Broad
legislative delegations to the Executive Branch—whether to
the President or to administrative agencies—are inherently
suspect. And by any measure, the minimum wage mandate
is a question of "vast economic and political significance."
*Id.* at 716, 142 S.Ct. 2587 (quoting *UARG*, 573 U.S. at
324, 134 S.Ct. 2427).

I

Much ink has been spilled on the "source and status" of
the major questions doctrine. *Biden v. Nebraska*, –––
U.S. ––––, 143 S. Ct. 2355, 2376, 216 L.Ed.2d 1063
(2023) (Barrett, J., concurring). Some view the doctrine
as a substantive canon rooted in non-delegation principles.
*See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
595 U.S. 109, 124, 142 S.Ct. 661, 211 L.Ed.2d 448 (2022)
(per curiam) (Gorsuch, J., concurring) (the major questions
doctrine and non-delegation doctrine are both "designed to
protect the separation of powers"). Others understand the
doctrine as a linguistic canon—"an interpretive tool reflecting
'common sense as to the manner in which Congress is likely
to delegate a policy decision of such economic and political
magnitude to an administrative agency.' " *Nebraska*, 143
S. Ct. at 2378 (Barrett, J., concurring) (quoting *Food
& Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121
(2000)). The Supreme Court in *West Virginia*—its clearest
explanation of the major questions doctrine—does not take
a side on that debate. 597 U.S. at 723, 142 S.Ct. 2587
(the doctrine's justifications include "both separation of
powers principles and a practical understanding of legislative
intent"). Regardless of its source, the major questions doctrine
does not yield because Congress delegated authority to the
President and not an agency.

A

Let's assume major questions is fundamentally a separation of
powers doctrine. On that view, the doctrine keeps Congress
in its constitutional lane, preventing it from delegating
"fundamental policy decisions" to the Executive Branch.
*Indus. Union Dep't, AFL-CIO v. Am. Petrol. Inst.*, 448 U.S.
607, 687, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) (Rehnquist,
J., concurring in the judgment); *see* U.S. Const. art. I, § 1.

It makes no difference which Executive Branch officer
has received an unlawful delegation: the "entire 'executive
Power' belongs to the President alone." *Seila Law LLC v.
Consumer Fin. Prot. Bureau*, 591 U.S. 197, 213, 140 S.Ct.
2183, 207 L.Ed.2d 494 (2020) (quoting U.S. Const. art. II, §
1). Yet "it would be 'impossib[le]' for 'one man' to 'perform
all the great business of the State,' " thus why the President
enlists subordinates to assist him in "faithfully execut[ing]"
the laws. *Id.* (quoting 30 Writings of George Washington
334 (J. Fitzpatrick ed. 1939); U.S. Const. art. II, § 3). But
the "buck stops with the President." *Free Enter. Fund
v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493, 130
S.Ct. 3138, 177 L.Ed.2d 706 (2010). Article II "makes a
single President responsible for the actions of the Executive
Branch"—whether they stem from the White House or a
federal agency. [1] *Id.* at 496–97, 130 S.Ct. 3138 (quotation
omitted); *see Louisiana v. Biden*, 55 F.4th 1017, 1031
n.40 (5th Cir. 2022) ("[D]elegations to the President and
delegations to an agency should be treated the same under the
major questions doctrine.").

**\*14** Indeed, a unitary executive is entrenched in our
constitutional structure. The Founders envisioned a system
in which the executive power is concentrated in a single
President who does not make the laws, but executes them.
*See* The Federalist No. 51 (James Madison), Nos. 70, 77
(Alexander Hamilton). The Supreme Court's major questions
cases recognize that basic premise: "Under our system of
government, Congress makes laws and the President, acting
at times through agencies ... 'faithfully execute[s]' them."
*UARG*, 573 U.S. at 327, 134 S.Ct. 2427 (quoting U.S.
Const. art. II, § 3). Unconstitutional delegations are no less
problematic when they are directed to the individual who
ultimately "bears responsibility for the actions of the many

departments and agencies within the Executive Branch." *Trump*, 144 S. Ct. at 2327.

Distinguishing between presidential and agency delegations also ignores the realities of administrative decision-making. The President is likely to be closely involved in major policies, even if they are ultimately promulgated by an agency. Take student loans. President Biden campaigned on a promise to provide student debt relief for low- to middle-income borrowers. *Fact Sheet: President Biden Announces Student Loan Relief for Borrowers Who Need It Most*, The White House (Aug. 24, 2022), https://perma.cc/492Y-5LZ9. After taking office, President Biden announced, "that the Department of Education will provide targeted debt relief to address the financial harms of the [COVID-19] pandemic, fulfilling [his] campaign commitment." *Id.* Six days later, the Department of Education published a memorandum interpreting federal law to give the Education Secretary authority "to effectuate a program of targeted loan cancellation directed at addressing the financial harms of the COVID-19 pandemic." *Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,944 (Aug. 30, 2022). That agency interpretation—which satisfied a presidential campaign promise—was later found to violate the major questions doctrine. *Nebraska*, 143 S. Ct. at 2372–75. The same can be said of the Department of Labor's (DOL) implementing rule. The President campaigned on this issue and directed the Department to implement a rule by Executive Order.

### B

Now assume the major questions doctrine operates as a linguistic canon that "situates text in context." *Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring). Here, it would be even stranger to treat the President differently. We regularly interpret statutory grants of authority. In so doing, we recognize that Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001); *see also U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc) (the Supreme Court presumes "that Congress intends to make major policy decisions itself, not leave those decisions to agencies"). Why would our normal interpretive process turn on the identity of the Executive Branch officer to whom Congress delegated power? An implausible reading of a statute is no less implausible when that statute confers authority on the President versus an agency.

### II

The Government would have us hold that the major questions doctrine does not apply to presidential action. It relies on our now-vacated decision in *Mayes v. Biden*, which concluded for the first time that the President is categorically exempt from major questions analysis. [2] 67 F.4th 921, 932–34 (9th Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023).

**\*15** *Mayes* described the Supreme Court's 2014 decision in *Utility Air* as the "current form" of the major questions doctrine, even though *West Virginia* was decided ten months before *Mayes*. *Id.* at 932–33. Casting *West Virginia* aside, *Mayes* described the doctrine as "motivated by skepticism of *agency interpretations* that 'would bring about an enormous and transformative expansion in ... regulatory authority without clear congressional authorization.' " *Id.* at 933 (quoting *UARG*, 573 U.S. at 324, 134 S.Ct. 2427) (emphasis added). Those concerns, the panel reasoned, do not apply to the President because he is more politically accountable than federal agencies. *Id.*

No court has ever embraced *Mayes*' political accountability theory. And no court is likely to after *West Virginia*, which does not reference "accountability" a single time in the majority opinion. *See* 597 U.S. at 706–35, 142 S.Ct. 2587. True, Justice Gorsuch touched on the democratic ills of divesting legislative power to administrative agencies. *Id.* at 739 (Gorsuch, J., concurring). Justice Gorsuch reasoned that unchecked congressional delegations to the Executive Branch risk legislation that reflects "nothing more than the will of the current President." *Id.* And it would be "worse yet" if legislation embodied "the will of unelected officials barely responsive to" the President. *Id.*

That distinction makes sense—the President *is* politically accountable to the people, while his subordinates are

unelected. But under separation of powers principles, it is a distinction without a difference. Again, "the executive power of the government was vested in one person"—the President. *Myers v. United States*, 272 U.S. 52, 116, 47 S.Ct. 21, 71 L.Ed. 160 (1926). So if major questions cases "have arisen from all corners of the administrative state," as the Supreme Court has observed, then the doctrine should apply whether a delegation is directed to the President or one of his subordinate officials. *Nebraska*, 143 S. Ct. at 2375 (quoting *West Virginia*, 597 U.S. at 721, 142 S.Ct. 2587); *see Gonzales v. Oregon*, 546 U.S. 243, 267, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006) (the major questions doctrine applies to a congressional delegation to the Attorney General).

In any event, a statutory delegation to the President must be valid "regardless of how likely the public is to hold the Executive Branch politically accountable." *See Brown & Williamson*, 529 U.S. at 161, 120 S.Ct. 1291. The President is more politically accountable than his agencies, but that does not fix an unlawful delegation. Nor does it correct what is otherwise a linguistically implausible reading of a statute. The Constitution places "carefully defined limits on the power of each Branch"—political accountability aside. *INS v. Chadha*, 462 U.S. 919, 958, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

### III

Applying the major questions doctrine here, we reason that because multiple Presidents have invoked the FPASA to issue a wage mandate, President Biden's mandate is not a "transformative" expansion of his authority. Maj. Op. at —— – —— (quoting *West Virginia*, 597 U.S. at 724, 142 S.Ct. 2587). But that conclusion is only part of the story. Executive action does not implicate the major questions doctrine unless it involves a question of "vast economic and political significance." *West Virginia*, 597 U.S. at 716, 142 S.Ct. 2587 (quoting *UARG*, 573 U.S. at 324, 134 S.Ct. 2427). The minimum wage mandate satisfies that standard.

### A

Start with economic significance. The major questions doctrine applies when the Executive claims authority over "a significant portion of the American economy," *Nebraska*, 143 S. Ct. at 2373 (quoting *UARG*, 573 U.S. at 324, 134 S.Ct. 2427), or requires "billions of dollars in spending" by private entities, *King v. Burwell*, 576 U.S. 473, 485, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015). The Department of Labor estimates that the minimum wage mandate will cost federal contractors $1.7 billion annually. *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,194 (Nov. 24, 2021). Over the next decade, DOL predicts that federal contractors will spend more than $18 billion to comply with the mandate. *Id.* at 67,210.

**\*16** Those figures are "significant" in any sense of the word. They exceed the Biden Administration's own $200 million annual cutoff for "significant regulatory actions." Exec. Order No. 14094, 88 Fed. Reg. 21,879 (Apr. 6, 2023). And the minimum wage mandate would similarly qualify as a "major rule" under the Congressional Review Act because it has "an annual effect on the economy of $100,000,000 or more." 8 U.S.C. § 804(2)(A). As the majority explains, the mandate also causes "a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions." *Id.* § 804(2)(B); *see* Maj. Op. at ——, —— – ——; 86 Fed. Reg. 67,206 ("relevant consumer for procurement contracts is the Federal Government" and "Government expenditures may rise" because of the mandate). "Given these circumstances, there is every reason to 'hesitate before concluding that Congress' meant to confer" on the President the authority to issue a minimum wage mandate. *West Virginia*, 597 U.S. at 725, 142 S.Ct. 2587 (quoting *Brown & Williamson*, 529 U.S. at 159, 120 S.Ct. 1291).

The district court concluded that the minimum wage mandate is not economically significant enough to involve a major question. *See Arizona v. Walsh*, No. CV-22-00213, 2023 WL 120966, at \*8 (D. Ariz. Jan. 6, 2023). It noted that the Clean Power Plan's $1 trillion reduction in GDP, at issue in *West Virginia*, significantly eclipsed the cost of President Biden's wage mandate. *Id.* Same with the $50 billion the Supreme Court considered a "reasonable proxy" for the nationwide eviction moratorium that flunked the major questions doctrine in *Alabama Association of Realtors v.*

*Department of Health & Human Services*, 594 U.S. 758, 764–65, 141 S.Ct. 2485, 210 L.Ed.2d 856 (2021) (per curiam).

🚩 *Id.* But this kind of side-by-side comparison cannot be dispositive. The Supreme Court has never set a floor on what qualifies as economically vast. And in at least one major questions case the Court engaged in little economic analysis at all. *See* 🚩 *Nat'l Fed'n of Indep. Bus.*, 595 U.S. at 117, 142 S.Ct. 661. The minimum wage mandate is less economically significant than other major questions, but that does not control the analysis. Thus, the DOL implementing rule is economically significant.

B

The minimum wage mandate is also politically significant. The Supreme Court finds it telling when the Executive's asserted authority "has 'conveniently enabled it to enact a program' that Congress has chosen not to enact itself." 🚩 *Nebraska*, 143 S. Ct. at 2373 (quoting 🚩 *West Virginia*, 597 U.S. at 731, 142 S.Ct. 2587) (internal alteration omitted). Such maneuvers are a sign the Executive "is attempting to work around the legislative process to resolve for itself a question of great political significance." *West Virginia*, 597 U.S. at 743, 142 S.Ct. 2587 (Gorsuch, J., concurring) (cleaned up).

The President did just that here. During his 2020 campaign, President Biden promised to raise the nationwide minimum wage for all workers to $15 an hour. *Statement by President Joe Biden on $15 Minimum Wage for Federal Workers and Contractors Going into Effect*, The White House (Jan. 28, 2022), https://perma.cc/QLS2-R8WD. That proposal failed on the Senate floor in a bipartisan vote. Emily Cochrane & Catie Edmondson, *Minimum Wage Increase Fails as 7 Democrats Vote Against the Measure*, N.Y. Times (Mar. 5, 2021), https://perma.cc/M7UQ-Z8WW. Later, once the DOL implementing rule took effect, President Biden described it as "a down payment" on his original campaign pledge. *Statement by President Joe Biden, supra.*

The minimum wage mandate's detour from the legislative process is no different from the student loan forgiveness program in 🚩 *Nebraska* or the Clean Power Plan in 🚩 *West Virginia.* In both cases, the Supreme Court noted that Congress considered and rejected the challenged policies before the President resorted to legislating by executive order.

*See* 🚩 *Nebraska*, 143 S. Ct. at 2373–74; 🚩 *West Virginia*, 597 U.S. at 731–32, 142 S.Ct. 2587. Like student loans and greenhouse gas emissions, minimum wages have long "been the subject of an earnest and profound debate across the country," making the President's unilateral attempt to settle that debate "all the more suspect." *West Virginia*, 597 U.S. at 732, 142 S.Ct. 2587 (quoting 🚩 *Gonzales*, 546 U.S. at 267–68, 126 S.Ct. 904).

IV

**\*17** No matter the source of the major questions doctrine, nothing excuses the President from its commands. And the minimum wage mandate is economically and politically significant. While the doctrine does not apply here for other reasons, the faulty reasoning in the vacated 🚩 *Mayes* opinion and by the district court below should not be repeated in future cases.

SANCHEZ, Circuit Judge, dissenting:

It is well-settled that "the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." 🚩 *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). Consistent with that power, Presidents have invoked the Federal Property and Administrative Services Act ("**Procurement Act**" or "FPASA") to direct federal agencies to include many different kinds of restrictive clauses in federal contracts. For example, Presidents have used the **Procurement Act** to require federal contractors to commit to affirmative action programs when racial discrimination threatened contractors' efficiency; to adhere to wage and price guidelines to combat inflation in the economy; to ensure compliance with immigration and labor laws; and to attain sick leave parity with non-contracting employers. *See* 🚩 *Mayes v. Biden*, 67 F.4th 921, 938 (9th Cir. 2023), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023). When challenged, the President's authority under the **Procurement Act** to set the foregoing terms and conditions in federal contracts has been uniformly upheld by federal courts. *See* 🚩 *id.* at 936–38.

🚩 Executive Order 14026 is of the same vein. It directs federal agencies to enter into certain contracts only with companies that will agree to pay their employees at or above a $15 hourly minimum wage for work on those contracts. President Obama issued the first such order requiring minimum-wage clauses to be inserted in certain contracts with the federal government, and President Trump maintained it with a limited carveout for contracts in connection with seasonal recreational services on federal lands. President Biden's executive order, in turn, reflects his determination that the federal government benefits by paying employees sufficiently for their work on federal contracts because higher pay enhances productivity and increases the quality of their work.

Because the plain text of the **Procurement Act**, longstanding judicial precedent, and executive practice since its enactment all confirm that President Biden has the authority to direct federal agencies in this manner, and because the Department of Labor (the "Department") did not act arbitrarily or capriciously by implementing a binding presidential directive, I respectfully dissent.

## I.

A fundamental tenet of our constitutional order is that the President's authority to act "must stem either from an act of Congress or from the Constitution itself." 🚩 *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). When, as here, the President issues an executive order based on congressionally delegated authority, the order has force of law if there is "a nexus between the [order] and some delegation of the requisite legislative authority by Congress." 🚩 *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). The President's executive order does not have to be tied to a specific statutory provision. *See* 🚩 *id.* at 308, 99 S.Ct. 1705 ("This is not to say that any grant of legislative authority to a federal agency by Congress must be specific before regulations promulgated pursuant to it can be binding on courts in a manner akin to statutes."). The pertinent inquiry, the Supreme Court explains, is whether executive action is "reasonably within the contemplation" of any "statutory grants of authority." 🚩 *Id.* at 306, 99 S.Ct. 1705 (emphasis omitted); *see also* 🚩 *Chen v. I.N.S.*, 95 F.3d 801, 805 (9th Cir. 1996) (executive orders based on congressionally

delegated authority must be "grounded in a statutory mandate or congressional delegation of authority").

**\*18** 🚩 Executive Order 14026 is lawful because it is "reasonably within the contemplation" of the **Procurement Act**. 🚩 *Chrysler Corp.*, 441 U.S. at 306, 99 S.Ct. 1705. The **Procurement Act** gives federal agencies broad discretion to "specify [their] needs" in negotiations with federal contractors and "include restrictive provisions or conditions" in their solicitations. 🚩 41 U.S.C. § 3306(a)(1)(A)– 🚩 (a)(2)(B); *see also* 41 U.S.C. §§ 3101(a), 3703(c); 🚩 *Perkins*, 310 U.S. at 127, 60 S.Ct. 869. And it gives the President broad discretion to direct federal agencies in the use of their statutory power. *See* ❓ 40 U.S.C. § 121(a). 🚩 Executive Order 14026 comfortably fits within the President's broad statutory authority.

### A.

The **Procurement Act** codifies and organizes the Executive Branch's traditional procurement and contracting power. [1] The Act has the stated goal of "provid[ing] the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting" and "setting specifications." 40 U.S.C. § 101(1); *see also* Federal Property and Administrative Services Act of 1949, Pub. L. No. 81-152, § 2, 63 Stat. 377, 378.

To achieve that goal, the **Procurement Act** codified the federal agencies' traditional authority to negotiate federal contracts. Section 3101(a), for example, vests executive agencies with the authority to "make purchases and contracts for property and services" consistent with the "implementing regulations" of the Administrator. 41 U.S.C. § 3101(a). This provision confers on "the civilian agencies of the government" broad "authority to negotiate contracts." 1B John Cosgrove McBride & Thomas J. Touhey, *Government Contracts: Law, Administration & Procedures* § 9.10 (Walter A. I. Wilson ed., 2024). 🚩 Section 3306(a), in turn, recognizes agencies' authority to "specify [their] needs" and authorizes them to "include restrictive provisions or conditions" in their solicitations "to the extent necessary to satisfy the needs of the executive agency or as authorized by law." *Id.* § 3306(a)(1)(A)-(a)(2)(B). Section 3703(c)

directs agencies to award contracts "to the responsible source whose proposal is most advantageous to the Federal Government," considering cost and "other factors included in the solicitation." *Id.* § 3703(c). In sum, federal agencies enjoy wide latitude to determine their own needs and select the contractors who provide the federal government with the best value. *See* 🚩*Perkins*, 310 U.S. at 127, 60 S.Ct. 869; *see also* 🚩*Harmonia Holdings Grp., LLC v. United States, Alethix, LLC*, 999 F.3d 1397, 1407 (Fed. Cir. 2021).

The President, in turn, sits atop the federal government's procurement system and has both "necessary flexibility and 'broad-ranging authority' " to set government-wide procurement policies. 🚩*UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (citation omitted). In the key provision here, the ==Procurement Act== authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" the Act's subtitles—including the above-mentioned provisions authorizing agencies to specify the terms of federal contracts —and directs that the "policies must be consistent with" the ==Procurement Act==. ❓40 U.S.C. § 121(a).

**\*19** The statutory power to direct federal agencies as they specify the terms of federal contracts is a key lever that presidents of both parties have used to further their policy agendas. As 🚩*Mayes* explained, "Presidents have used the ==Procurement Act== to require federal contractors to commit to affirmative action programs when racial discrimination was threatening contractors' efficiency; to adhere to wage and price guidelines to help combat inflation in the economy; to ensure compliance with immigration laws; and to attain sick leave parity with non-contracting employers." 🚩*Mayes*, 67 F.4th at 938, *vacated as moot*, 89 F.4th 1186.[2]

While broad, the President's authority to direct the federal agencies' negotiating power is not unbounded. ❓Section 121(a) provides an explicit limitation on the President's authority: executive action must be "consistent with" the ==Procurement Act==. ❓40 U.S.C. § 121(a).

For the following 70 years after the Act's enactment in 1949, courts uniformly enforced ❓Section 121(a)'s consistency requirement by requiring executive orders issued under the Act to have a "nexus" with the Act's stated objectives of "provid[ing] the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting" and "setting specifications." ❓40 U.S.C. § 101(1); *see also* 🚩*Mayes*, 67 F.4th at 940, *vacated as moot*, 89 F.4th 1186. This is a commonplace method of statutory interpretation. The Supreme Court itself has looked to a statute's statement of purpose as "an appropriate guide to the meaning of the statute's operative provisions" and used the statement of purpose to clarify an otherwise broad delegation of authority to the Attorney General. *See* 🚩*Gundy v. United States*, 588 U.S. 128, 142, 139 S.Ct. 2116, 204 L.Ed.2d 522 (2019) (plurality opinion) (alterations adopted) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 218 (2012)).

The D.C. Circuit has required a "sufficiently close nexus" between an executive order based on ❓Section 121(a) and the Act's stated goals of promoting economy and efficiency in federal procurement and contracting. *See* 🚩*Chao*, 325 F.3d at 366 (quoting 🚩*Kahn*, 618 F.2d at 792). Similarly, the Fourth Circuit requires an executive order based on ❓Section 121(a) to be "reasonably related to the ==Procurement Act's== purpose." 🚩*Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981).

In 🚩*Mayes*, a unanimous panel of this court similarly read the ==Procurement Act's== statement of objectives in ❓Section 101(1) to supply "a clear textual limiting principle" for the President's otherwise broad ❓Section 121(a) rulemaking authority. 🚩*Mayes*, 67 F.4th at 942, *vacated as moot*, 89 F.4th 1186.[3] And the Tenth Circuit has since followed suit. *See* 🚩*Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 721 (10th Cir. 2024) ("FPASA authorizes only 'policies and directives that the President considers necessary' to 'provide an economical and efficient system for' procurement and supply." (alterations adopted) (quoting 40 U.S.C. §§ 101(1), ❓121(a))).

**\*20** So here is the bottom line. The President has the authority and discretion to issue federal government-wide policies directing federal agencies in the use of their extensive power to set the terms of federal contracts. *See* ❓40 U.S.C. § 121(a); 🚩41 U.S.C. §§ 3306(a), 3101(a), 3703(c). But any

such order must be "consistent with" the **Procurement Act**. *See* 40 U.S.C. § 121(a). And to determine whether a given directive is, in fact, "consistent with" the Act, courts look for a nexus to the Act's stated goals of improving efficiency and economy in federal procurement and contracting.

### B.

That background to the **Procurement Act's** origination and statutory scheme leads us to the question at hand: does President Biden have the authority to direct federal agencies to include a clause in federal contracts requiring contractors to pay employees a $15 minimum wage for work on federal projects? In my view, the answer is an unequivocal yes. Executive Order 14026 fits comfortably within the President's broad authority under the **Procurement Act** to direct federal agencies in the use of their statutory power to specify the terms of federal contracts.

As explained above, the **Procurement Act** recognizes that federal agencies have wide latitude to specify the terms of federal contracts. *See* 41 U.S.C. §§ 3101(a), 3306(a), 3703(c); *see also* *Perkins*, 310 U.S. at 127, 60 S.Ct. 869. There is no reason why an agency cannot exercise its statutory authority to specify that a pre-set minimum level of compensation for work on federal projects is a "need." *See* 41 U.S.C. § 3306(a). Even the Plaintiff States agree that Section 121(a) allows the President "to instruct [agencies] on how to exercise their statutory authority." Here, President Biden issued a government-wide directive that, for the particular categories of covered contracts—most notably contracts "for services or construction," 86 Fed. Reg. 22,835, 22,837 (Apr. 27, 2021)—a $15 hourly minimum wage for work on federal contracts is a need given the "nature of the ... services to be acquired." 41 U.S.C. § 3306(a)(1)(C). Again, Presidents from Kennedy, Johnson, and Carter to Bush, Obama, and Trump have long issued comparable government-wide directives to federal agencies to include all manner of clauses in federal contracts in furtherance of their economic agendas. *See* *Mayes*, 67 F.4th at 936–38, *vacated as moot*, 89 F.4th 1186. President Biden's order lawfully functions the same way.

Further, Executive Order 14026 has a clear nexus to the **Procurement Act's** goals of increasing economy and efficiency in federal procurement. *See* 40 U.S.C. § 101(1). The Order is based on the President's judgment that raising the minimum wage for federal contractors would "bolster economy and efficiency in Federal procurement" because a higher minimum wage "enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." 86 Fed. Reg. at 22,835.

The Department's implementing rule provides extensive support for the reasonableness of the President's determination. 86 Fed. Reg. 67,126, 67,212–15 (Nov. 24, 2021). The rule notes, for example, that "higher-paying contractors may be able to attract higher quality workers who are able to provide higher quality services, thereby improving the experience of citizens who engage with these government contractors"—a view supported by empirical research. *Id.* at 67,212. The rule explains, citing numerous studies, that a higher minimum wage for contractors' employees could make them more productive, reduce their rate of turnover, and reduce absenteeism. *Id.* at 67,213–14. Twenty-two states and the District of Columbia agree and have submitted an amicus brief in support of Executive Order 14026, in which amici observe that "the States and localities that have raised minimum wages for their own contractors have found that such policies create better quality jobs for communities and improve the contracting process both by reducing the hidden public costs of the procurement system, and by shifting purchasing towards more reliable, high road contractors." [4]

**\*21**  In short, the President has rationally determined that raising the minimum wage for work on federal projects will lead to improvements in productivity and the quality of work and thereby benefit the government's contracting operations. "Such a strategy of seeking the greatest advantage to the Government, both short- and long-term, is entirely consistent with the congressional policies behind the FPASA." *Kahn*, 618 F.2d at 793.

### II.

Today the majority rejects the consensus approach in favor of a far more restrictive understanding of the scope of the President's authority under the **Procurement Act**. The

majority acknowledges that the Act authorizes the President to "make rules for the Executive Branch's implementation of the Act's many operative provisions." *See* Maj. Op. at —— (citing 🔲 40 U.S.C. § 121(a)). But the majority goes looking for a provision, other than 🔲 Section 121(a), that specifically authorizes the President to adopt a "nationwide minimum wage" and, finding none, concludes that the Order is unlawful.[5] *See id.* at —— – ——. The majority's quixotic search for a specific statutory provision, however, cannot be squared with the plain terms of the **Procurement** Act.

Congress explicitly recognized the Executive Branch's expansive authority to negotiate with federal contractors by including restrictive clauses in federal contracts. *See* 41 U.S.C. §§ 3101(a), 🔲 3306(a), 3703(c); *see also* 🔲 *Perkins*, 310 U.S. at 127, 60 S.Ct. 869. The Act has always been understood to give the President broad authority and discretion to direct federal agencies in the use of that power. *See* 🔲 40 U.S.C. § 121(a); 🚩 *Mayes*, 67 F.4th at 938, *vacated as moot*, 89 F.4th 1186. The "expansive language" that Congress used to delegate policymaking authority to the President regarding procurement and contracting, and negotiating authority to the agencies, is unmistakable evidence of legislative intent to grant wide discretion to the Executive Branch. *See San Luis Obispo Coastkeeper v. Santa Maria Valley Water Conservation Dist.*, 49 F.4th 1242, 1246 (9th Cir. 2022) (observing that "expansive" statutory grant of authority is clear evidence of congressional intent to grant discretion), *cert. denied sub nom. City of Santa Maria v. San Luis Obispo Coastkeeper*, —— U.S. ——, 144 S. Ct. 74, 217 L.Ed.2d 12 (2023); *see also* 🔲 *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1288 (11th Cir. 2021). And Congress's broad delegation to the President in this area makes particular sense in light of the federal government's "unrestricted power" to set the terms of government contracts and the "traditional principle of leaving purchases necessary to the operation of our Government to administration by the executive branch of Government." 🔲 *Perkins*, 310 U.S. at 127, 60 S.Ct. 869.

**\*22** Given the **Procurement** Act's broad delegation of authority to the Executive Branch, why would we require the President to go further and find a provision specifically referencing a $15 minimum wage for work on federal projects? As Judge Anderson recognized, "[n]either common sense nor historical practices would suppose that Congress

must foresee and explicitly authorize every qualification for government contractors and workers that the infinitely various contractual circumstances may require." 🔲 *Georgia*, 46 F.4th at 1311 (Anderson, J., concurring in part and dissenting in part).

To be sure, there are certain " 'extraordinary cases' that provide a 'reason to hesitate before concluding that Congress' meant to confer" on the executive agencies a sweeping delegation of authority. *See* Maj. Op. at —— (alterations adopted) (quoting 🔲 *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721, 142 S.Ct. 2587, —— L.Ed.2d —— (2022)). In those cases implicating the major questions doctrine, "the agency must point to 'clear congressional authorization' " for its proposed regulation. *See id.* at —— (alterations adopted) (quoting 🔲 *West Virginia*, 597 U.S. at 723, 142 S.Ct. 2587). But critically, the majority correctly holds that this is *not* one of those extraordinary cases. *See id.* at —— – ——. So the majority has no basis for its clear statement rule requiring the President to identify a statutory provision specifically referencing a $15 minimum wage for work on federal projects.

The majority also suggests that 🚩 Executive Order 14026 does not have a sufficiently close nexus to the **Procurement Act's** goals of increasing efficiency and economy in federal contracting. This is so, the majority argues, because increasing the wage of federal contractors may lead to increased costs that may get passed on to the federal government. *See id.* at —— (citing 86 Fed. Reg. at 67,206). But the majority's argument rests on the flawed assumption that the President cannot issue policies under the **Procurement Act** if the policy could lead to *any* potential increase in government expenditures. That has never been the law.

As the Tenth Circuit recently explained, "presidents have issued—and courts have upheld—a wide range of orders under FPASA governing federal contractors and their workers, often without a direct connection to cost reduction." *See* 🔲 *Bradford*, 101 F.4th at 727 (citing 🔲 *Chao*, 325 F.3d at 362, 366–67; 🔲 *Kahn*, 618 F.2d at 796). That is because " '[e]conomy' and 'efficiency' are not narrow terms." 🔲 *Kahn*, 618 F.2d at 789. "[T]hey encompass those factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." 🔲 *Id.*

Courts reviewing the validity of executive orders under the **Procurement Act** have never insisted on a precise quantification of the expected benefits of a directive, and for good reason. The President—not unelected judges—has the democratic accountability, institutional competence, and statutory authority to determine whether it is sound economic policy to require minimum-wage floors for work on government contracts.

Relatedly, the majority argues that ⚑ Executive Order 14026 violates the Act's requirement that agencies shall specify their needs "in a manner designed to achieve full and open competition for the procurement." *See* 41 U.S.C. § 3306(a)(1)(A). This is because, in the majority's view, "minimum wage rates invariably impair competition in the market for federal contracting services" because they "strip[ ] federal contract bidders of a key way to differentiate their services—labor cost." *See* Maj. Op. at ——. The majority's analysis suffers from two serious flaws.

**\*23** First, all restrictive contractual provisions limit the universe of potential bidders who can provide the given service. That is the feature of a restrictive clause, not a bug. If the majority's interpretation were correct, federal agencies would be barred from inserting any restrictive clauses in federal contracts on the basis that they might impair competition from certain bidders. But this flies in the face of the plain language of the **Procurement Act**, which gives agencies broad authority to "specify [their] needs," ⚑ 41 U.S.C. § 3306(a)(1)(A), impose "restrictive provisions or conditions," *id.* § 3306(a)(2)(B), and define "minimum acceptable standards" in solicitation bids, *id.* § 3306(a)(3)(B). Again, as the Supreme Court has explained, the Executive Branch enjoys "unrestricted power" to "determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." ⚑ *Perkins*, 310 U.S. at 127, 60 S.Ct. 869.

Second, the majority improperly second-guesses the Executive Branch's determination about its own procurement needs. As our sister circuits have recognized, "procurement decisions invoke highly deferential rational basis review" because "[c]ontracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." ⚑ *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010)

(alterations adopted) (internal quotation marks and citation omitted); *see also* *Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004) ("[T]he determination of an agency's minimum needs is a matter within the broad discretion of agency officials, and not for this court to second guess." (internal citations omitted)). Under the guise of statutory review, however, the majority pronounces that "[s]etting a price control on labor disregards worker supply and demand, geographic price differentials on costs for federal contracting services, and local market realities." Maj. Op. at ——. We are ill-equipped to judicially second-guess procurement decisions that are grounded in social, economic, and political policy judgments. *See* ⚑ *Perkins*, 310 U.S. at 127, 60 S.Ct. 869. Whether ⚑ Executive Order 14026 represents wise policy or will have the effects on the labor market that the majority predicts is better left to economists and elected officials.

### III.

Next, the majority suggests that ⚑ Executive Order 14026 is unlawful because it is inconsistent with other federal statutes governing wages for federal contractors. *See* Maj. Op. at —— – ——. As the majority notes, the Davis-Bacon Act ("DBA"), Walsh-Healey Public Contracts Act ("PCA"), and McNamara-O'Hara Service Contract Act ("SCA") all require payment of the local "prevailing" minimum wage for their respective sectors of the economy (laborers and mechanics, contractors engaged in furnishing goods, and contractors which mainly provide services). *See* 40 U.S.C. § 3142(b); ⚑ 41 U.S.C. §§ 6502(1), 6703(1). The majority claims that ⚑ Executive Order 14026 would "effectively nullify" these statutes. *See* Maj. Op. at ——.

"When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." ⚑ *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510, 138 S.Ct. 1612, 200 L.Ed.2d 889 (2018) (cleaned up) (citation omitted). "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *See* ⚑ *id.* (cleaned up) (citation omitted). Because we can easily read the **Procurement Act** and the

DBA, PCA, and SCA to work in harmony, it is our duty to do so. *See San Luis Obispo Coastkeeper*, 49 F.4th at 1247.

As the Department explained in the implementing rule, the DBA, PCA, and SCA establish *minimum* wage rates, not maximum wage rates, so it is not inconsistent for the President to use the **Procurement Act** to establish a higher minimum wage rate. 86 Fed. Reg. at 67,129. After all, "Congress frequently sets minimum requirements while expecting that other entities will adopt more stringent regulations," *Bradford*, 101 F.4th at 724 (citations omitted), and the majority has no evidence—let alone "clearly expressed congressional intention"—that Congress intended to occupy the field of wage regulation for federal contracting. *Epic Sys. Corp.*, 584 U.S. at 510, 138 S.Ct. 1612. Indeed, the DBA itself says that it "does not supersede or impair any authority otherwise granted by federal law to provide for the establishment of specific wage rates." 40 U.S.C. § 3146.

**\*24** So as the Tenth Circuit explained, the problem with the majority's argument is that "there is no indication here that Congress intended for any of the minimum wage statutes to preclude the payment of higher wages to employees working on or in connection with covered contracts." *Bradford*, 101 F.4th at 724. In the absence of any conflict, there is no basis to read the minimum wage laws as creating an unwritten exception to the broad rulemaking authority the **Procurement Act** delegates to the President.

### IV.

I agree with the majority's conclusion that Executive Order 14026 does not implicate the major questions doctrine. *See* Maj. Op. at ——. The doctrine only applies where "an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy or make decisions of vast economic and political significance." *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 324 (2014) (cleaned up) (internal quotation marks and citations omitted).

The doctrine plainly does not apply here, as the majority recognizes, because Executive Order 14026 does not represent a "transformative" expansion of any authority. *See* Maj. Op. at ——. Presidents for decades have invoked the **Procurement Act** to issue orders directing federal agencies

to include various far-reaching clauses in federal contracts. *See id.* at —— – ——. That straightforward conclusion, at the very first prong of the majority's analysis, "is a sufficient ground for deciding this case, and the cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further." *PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment). [6]

### V.

Finally, the majority holds that the Department's rule implementing Executive Order 14026 is unlawful because the Department "failed to consider alternatives" to requiring contractors to pay a $15 minimum wage. Specifically, the majority believes the Department should have considered "modifying the amount of the minimum wage rate, changing the effective date for the wage rate, or phasing in the wage rate over a number of years." *See* Maj. Op. at —— (alterations adopted) (quoting 86 Fed. Reg. at 67,130). The majority is incorrect. Even if APA review is available when an agency simply carries out policy determinations made by the President, an agency does not act "arbitrarily and capriciously" by implementing a binding presidential directive.

**\*25** The President's Executive Order 14026 clearly sets the amount and timing of the minimum-wage requirement. It expressly requires that, as of January 30, 2022, workers performing on or in connection with covered contracts must be paid $15 per hour unless exempt. *See* 86 Fed. Reg. at 22,835. It then directs the Secretary of Labor to "issue regulations by November 24, 2021, to implement the requirements of this order," which "shall include both definitions of relevant terms and, as appropriate, exclusions from the requirements of this order." *See id.* at 22,836.

The Department was evidently aware of its authority to exclude certain types of contracts or contractors from the minimum-wage requirement, given its decision to create "an exclusion from coverage for" workers covered by the Fair Labor Standards Act "who spend less than 20 percent of their work hours in a workweek performing 'in connection with' covered contracts." 86 Fed. Reg. at 67,217; *see also id.* at 67,227 (codified at 29 C.F.R. § 23.40 (2024))

(full set of exclusions). But as the Department explained in its implementing rule, the President's order did not give it authority to modify the amount or timing of the minimum-wage requirement. *See* 86 Fed. Reg. at 67,130. The Department did not act arbitrarily or capriciously by declining to consider alternatives it could not modify because those choices would have contravened the President's clear directive, and the President is the head and embodiment of the Executive Branch.

I respectfully dissent.

**All Citations**

--- F.4th ----, 2024 WL 4675411

---

## Footnotes

1    Appellants also assert that DOL had to articulate that its rule was carrying out an operative section of the FPASA to survive APA review. Although an agency must articulate reasons for issuing a rule under arbitrary-or-capricious review, the same is not true for legal authority. In issuing a rule, an agency either acts in accordance with the law or it does not, regardless of the justifications explained in the rule's preamble.

2    Make no mistake, as the dissent acknowledges, 🚩*Mayes* is no longer binding law. *See* ⚠️*Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n.2 (9th Cir. 1991) ("[A] decision that has been vacated has no precedential authority whatsoever.").

3    In her dissenting opinion, Judge Eid reasoned that if the FPASA "grants the President nearly unfettered power to create any policy he considers necessary to carry out nonpersonal services under the guise of economy and efficiency," then it lacks an intelligible principle and violates the non-delegation doctrine. 🚩*Bradford, 101 F.4th at 733* (Eid, J., dissenting). Appellants have not raised the non-delegation argument on appeal.

4    The dissent misunderstands this analysis as a "search" for a "statutory provision specifically referencing a $15 minimum wage for work on federal projects." Dissent at ——, ——. Not so. We ask whether an operative provision in the FPASA can be read to permit a minimum wage mandate, not whether Congress had the foresight to "explicitly authorize" specific wages "for government contractors and workers that the infinitely various contractual circumstances may require." *Georgia, 46 F.4th at 1311* (Anderson, J., concurring in part and dissenting in part).

5    The minimum wage mandate also exceeds the President's authority under FPASA by including within its scope subcontractors, lessors, licensees, and permittees. *See* 86 Fed. Reg. at 22,835. The Government argues that Appellants lack standing to challenge the executive order as it pertains to these entities because Appellants do not allege that any of their arms are federal subcontractors, lessors, licensees, or permittees. But the district court correctly held that the states had standing because it was "more than merely speculative" that in-state companies paying higher wages would make larger deductions from their "state taxable incomes" and cause the states to "incur unemployment insurance expenses." 🚩*Arizona, 2023 WL 120966, at \*4*; *cf.* 🚩*Dep't of Com. v. New York*, 588 U.S. 752, 768, 139 S.Ct. 2551, 204 L.Ed.2d 978 (2019). The Government argues that the Supreme Court's subsequent decision in 🚩*United States v. Texas*, 599 U.S. 670, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023), defeats that standing argument. But that case pertained to prosecutorial inaction where the injury was not redressable. 🚩*Id. at 678, 143 S.Ct. 1964.* In this case, the injury is

redressable. The requested injunction will relieve such entities from paying higher wages and making larger deductions from their taxable incomes.

6　　Because we conclude that the major questions doctrine does not apply under the standard established in 🚩*West Virginia*, we do not address the Government's separate argument that this doctrine does not apply to congressional delegations of authority to the President, as opposed to executive agencies.

7　　The Tenth Circuit majority in 🚩*Bradford* reached a similarly wrong conclusion. 🚩101 F.4th at 731. For reasons we explain, we are unpersuaded by the Tenth Circuit majority.

8　　The text of the APA also suggests that 🚩*Franklin* was wrong. The APA's definition of "agency" includes "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," but does not include Congress, the courts, or the governments of the territories, possessions, or the District of Columbia. 🚩5 U.S.C. § 701(b)(1). The President is an "authority of the Government," and he is not excluded from the definition. *See id.* Even when we are bound by precedent, precedent not in accordance with the text of the APA should not be expanded. *See* 🚩*Garza v. Idaho*, 586 U.S. 232, 259, 139 S.Ct. 738, 203 L.Ed.2d 77 (2019) (Thomas, J., dissenting) (when precedent misconstrues statutory text as an "original matter, the Court should tread carefully before extending" it).

1　　Article II also vests the President with certain inherent constitutional powers. *See* 🚩*Trump v. United States*, 603 U.S. 593, 144 S. Ct. 2312, 2327–28, 219 L.Ed.2d 991 (2024). For example, the President has constitutionally derived authority over pardons and many aspects of foreign affairs. *Id.* That authority "is sometimes 'conclusive and preclusive,' " and the President "may act even when the measures he takes are 'incompatible with the expressed or implied will of Congress.' " *Id.* at 2327 (quoting 🚩*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637, 638, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring)). It follows that the major questions doctrine has less force when Congress delegates authority to the President in areas where he already enjoys innate constitutional power. *See* 🚩*Youngstown*, 343 U.S. at 635–37, 72 S.Ct. 863 (Jackson, J., concurring). But this is not such a case. The President's procurement authority stems from the FPASA, not the Constitution.

2　　🚩*Mayes* broke from three other circuits that have applied the major questions doctrine to actions by the President. *See Louisiana*, 55 F.4th at 1031 n.40; 🚩*Georgia v. President of the U.S.*, 46 F.4th 1283, 1295–96 (11th Cir. 2022) (Grant, J.); 🚩*Kentucky v. Biden*, 23 F.4th 585, 606–08 (6th Cir. 2022).

1　　Before the **Procurement Act**, no centralized agency organized the procurement activities of the federal government, which led to "shocking instances of wasteful practices and poor business management" in the government's supply operations. *See* 🚩*Georgia v. President of the U.S.*, 46 F.4th 1283, 1293 (11th Cir. 2022) (Grant, J.) (quoting Commission on Organization of the Executive Branch of the Government, *Concluding Report* 2 (1949)). Congress passed the **Procurement Act** to fix that problem. *See* 🚩*id.*

2　　"[T]he President's view of his own authority under a statute is not controlling, but when that view has been acted upon over a substantial period of time without eliciting congressional reversal, it is 'entitled to great respect.' " *See* 🚩*AFL-CIO v. Kahn*, 618 F.2d 784, 790 (D.C. Cir. 1979) (en banc) (citation omitted); *cf. Bd. of Governors of Fed. Rsrv. Sys. v. First Lincolnwood Corp.*, 439 U.S. 234, 248, 99 S.Ct. 505, 58 L.Ed.2d 484 (1978) ("[A]n agency's long-standing construction of its statutory mandate is entitled to great respect, 'especially when Congress has refused to alter the administrative construction.' " (citations omitted)).

And here, rather than elicit congressional reversal, Congress *recodified* the **Procurement Act** without any substantive change in 1986, 1996, and 2002. *See, e.g.*, Pub. L. No. 99-500, 100 Stat. 1783, 1783-345 (1986); Pub. L. No. 99-591, 100 Stat. 3341, 3341-345 (1986); Pub. L. No. 104-208, 110 Stat. 3009, 3009-337 (1996); Pub. L. No. 107-217, 116 Stat. 1062, 1063, 1068 (2002).

3    Although 🚩*Mayes* was later vacated as moot, we have repeatedly recognized that " '[v]acated opinions remain persuasive, although not binding, authority.' " *Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 717 n.10 (9th Cir. 2023) (quoting 🏷*Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2002)).

4    Specifically, Illinois, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin ("amici States") submitted an amicus brief in support of Defendants-Appellees.

5    In the **Procurement Act's** long history, only a recent decision by the Sixth Circuit and a single-judge opinion from the Eleventh Circuit have endorsed similar lines of reasoning. *See Commonwealth v. Biden*, 57 F.4th 545, 552 (6th Cir. 2023); 🏷*Georgia*, 46 F.4th at 1293 (Grant, J.). The majority also suggests that a footnote in 🏷*Chrysler Corp.*, 441 U.S. at 304 n.34, 99 S.Ct. 1705, "endorsed" its restrictive reading of ❓Section 121(a), *see* Maj. Op. at ——, but that is not so. Most courts that have analyzed the President's authority under ❓Section 121(a) have either ignored or construed the 🏷*Chrysler* footnote for what it is—clearly dicta. *See, e.g.*, 🏷*Louisiana v. Biden*, 55 F.4th 1017, 1026 n.24 (5th Cir. 2022); 🏷*Mayes*, 67 F.4th at 940–43, *vacated as moot*, 89 F.4th 1186; *Biden*, 57 F.4th at 551–55; *see also* 🏷*Georgia*, 46 F.4th at 1310 (Anderson, J., concurring in part and dissenting in part) (explaining that " 🏷*Chrysler* expressly disavows" any requirement that "delegated authority must always be tied to a specific statutory provision").

6    The minimum wage increase order here would affect far fewer individuals than the cases in which the Supreme Court has invoked the major questions doctrine. *See, e.g.*, 🏷*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 115, 142 S.Ct. 661, 211 L.Ed.2d 448 (2022) (per curiam) (invoking the major questions doctrine where an emergency rule concerning employee vaccinations would have affected 84 million workers); 🏷*Biden v. Nebraska*, —— U.S. ——, 143 S. Ct. 2355, 2372, 216 L.Ed.2d 1063 (2023) (applying doctrine to loan forgiveness program that would "release 43 million borrowers from their obligations to repay $430 billion in student loans"); 🏷*West Virginia*, 597 U.S. at 715, 142 S.Ct. 2587 (applying doctrine to agency action that "would reduce GDP by at least a trillion 2009 dollars by 2040" (citation omitted)); 🏷*King v. Burwell*, 576 U.S. 473, 485, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015) (concluding that implementation of tax credits under the Affordable Care Act constitutes a major question, since those tax credits "involv[e] billions of dollars in spending each year and affect[ ] the price of health insurance for millions of people").

---

End of Document                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.