# United States Court of Appeals for the Fifth Circuit

---

No. 23-40671

---

United States Court of Appeals
Fifth Circuit

**FILED**

February 4, 2025

Lyle W. Cayce
Clerk

STATE OF TEXAS; STATE OF MISSISSIPPI; STATE OF
LOUISIANA,

*Plaintiffs—Appellees,*

*versus*

PRESIDENT DONALD J. TRUMP, *in his official capacity as President of the
United States*; DEPARTMENT OF LABOR; VINCENT MICONE, *Acting
Secretary, U.S. Department of Labor, in his official capacity as United States
Acting Secretary of Labor*; JESSICA LOOMAN, *in her official capacity as
Administrator of the United States Department of Labor, Wage & Hour
Division*,

*Defendants—Appellants.*[1]

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 6:22-CV-4

---

Before CLEMENT, GRAVES, and RAMIREZ, *Circuit Judges*.

IRMA CARRILLO RAMIREZ, *Circuit Judge*:

---

[1] President Donald J. Trump and Acting Secretary of Labor Vincent Micone are
automatically substituted for President Joseph R. Biden and Secretary of Labor Julie A. Su
as parties in this case. *See* FED. R. APP. P. 43(c).

No. 23-40671

Three states challenged an executive order instructing various federal agencies to require parties with which they contract to pay their workers a $15 minimum hourly wage. The district court permanently enjoined the executive order. We REVERSE and REMAND for further proceedings.

I

On April 27, 2021, President Joseph R. Biden issued Executive Order 14,026 (the "EO"), which ordered various federal agencies to "ensure that their contracts" contain "a clause requiring that contractors and any covered subcontractors agree to" pay specified workers a $15 minimum wage. The President issued the EO titled "Increasing the Minimum Wage for Federal Contractors" under "the authority vested in [him] as President by the Constitution and the laws of the United States of America, including the Federal Property and Administrative Services Act." Exec. Order No. 14,026, 86 Fed. Reg. 22835, 22835 (Apr. 27, 2021).

On February 10, 2022, Texas, Louisiana, and Mississippi (the "States") sued the President, the then-Secretary of Labor, and the then-Acting Administrator of the Department of Labor's Wage & Hour Division in their official capacities (collectively, the "Federal Government"), in the United States District Court for the Southern District of Texas. The States asserted five counts: (I) the President acted *ultra vires* in issuing the EO; (II) the EO and the Department of Labor's final rule implementing the EO (the "Final Rule") violate the APA for not being in accordance with law or for being in excess of statutory authority; (III) the EO and the Final Rule violate the APA as arbitrary and capricious; (IV) Congress's delegation of authority to the President under the Federal Property and Administrative Services Act of 1949, 40 U.S.C. §§ 101 *et seq.* (the "FPASA") violates the nondelegation doctrine; and (V) the EO and

No. 23-40671

the Final Rule constitute an unconstitutional exercise of Congress's spending power.

On September 26, 2023, the district court granted in part and denied in part the parties' dispositive cross-motions. *See Texas v. Biden*, 694 F. Supp. 3d 851 (S.D. Tex. 2023). It determined that the FPASA does not provide the President "broad policy-making authority to set the minimum wage of certain employees of federal contractors and subcontractors," and instead "limit[s] the President to a supervisory role in policy implementation." *Id.* at 866. The district court then applied the major questions doctrine, finding that the EO "is a major question," so the FPASA did not authorize the President "to raise the minimum wage paid by federal contractors and subcontractors." *Id.* at 867. The district court also found that the EO could not be reviewed under the APA because it is "presidential action immune from APA review." *Id.* at 870. It declined to consider the remaining merits issues because it had already found that the EO exceeded the President's authority under the FPASA. *See id.* at 870–72. Turning to the remaining injunctive-relief elements and finding each present,[2] the district court ultimately (i) entered judgment for the States on Count I, (ii) entered judgment for the Federal Government as to the EO on Counts II and III, and (iii) enjoined the Federal Government "from enforcing [the EO] and the Final Rule against [the States] and their agencies." *Id.* at 872–74.

The Federal Government timely appealed under 28 U.S.C. § 1291.

## II

Permanent injunctions are reviewed on appeal for abuse of discretion. *Young Conservatives of Tex. Found. v. Smatresk*, 73 F.4th 304, 308 (5th Cir.

---

[2] Because the Federal Government did not present arguments regarding the remaining injunctive-relief factors in its briefing, we do not consider them here.

2023). This review is "segmented" though, "such that 'we will review the district court's findings of fact under the clearly erroneous standard, and the conclusions of law under the *de novo* standard.'" *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (per curiam) (quoting *Peaches Ent. Corp. v. Ent. Repertoire Assocs.*, 62 F.3d 690, 693 (5th Cir. 1995)); *see Med-Cert Home Care, L.L.C. v. Becerra*, 19 F.4th 828, 830 (5th Cir. 2021) (reviewing a permanent injunction "for abuse of discretion[] and the legal issues underlying the grant of the injunction *de novo*"). "A district court abuses its discretion when it relies on clearly erroneous factual findings, relies on erroneous conclusions of law, or misapplies the law to the facts." *K.P. v. LeBlanc*, 729 F.3d 427, 435 (5th Cir. 2013).

## III

### A

The FPASA "provide[s] the [f]ederal [g]overnment with an economical and efficient system" for, among other things, "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. § 101(1). The FPASA authorizes the President to "prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle." *Id.* § 121(a). Since its enactment, the FPASA has served as the basis for numerous executive orders issued by presidents representing both major political parties. *See, e.g.*, *Chamber of Com. v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996) (Bill Clinton); *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 362 (D.C. Cir. 2003) (George W. Bush); *see also Louisiana v. Biden*, 55 F.4th 1017, 1023–27 (5th Cir. 2022) (recounting previous challenges to the FPASA-based executive orders).

Relying on the authority vested in him "as President by the Constitution and the laws of the United States of America, including [the FPASA], 40 U.S.C. 101 et seq.," President Biden declared:

> This order promotes economy and efficiency in Federal procurement by increasing the hourly minimum wage paid by the parties that contract with the Federal Government to $15.00 for those workers working on or in connection with a Federal Government contract as described in section 8 of this order. Raising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs. Accordingly, ensuring that Federal contractors pay their workers an hourly wage of at least $15.00 will bolster economy and efficiency in Federal procurement.

Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. at 22835; *see also Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 714–15 (10th Cir. 2024) (providing pertinent regulatory history). The President issued the EO "to promote economy and efficiency in procurement by contracting with sources that adequately compensate their workers." Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. at 22835. Sections 8 and 9 of the EO detail its applicability, effective date, and any exceptions that may apply. *See id.* at 22837–38. In general, the EO (i) applies "to any new contract; new contract-like instrument; new solicitation; extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument" if "it is a procurement contract or contract-like instrument for services or construction," and (ii) became effective immediately. *Id.* at 22837.[3]

---

[3] The district court did not consider the validity of the Final Rule, but it recognized that the EO and the Final Rule are legally distinct actions taken by different government

B

This appeal centers on a single question: Is the EO a permissible exercise of the President's authority under the FPASA?[4]

The starting point in statutory interpretation, as always, is the text. *Ross v. Blake*, 578 U.S. 632, 638 (2016). "[S]tatutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (internal quotations omitted). "Absent congressional direction to the contrary, words in statutes are to be construed according to 'their ordinary, contemporary, common meanings.'" *Kennedy v. Tex. Utils.*, 179 F.3d 258, 261 (5th Cir. 1999) (brackets omitted) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993)). Because statutory language "cannot be interpreted apart from context," *Smith v. United States*, 508 U.S. 223, 229 (1993), it is necessary to examine "the structure and language of the statute as a whole," *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 503 U.S. 407, 417 (1992). *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[T]he words of a statute must be read

---

actors. *See Texas*, 694 F. Supp. 3d at 869–71. So even though the parties support their arguments on appeal with aspects of the Final Rule, the Final Rule is not analytically relevant to the FPASA determination regarding the EO.

[4] The question presented concerns the President's exercise of *statutory* authority. The President's *constitutional* authority to take these actions is not presently before us. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020) ("As Madison explained, 'If any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.'" (brackets omitted) (quoting 1 ANNALS OF CONG. 463 (1789))); *see also* Kevin M. Stack, *The Reviewability of the President's Statutory Powers*, 62 VAND. L. REV. 1171, 1208–12 (2009) (discussing whether judicial review of "the President's assertions of statutory power is inconsistent with the President's powers under Article II and the separation of powers"); Evan D. Bernick, *Faithful Execution: Where Administrative Law Meets the Constitution*, 108 GEO. L.J. 1, 51 (2019) ("If a given statute is properly read to delegate discretion to the President, judges must consider whether the Take Care Clause has been triggered through presidential action.").

in their context and with a view to their place in the overall statutory scheme."). The interpretive inquiry ends if the statutory language is clear and unambiguous. *First Am. Bank v. Resol. Tr. Corp.*, 30 F.3d 644, 647 (5th Cir. 1994).

1

a

The parties agree that § 121(a) contains the FPASA's substantive grant of authority to the President. *See Louisiana*, 55 F.4th at 1023 n.17. It reads: "The President may prescribe policies and directives that the President considers necessary to carry out this subtitle. The policies must be consistent with this subtitle."[5] 40 U.S.C. § 121(a).

Because the authority to "prescribe policies and directives" delegated to the President by the text of § 121(a) "may" be exercised, it is discretionary. *See, e.g.*, *United States v. Doe*, 932 F.3d 279, 282 (5th Cir. 2019) ("The rule is entirely discretionary—if the district court finds X, then it may do Y." (emphasis omitted)). The "policies and directives" issued under § 121(a) must be "necessary to carry out this subtitle"; this determination of necessity is committed to the President. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 684 (2018). Finally, the policies the President prescribes must be objectively "consistent with this subtitle." *See, e.g.*, *Cappaert v. United States*, 426 U.S. 128, 141–42 (1976).

Two words and a phrase in the statute—"necessary," "consistent," and "to carry out"—are not defined, so they must be given their ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012); *see Cascabel Cattle Co. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020) ("We

---

[5] The provisions constituting "this subtitle" are identified in 40 U.S.C. § 111.

often look to dictionary definitions for help in discerning a word's ordinary meaning.").[6] "Necessary" means "[i]ndispensable, vital, essential; requisite." "Consistent" means "[m]arked by consistency," *i.e.*, "agreement, harmony, [or] compatibility." And "to carry out" means "to put (something) into action or practice; to cause (something) to be implemented; to undertake."

Together, the statute's plain language sets forth two requirements for the President to "prescribe policies and directives" under § 121(a): (1) the President must *subjectively* determine that the policy or directive prescribed is (a) indispensable, vital, essential, or requisite (b) to cause at least one provision listed in 40 U.S.C. § 111 to be implemented; and (2) the policy or directive the President prescribes must be *objectively* harmonious, compatible, or otherwise not inconsistent with the provisions listed in 40 U.S.C. § 111.

b

The EO states that its purpose is "to promote economy and efficiency in procurement by contracting with sources that adequately compensate their workers." Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. at 22835. This purpose is consistent with carrying out one of the provisions of the relevant subtitle. *See* 40 U.S.C. § 101(1). The EO's language also shows the President determined that "contracting with sources that adequately compensate their workers" is vital or essential to carrying out § 101.[7] *See* Increasing the Minimum Wage for Federal Contractors, 86 Fed.

---

[6] The dictionary definitions in this opinion come from the online edition of the Oxford English Dictionary, which was last visited on February 4, 2025.

[7] While the President provided this explanation in the EO, § 121(a)'s text does not appear to require as much. *See, e.g.*, *Trump*, 585 U.S. at 686–87.

Reg. at 22835. Accordingly, the first requirement under § 121(a) is satisfied here.

As for the second requirement, the parties focus their attention on the EO's consistency with § 101. This presents a question of first impression in our circuit: What test should be applied to determine whether the EO is harmonious, compatible, or otherwise not inconsistent with § 101? *See Louisiana*, 55 F.4th at 1026 n.25 (declining to identify a test for this inquiry). Of our sister circuits that have considered this question, all but one have adopted one of two tests: (1) whether a "sufficiently close nexus" exists between § 101's "criteria" and the prescribed policy or directive, *AFL-CIO v. Kahn*, 618 F.2d 784, 792 (D.C. Cir. 1979) (en banc), and (2) whether the prescribed policy or directive "reasonably relate[s] to [the FPASA]'s purpose of ensuring efficiency and economy in government procurement," *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th Cir. 1981). Because both these tests "yield the same result" here, it is unnecessary "to provide a definitive standard." *Mayes v. Biden*, 67 F.4th 921, 940 n.33 (9th Cir.) *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023); *see* David M. Driesen, *Judicial Review of Executive Orders' Rationality*, 98 B.U. L. Rev. 1013, 1061 (2018) ("Many of the decisions undertaking reasonableness review of executive orders (without calling it that) arise under [the FPASA].").

The ordinary meaning of "economy" is "[t]he management or administration of the material resources of a community, discipline, or other organized body; the art or science of managing such resources," and the ordinary meaning of "efficiency" is "[f]itness or power to accomplish, or success in accomplishing, the purpose intended; adequate power, effectiveness, efficacy." These words are "not narrow terms," and in the context of federal procurement, economy and efficiency include "factors like price, quality, suitability, and availability of goods or services that are involved in all acquisition decisions." *Kahn*, 618 F.2d at 789. The EO speaks

directly to these factors, including price of services, quality of goods and services, and availability of services. *See* Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. at 22835 ("Raising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs."); *see also Mayes*, 67 F.4th at 942 (noting the EO's "close[] relat[ion] to the ordinary management of labor"). This link between the EO and the economy and efficiency of the federal procurement system satisfies either the "sufficiently close nexus" or the "reasonably related" test. *See Kahn*, 618 F.2d at 792–93; *Liberty Mut.*, 639 F.2d at 170–72. The second requirement of § 121(a) is therefore also satisfied.

Because the EO satisfies both statutory requirements, the President's promulgation of the EO does not violate § 121(a).

2

The States advance a considerable number of arguments to the contrary, based on the statutory text and other considerations.

a

As for their text-based arguments, the States first contend that § 101 cannot serve as a basis for the EO because it is not "an operative provision." The Sixth, Ninth, and Eleventh Circuits have adopted this argument, finding that § 101 is not a source of the President's authority. *Kentucky v. Biden*, 23 F.4th 585, 604 (6th Cir. 2022); *Nebraska v. Su*, 121 F.4th 1, 11 (9th Cir. 2024); *Georgia v. President of the U.S.*, 46 F.4th 1283, 1298 (11th Cir. 2022). But the FPASA's text does not use the term "operative" or classify any provisions as "operative." Instead, § 121(a) requires the policies or directives prescribed by the President to be, in the President's judgment, necessary to carry out "this subtitle," and Congress expressly determined that § 101 is

part of "this subtitle." 40 U.S.C. § 111(1); *see Louisiana*, 55 F.4th at 1023 n.17; *Georgia*, 46 F.4th at 1311 (ANDERSON, J., concurring in part and dissenting in part) (stating that § 101 is "actually located within the subtitle and therefore is part of the subtitle that § 121 gives the President the authority to carry out"). Neither our precedent nor the FPASA itself excludes § 101 from the "this subtitle" language in § 121(a). Indeed, *Louisiana v. Biden* seems to reach a conclusion different from the Sixth, Ninth, and Eleventh Circuits: "To the extent that 40 U.S.C. § 121 authorizes the President to prescribe policies and directives concerning contracting, we agree that the statement of purpose acts as a set of guidelines within which those policies must reside." 55 F.4th at 1023 n.17. It rejected the notion that the Supreme Court has imposed "a narrowing instruction for interpretation of the [FPASA]." *Id.* at 1026 n.24; *Chrysler Corp. v. Brown*, 441 U.S. 281, 308 (1979) ("This is not to say that any grant of legislative authority to a federal agency by Congress must be specific before regulations promulgated pursuant to it can be binding . . . . What is important is that the reviewing court reasonably be able to conclude that the grant of authority contemplates the regulations issued.").

Relatedly, the States contend that § 121(a) does not grant "standalone authority" to the President but rather supplements "substantive" authority already granted under the FPASA. The FPASA's text does not use the term "substantive" or classify any of its provisions as "substantive." The States do not show that being "consistent with this subtitle" requires the EO to be coupled with any particular provision of the FPASA. Under the FPASA, a policy or directive need only (1) carry out the relevant subtitle as determined by the President, and (2) not objectively conflict with a provision in that subtitle. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed

No. 23-40671

by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.").

Crediting the States' argument that Congress intended for § 121(a) to be understood more narrowly would require us to read an exception into Congress's enactment, which we cannot do. *See Bostock v. Clayton County*, 590 U.S. 644, 669 (2020) (holding that "Congress's failure to speak directly to a specific case that falls within a more general statutory rule" does not "create[] a tacit exception" to that rule); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 101 (2012) ("[T]he presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions.").

Second, the States contend that the FPASA's "structure" demonstrates § 121(a)'s "limited" scope. This argument invokes the whole-text canon of construction, which instructs courts to read statutory language "in [its] context and with a view to [its] place in the overall statutory scheme." *Davis*, 489 U.S. at 809. "Properly applied, it typically establishes that only one of the possible meanings [of] a word or phrase . . . would cause [a] provision to clash with another portion of the statute." Scalia & Garner, *supra*, at 168. The States do not identify a provision in the relevant subtitle that is inconsistent with the EO. They offer a hypothetical, premised on a regulation that, unlike here, would directly contradict a provision in the FPASA's relevant subtitle.

As part of their second argument, the States also claim that many provisions in the relevant subtitle are "directed at the economy and efficiency of the federal government's procurement method or process, not its contractors," so the EO's effect on contractors "inherently frustrates" the FPASA's scheme. This argument focuses on a perceived function of the

No. 23-40671

FPASA's scheme rather than the statutory text. Even if, as the States contend, Congress intended the FPASA to (i) aid the economy and efficiency of the federal procurement system, and (ii) leave contractors untouched, § 121(a)'s plain language is clear and unambiguous. We cannot "rewrite the statute so that it covers only what [the States] think is necessary to achieve what [they] think Congress really intended." *Lewis v. City of Chicago*, 560 U.S. 205, 215 (2010); *see Sackett v. EPA*, 598 U.S. 651, 714 (2023) (Kagan, J., concurring in the judgment) ("[A] court may not rewrite Congress's plain instructions because they go further than preferred."). We cannot "displace ordinary statutory terms with judicial 'speculation as to Congress's intent.'" *Pulsifer v. United States*, 601 U.S. 124, 179 (2024) (Gorsuch, J., dissenting) (brackets omitted) (quoting *Magwood v. Patterson*, 561 U.S. 320, 334 (2010)). Statutes are interpreted "according to [their] plain language," and we deviate from this path only where "a clear contrary legislative intention is shown." *United States v. Scrimgeour*, 636 F.2d 1019, 1022–23 (5th Cir. Unit B Feb. 1981). Because the provisions in the relevant subtitle do not demonstrate a "clearly contrary" intent from Congress, § 121(a)'s plain language controls.[8]

In their third argument, the States contend that "[a]nother set of laws" shows that the FPASA "was not designed to address a minimum

---

[8] Even assuming *arguendo* that the States are generally correct about the scope of the President's authority under the FPASA, the President did not act *ultra vires* when he issued the EO simply because the EO effects a policy that the States claim Congress did not intend. *See Bostock*, 590 U.S. at 674 ("'[T]hat a statute has been applied in situations not expressly anticipated by Congress' . . . simply 'demonstrates the breadth' of a legislative command." (original alterations omitted) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985))). The Supreme Court has been clear that when an application of a law "emerges that is both unexpected and important," courts cannot "decline to enforce the plain terms of the law" and "refer the subject back to Congress." *Id.* at 676.

No. 23-40671

wage." Comparisons to other statutes, however, are impermissible if the statutory language at issue is clear and unambiguous. *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 289 (5th Cir. 2012). Because § 121(a) is clear and unambiguous, the States' comparative argument cannot be properly considered. Regardless, the States do not identify anything in the wage statutes that contradicts the EO's language.

Fourth, the States contend the Federal Government's reading of § 121(a) is considerably overbroad. Given the statute's plain language on this account, nearly all courts around the country have recognized the breadth of the President's authority under § 121(a). *E.g.*, *Farkas v. Tex. Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967) (noting the "broad authority" the FPASA gives to the President); *Bradford*, 101 F.4th at 735 (EID, J., dissenting) (recognizing that "the FPASA gives the President nearly unfettered power to regulate any nonpersonal service via any contract-like instrument"); *Chao*, 325 F.3d at 366 (recognizing "the necessary flexibility and 'broad-ranging authority'" the FPASA provides the President); *Georgia*, 46 F.4th at 1315 (ANDERSON, J., concurring in part and dissenting in part) ("[T]he delegation to the President [under the FPASA] provides broad discretion to achieve broad goals."); *see Louisiana*, 55 F.4th at 1028 ("[The FPASA] introduces no serious limit on the President's authority and, in fact, places discernment explicitly in the President's hands."); *see also Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 31–32 (1827) (STORY, J.) ("Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts.").

Congress knows how to enact statutes of various scopes and breadths. And it is well aware that courts give clear and unambiguous statutory language its ordinary meaning. So when Congress uses broad language that is

No. 23-40671

clear and unambiguous, it intends for courts to give effect to it all the same. *See* SCALIA & GARNER, *supra*, at 101 ("[G]eneral words (like all words, general or not) are to be accorded their full and fair scope. They are not to be arbitrarily limited."); *see also Dames & Moore v. Regan*, 453 U.S. 654, 678 (1981) ("Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take or every possible situation in which he might act.").

b

The States offer two additional arguments that are not based on the statutory text.

First, the States contend that because the original purpose of the FPASA was to "[e]liminat[e] the 'shocking instances of wasteful practices and poor business management' in government procurement practices," the President transgressed his "inherently limited" authority under the FPASA.[9] But "[g]iven the clear meaning of the text, there is no need to resolve this dispute or to consult the purpose of [the statute] at all." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004); *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) ("[T]he text of a law controls over purported legislative intentions . . . ." (quoting *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022))); *see also* SCALIA & GARNER, *supra*, at 56 ("[T]he purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires.").

_____

[9] The States reference the FPASA's legislative history to support their argument. But "there is no need to refer to . . . legislative history" since § 121(a) is clear and unambiguous. *United States v. Second Nat. Bank of N. Mia.*, 502 F.2d 535, 540 (5th Cir. 1974); *see Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").

No. 23-40671

"Where, as here, the language of a provision is sufficiently clear in its context . . . , there is no occasion to examine the additional considerations of 'policy' that may have influenced the lawmakers in their formulation of the statute." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam) (cleaned up) (quoting *Aaron v. SEC*, 446 U.S. 680, 695 (1980)). Courts cannot elevate a party's conception of a statute's purpose over the plain text. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.").

Second, the States contend the EO violates the FPASA because the EO does not effect a policy that furthers the economy and efficiency of the federal procurement system. The economics of the EO are not a matter for federal courts. *See, e.g.*, *Lochner v. New York*, 198 U.S. 45, 72 (1905) (HARLAN, J., dissenting) ("I do not stop to consider whether any particular view of this economic question presents the sounder theory."), *overruled by Day-Brite Lighting, Inc. v. Missouri*, 342 U.S. 421 (1952), *and overruled by Ferguson v. Skrupa*, 372 U.S. 726 (1963), *and abrogated by W. Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 227 (5th Cir. 2013) ("We deploy no economic theory of social statics or draw upon a judicial vision of free enterprise.")[10]; *cf. Newspaper Ass'n of Am. v. Postal Regul. Comm'n*, 734 F.3d 1208, 1216 (D.C. Cir. 2013) ("When, as here, an agency is making 'predictive judgments about the likely economic effects of a rule,' we are particularly loath to second-guess its analysis." (quoting

_____

[10] Some of the cited authorities concern judicial review of legislative enactments rather than executive action. The logic is nevertheless analogous because this appeal concerns presidential exercise of *statutory* authority. *See* Kevin M. Stack, *The Statutory President*, 90 IOWA L. REV. 539, 543 (2005) ("[T]he president's accountability, visibility, and ability to coordinate policy provide strong reasons for presuming that Congress would prefer that the president's assertions of statutory authority be reviewed deferentially.").

No. 23-40671

*Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009) (Kavanaugh, J.))).

Article III courts "decide only matters 'of a Judiciary Nature.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting 2 The Records of the Federal Convention of 1787 430 (Max Farrand ed., 1966) (statement of James Madison)). Because federal judges do not possess "special expertise or authority to declare . . . what a self-governing people should consider just or wise," *Bostock*, 590 U.S. at 681, it is not within our institutional competence to "second-guess the wisdom" of "policy choice[s]." *Mansell v. Mansell*, 490 U.S. 581, 594 (1989). *See Nebbia v. New York*, 291 U.S. 502, 537 (1934) ("With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal.").

Precedent makes clear that the President's justifications for issuing the EO and the States' corresponding counterarguments are policy considerations that we cannot weigh. So long as the EO passes muster under the FPASA's plain language, we have no role left to play, *see Mansell*, 490 U.S. at 594—otherwise, we might "impermissibly micromanag[e] the [P]resident's decision-making process or otherwise compromis[e] the Constitution's separation of powers," Lisa Manheim & Kathryn A. Watts, *Reviewing Presidential Orders*, 86 U. Chi. L. Rev. 1743, 1813 (2019). A different outcome must come from Congress or the President, not the federal courts. *See Munn v. Illinois*, 94 U.S. (4 Otto) 113, 134 (1876) ("For protection against abuses by legislatures the people must resort to the polls, not to the courts."); *see also, e.g.*, *Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019) ("[C]ourts aren't free to rewrite clear statutes under the banner of our own policy concerns. If the [complainant] doesn't like Congress's . . . policy choices, it must take its complaints there.").

No. 23-40671

\*　　\*　　\*

40 U.S.C. § 121(a)'s language is clear and unambiguous: The President may prescribe policies or directives the President considers necessary to carry out the provisions under § 111, so long as such policies or directives do not conflict with those provisions. The EO falls within this statutory authorization and is therefore a valid exercise of the President's authority under the FPASA.

## IV

The parties also dispute whether the EO violates the major questions doctrine.[11]

## A

Initially, we consider whether the major questions doctrine may be applied here.

First, the major questions doctrine applies when a question exists as to a statute's linguistic clarity. *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("[I]n certain extraordinary cases, both separation of powers principles and a practical understanding of legislative intent make us 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there."); *Gundy v. United States*, 588 U.S. 128, 167 (2019) (GORSUCH, J., dissenting) ("[A]n agency can fill in statutory gaps where 'statutory circumstances' indicate that Congress meant to grant it such powers. But we don't follow that rule when the 'statutory gap' concerns 'a question of deep "economic and political significance" that is central to the

---

[11] The rule of orderliness binds us to apply the major questions doctrine to congressional delegations of authority to the President. *See Louisiana*, 55 F.4th at 1031 n.40. *But see Mayes*, 67 F.4th at 932–34 (explaining why the major questions doctrine does not apply to presidential actions).

No. 23-40671

statutory scheme.'" (footnote omitted)). As discussed *supra*, § 121(a)'s text is clear and unambiguous—no issue of linguistic clarity exists. *See Kovac v. Wray*, 109 F.4th 331, 335 (5th Cir. 2024) ("We need not analyze whether the major questions doctrine applies . . . if the relevant statutes provide 'clear congressional authorization.'" (quoting *West Virginia*, 597 U.S. at 724)). This major-questions prerequisite is therefore absent.

Second, the major questions doctrine has yet to be applied to the government's exercise of proprietary, as opposed to regulatory, authority. *See Mayes*, 67 F.4th at 935–36; *Georgia*, 46 F.4th at 1314–15 (ANDERSON, J., concurring in part and dissenting in part); *see also Louisiana*, 55 F.4th at 1032 (acknowledging that the distinction between proprietary and regulatory authority "may carry more weight" if the government's assertion of authority under the FPASA is proprietary). "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127 (1940). The government is less restricted when exercising its proprietary authority as opposed to its regulatory authority. *See NASA v. Nelson*, 562 U.S. 134, 148 (2011). Here, the EO "reflects the President's management decision that the federal government will do business with companies only on terms he regards as promoting economy and efficiency," which falls within the realm of proprietary authority. *See Bradford*, 101 F.4th at 726. It is questionable whether the major questions doctrine applies to an exercise of the government's proprietary (*i.e.*, nonregulatory) authority.[12]

---

[12] The major questions doctrine may be inapplicable for an additional reason depending on the answer to an unresolved question of law: whether the major questions doctrine is "a linguistic canon, . . . a substantive canon . . . , or both." *Save Jobs USA v.*

No. 23-40671

### B

The States advance three primary arguments to the contrary.

First, the States contend that the EO's subject matter is outside the President's expertise. As the President is exercising the government's proprietary authority, the wages paid by federal contractors are directly within the President's purview. *See Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 896 (1961) (discussing the United States' ability "to manage [its] internal operation[s]" in its capacity as "proprietor").

Second, the States urge us not to "lose sight of 'common sense'" because "[i]t is not credible that Congress offhandedly empowered presidents to impose national social policies in a statute designed to streamline procurement." As discussed, the FPASA's delegation of authority to the President is clear, unambiguous, and broad—other than their policy concerns, which we cannot properly consider, the States do not explain why this outcome defies common sense under the law. *See Avion Funding, L.L.C. v. GFS Indus., L.L.C. (In re GFS Indus., L.L.C.)*, 99 F.4th 223, 232 n.11 (5th Cir. 2024) (rejecting arguments "grounded in policy considerations, not statutory text or structure").

---

*DHS*, 111 F.4th 76, 80 (D.C. Cir. 2024); *see Rest. L. Ctr. v. U.S. Dep't of Lab.*, 115 F.4th 396, 407 n.9 (5th Cir.) *opinion withdrawn and superseded on reh'g*, 120 F.4th 163 (5th Cir. 2024) ("There is some uncertainty over whether we should apply th[e major questions] doctrine as a substantive clear-statement rule or as a purely linguistic canon of construction." (citations omitted)). If the major questions doctrine is a substantive canon, the rule of orderliness precludes us from applying it because we may consult substantive canons only after determining a statute is ambiguous (which § 121(a) is not). *See Vitol, Inc. v. United States*, 30 F.4th 248, 253 (5th Cir. 2022). For now, it is unnecessary to answer this open question. *Compare West Virginia*, 597 U.S. at 736–42 (2022) (Gorsuch, J., concurring) (substantive canon), *with Biden v. Nebraska*, 143 S. Ct. 2355, 2378–83 (2023) (Barrett, J., concurring) (linguistic canon).

No. 23-40671

Third, the States contend that if Congress, through the FPASA, granted the President the authority the Federal Government asserts on appeal, then Congress violated the nondelegation doctrine. The district court declined to consider the merits of the States' nondelegation argument. *See Biden*, 694 F. Supp. 3d at 871. We ordinarily allow district courts to consider issues presented in the first instance, and there is no reason to deviate from that practice here. *See Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 957 (5th Cir. 2024).

V

We REVERSE the permanent injunction and REMAND for further proceedings consistent with this opinion.