No. 23-40671

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS; STATE OF MISSISSIPPI; STATE OF LOUISIANA,

Plaintiffs-Appellees,

v.

PRESIDENT DONALD J. TRUMP, in his official capacity as President of the United States; DEPARTMENT OF LABOR; LORI CHAVEZ-DEREMER, in her official capacity as United States Secretary of Labor; PATRICIA DAVIDSON, in her official capacity as Deputy Administrator of the United States Department of Labor, Wage & Hour Division,

Defendants-Appellants.

On Appeal from the United States District Court
for the Southern District of Texas

## RESPONSE TO PETITION FOR REHEARING EN BANC

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

NICHOLAS J. GANJEI
  *United States Attorney*

CHARLES W. SCARBOROUGH
DANIEL WINIK
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7245*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8849*

**CERTIFICATE OF INTERESTED PERSONS**

*Texas v. Trump*

A certificate of interested persons is not required under Fifth Circuit

Rule 28.2.1, as appellants are all governmental parties.

_/s/ Daniel Winik_
Daniel Winik

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ...................................................... i

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ................................................................................................ 1

STATEMENT ....................................................................................................... 2

ARGUMENT ....................................................................................................... 5

    A.    The Panel's Reasoning Was Sound ................................................. 5

    B.    Plaintiffs Have Shown No Basis For Rehearing ......................... 10

CONCLUSION .................................................................................................... 20

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*AFL-CIO v. Kahn,*
   618 F.2d 784 (D.C. Cir. 1979) .........................................................................8, 15

*Alabama Association of Realtors v. HHS,*
   594 U.S. 758 (2021) ...........................................................................................18

*Apter v. HHS,*
   80 F.4th 579 (5th Cir. 2023) .............................................................................11

*Biden v. Missouri,*
   595 U.S. 87 (2022) .............................................................................................18

*Biden v. Nebraska,*
   600 U.S. 477 (2023) .....................................................................................16, 18

*Bradford v. U.S. Department of Labor,*
   101 F.4th 707 (10th Cir. 2024) ...................................... 1, 8, 9, 10, 14, 15, 16, 17

*Building & Construction Trades Department v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002) ............................................................................13

*Central Forwarding, Inc. v. ICC,*
   698 F.2d 1266 (5th Cir. 1983) ............................................................. 11-12, 12

*Chamber of Commerce v. Napolitano,*
   648 F. Supp. 2d 726 (D. Md. 2009) ..................................................................10

*Contender Farms, L.L.P. v. U.S. Department of Agriculture,*
   779 F.3d 258 (5th Cir. 2015) .......................................................................11, 12

*Contractors Association of Eastern Pennsylvania v. Secretary of Labor,*
   442 F.2d 159 (3d Cir. 1971) ...............................................................................7

*Farkas v. Texas Instrument, Inc.,*
   375 F.2d 629 (5th Cir. 1967) ..............................................................................7

*Gundy v. United States*,
588 U.S. 128 (2019) ......................................................................13

*Liberty Mutual Insurance Co. v. Friedman*,
639 F.2d 164 (4th Cir. 1981) .................................................14, 15

*Lorillard v. Pons*,
434 U.S. 575 (1978) ........................................................................8

*Louisiana v. Biden*,
55 F.4th 1017 (5th Cir. 2022) ..................................7-8, 8, 11, 16, 17

*Mayes v. Biden*,
67 F.4th 921 (9th Cir. 2023) ..........................................................8

*McCulloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ......................................................6

*Mistretta v. United States*,
488 U.S. 361 (1989) ......................................................................12

*NASA v. Nelson*,
562 U.S. 134 (2011) ......................................................................16

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) .................................................1, 15, 17

*NFIB v. OSHA*,
595 U.S. 109 (2022) ......................................................................12

*Sturgeon v. Frost*,
587 U.S. 28 (2019) ........................................................................10

*Texas v. EPA*,
983 F.3d 826 (5th Cir. 2020) ..........................................................6

*UAW-Labor Employment & Training Corp. v. Chao*,
325 F.3d 360 (D.C. Cir. 2003) ..........................................7, 8, 10, 15

*United States v. Mississippi Power & Light Co.*,
638 F.2d 899 (5th Cir. Unit A 1981) ..............................................7

*United States v. New Orleans Public Service, Inc.*,
553 F.2d 459 (5th Cir. 1977), *vacated*, 436 U.S. 942 (1978) .............................7

*West Virginia v. EPA*,
597 U.S. 697 (2022) ....................................................................................15, 18

**Statutes:**

Federal Property and Administrative Services Act of 1949,
Pub. L. No. 81-152, 63 Stat. 377.........................................................................2
40 U.S.C. § 101 ...........................................................................8, 11
40 U.S.C. § 101(1) .........................................................................2, 5
40 U.S.C. § 111 ...................................................................................2
40 U.S.C. § 121(a) ...........................................................1, 2, 5, 6, 8

Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002)................................................8

21 U.S.C. § 393(b)(4) .........................................................................................11

40 U.S.C. § 486(a) (2000) .....................................................................................7

**Executive Branch Materials:**

Exec. Order No. 13,658,
79 Fed. Reg. 9851 (Feb. 20, 2014) .......................................................................2

Exec. Order No. 13,838,
83 Fed. Reg. 25,341 (June 1, 2018).......................................................................3

Exec. Order No. 14,026,
86 Fed. Reg. 22,835 (Apr. 30, 2021) .................................................................3, 9

Exec. Order No. 14,173,
90 Fed. Reg. 8633 (Jan. 31, 2025).......................................................................7

*Increasing the Minimum Wage for Federal Contractors*,
86 Fed. Reg. 67,126 (Nov. 24, 2021)....................................................3, 9, 10, 18

89 Fed. Reg. 79,644 (Sept. 30, 2024)....................................................................3

**Other Authorities:**

*Consistent*, Oxford English Dictionary, https://doi.org/10.1093/
OED/2753437657 (last visited Feb. 27, 2025) ..................................................6

## INTRODUCTION

For more than a decade, executive orders have required a minimum-wage clause to be inserted in certain contracts with the federal government. These orders have not set a nationwide minimum wage for all employees of federal contractors. They have simply directed agencies to enter certain contracts with companies that will pay at or above the prescribed level for work on or in connection with those contracts. The orders have reflected the determination, made by the Presidents who issued them, that the federal government benefits when its contracts are performed by sufficiently well-paid employees.

The panel here unanimously held that the current version of the order falls within the President's broad authority to "prescribe policies and directives that [he] considers necessary to carry out" the relevant "subtitle" of the U.S. Code. 40 U.S.C. § 121(a). That conclusion is consistent with this Court's and the Supreme Court's precedents, as well as with the Tenth Circuit's decision upholding this order in *Bradford v. U.S. Department of Labor,* 101 F.4th 707 (10th Cir. 2024), *cert. denied*, 2025 WL 76436 (U.S. Jan. 13, 2025). And although the Ninth Circuit held the order invalid in *Nebraska v. Su*, 121 F.4th 1 (9th Cir. 2024), that court is considering (and has ordered a response to)

the government's petition for rehearing en banc. Rehearing here is unwarranted.

## STATEMENT

1. Congress enacted the Federal Property and Administrative Services Act of 1949, Pub. L. No. 81-152, 63 Stat. 377 (codified as amended at 40 U.S.C. § 101 *et seq.*), known as the Procurement Act, "to provide the Federal Government with an economical and efficient system" for "[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." 40 U.S.C. § 101(1). The Act empowers the President to "prescribe policies and directives that [he] considers necessary to carry out this subtitle" as long as the directives are "consistent with this subtitle." *Id.* § 121(a). "[T]his subtitle," defined by 40 U.S.C. § 111, includes authorities for procurement and property management.

2. Presidents have used this power to issue a wide range of directives. As noted above, this case concerns a series of directives for agencies to contract with companies that will pay specified minimum wages for work on or in connection with a covered contract. President Obama issued the first such directive in 2014, specifying a minimum wage of $10.10 per hour. Exec. Order No. 13,658, 79 Fed. Reg. 9851 (Feb. 20, 2014).

In 2018, President Trump excluded from the order contracts "in connection with seasonal recreational services" or "seasonal recreational equipment rental for the general public on Federal lands." Exec. Order No. 13,838, 83 Fed. Reg. 25,341, 25,341 (June 1, 2018). His order otherwise maintained the minimum-wage requirement, including for "lodging and food services associated with seasonal recreational services." *Id.*

In 2021, President Biden increased the amount of the required wage and rescinded the exclusion. Exec. Order No. 14,026, 86 Fed. Reg. 22,835 (Apr. 30, 2021). His order directed agencies to include in covered contracts a clause requiring contractors to pay at least $15 per hour (indexed for inflation) for time spent working on or in connection with the contract. *Id.* at 22,835. It reflected his determination that "[r]aising the minimum wage enhances worker productivity and generates higher-quality work by boosting workers' health, morale, and effort; reducing absenteeism and turnover; and lowering supervisory and training costs." *Id.* The Department of Labor issued a rule implementing the executive order. *Increasing the Minimum Wage for Federal Contractors*, 86 Fed. Reg. 67,126 (Nov. 24, 2021).

With increases for inflation, the wage required by covered contracts is currently $17.75. 89 Fed. Reg. 79,644 (Sept. 30, 2024).

3.　Texas, Louisiana, and Mississippi brought this challenge to the 2021 executive order and implementing rule.  ROA.14-45.  The district court entered partial summary judgment and a permanent injunction in plaintiffs' favor, concluding that the order exceeded the President's authority under the Procurement Act.  ROA.749-784.  The court did not reach plaintiffs' claims that the implementing rule is invalid under the Administrative Procedure Act, that the Procurement Act would violate the nondelegation doctrine to the extent it authorizes the executive order, and that the executive order and implementing rule constitute an unlawful exercise of Congress's spending power.  ROA.776-780.  The court enjoined defendants "from enforcing" the challenged requirement "against the States of Texas, Louisiana, and Mississippi and their agencies."  ROA.784.

4.　A panel of this Court unanimously reversed.  The panel explained that "'policies and directives' issued under § 121(a) must be 'necessary to carry out this subtitle,'" that "this determination of necessity is committed to the President," and that "the policies the President prescribes must be objectively 'consistent with this subtitle.'"  Op. 7.  Applying the "ordinary meaning" of "'necessary,' 'consistent,' and 'to carry out,'" the panel concluded that the challenged requirement satisfies those conditions.  *Id.*; *see* Op.

8-10.  And the panel concluded that the major questions doctrine was inapposite both because "§ 121(a)'s text is clear and unambiguous" and because the "doctrine has yet to be applied to the government's exercise of proprietary, as opposed to regulatory, authority."  Op. 19.  The panel remanded "for further proceedings consistent with" the opinion, potentially including the consideration of plaintiffs' nondelegation claim.  Op. 21.

## ARGUMENT

Plaintiffs' petition for rehearing should be denied.  The panel decision correctly upheld the challenged requirement and does not conflict with any decision of this Court or the Supreme Court.

### A.    The Panel's Reasoning Was Sound

1.    As noted above, the Procurement Act authorizes the President to "prescribe policies and directives that [he] considers necessary to carry out this subtitle," so long as the policies are "consistent with this subtitle."  40 U.S.C. § 121(a).  "[T]his subtitle" includes basic authorities for procurement and property management.  Among its provisions is 40 U.S.C. § 101(1), which states that the subtitle's "purpose … is to provide the Federal Government with an economical and efficient system for," among other things,

"[p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting."

By its plain terms, § 121(a) gives the President broad discretion to direct agencies' performance of their contracting functions. The word "necessary" has a range of meanings, but "it frequently imports no more than that one thing is convenient, or useful, or essential to another." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413 (1819). That interpretation is appropriate here given Congress's authorization for the President to act as he "*considers* necessary," 40 U.S.C. § 121(a) (emphasis added). *See Texas v. EPA*, 983 F.3d 826, 837 (5th Cir. 2020) (statute providing that EPA "'may' make changes that it 'deems necessary'" effectively "delegated discretionary authority to EPA to determine when adjustments should be made"). And "consistent" means "congruous" or "compatible." *Consistent*, Oxford English Dictionary, https://doi.org/10.1093/OED/2753437657 (last visited Feb. 27, 2025). Section 121(a) thus authorizes directives that the President considers useful to guide agencies in carrying out the functions covered by "this subtitle," as long as they are "consistent with" the provisions of "this subtitle." And directives are "consistent with" those provisions if they do not contradict the provisions, including the objectives articulated in § 101.

2. Courts, including this one, have long recognized that this language gives the President "necessary flexibility and 'broad-ranging authority'" in determining contracting policies. *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003); *see also, e.g.*, *Contractors Ass'n of Eastern Pa. v. Secretary of Labor*, 442 F.2d 159, 170 (3d Cir. 1971) ("broad grant of procurement authority"); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 n.1 (5th Cir. 1967) ("broad authority"). In *United States v. New Orleans Public Service, Inc.* (*NOPSI*), 553 F.2d 459 (5th Cir. 1977), *vacated*, 436 U.S. 942 (1978), and *United States v. Mississippi Power & Light Co.*, 638 F.2d 899 (5th Cir. Unit A 1981), for example, this Court upheld an executive order (recently rescinded by President Trump) that "impose[d] on government contractors the obligation to take affirmative action to achieve … equal opportunity goals." *Mississippi Power & Light*, 638 F.2d at 901; *see* Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025) (rescission order). The Court identified the Procurement Act (then codified at 40 U.S.C. § 486(a)) as one "source[] of legislative authorization for" the order. *NOPSI*, 553 F.2d at 466 & n.7; *see Mississippi Power & Light*, 638 F.2d at 905.

Given the breadth of the statutory text, courts have "generally landed on a 'lenient' standard" for reviewing directives under the Act. *Louisiana v.*

*Biden*, 55 F.4th 1017, 1026 (5th Cir. 2022) (quoting *Chao*, 325 F.3d at 367). They "have respected the President's judgment as to how a given executive order is likely to advance the statute's objectives." *Bradford,* 101 F.4th at 721. And they have understood those objectives to "'encompass'" numerous "'factors'"—including not just "'price'" but "'quality'"—that affect the value the government obtains from a given contract. *Id.* (quoting *AFL-CIO v. Kahn*, 618 F.2d 784, 789 (D.C. Cir. 1979) (en banc)).

Applying that broad understanding of the Act, Presidents of both parties have adopted a wide range of directives to manage federal procurement and contracting. *See Louisiana*, 55 F.4th at 1023-1026. And Congress has impliedly ratified the construction of the statute embraced by the Executive and Judicial Branches. *See Mayes v. Biden*, 67 F.4th 921, 938 (9th Cir.), *vacated as moot*, 89 F.4th 1186 (9th Cir. 2023). Congress "is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), as Congress did here in 2002. *See* Pub. L. No. 107-217, 116 Stat. 1062, 1063 (2002) (recodifying statement of purpose at 40 U.S.C. § 101); *id.* at 1068 (recodifying grant of authority at 40 U.S.C. § 121(a)); *id.* at 1303 ("[T]his Act makes no substantive change in existing law[.]").

3.    As the Tenth Circuit held in *Bradford*, the challenged executive order falls within the broad statutory text and the longstanding understanding of the authority it confers.  The order directs federal agencies to enter covered contracts only with entities willing to pay their workers a prescribed wage for work on or in connection with those contracts, on the basis of a presidential determination that doing so would "bolster economy and efficiency in Federal procurement" because higher wages "enhance[] worker productivity and generate[] higher-quality work."    86 Fed. Reg. at 22,835.

As the Tenth Circuit recognized, the order reflected a determination that those effects of a higher wage rate would inure to the government's benefit.  *See Bradford*, 101 F.4th at 721-722.  The Department of Labor's rule implementing the order noted that the government's expenditures on covered contracts could rise if the minimum-wage provision "increase[d] employers' costs (beyond offsetting productivity gains and cost-savings), and contractors pass[ed] along part or all of the increased cost to the government in the form of higher contract prices."  86 Fed. Reg. at 67,206.  The rule concluded, however, that "benefits" to the government "attributable to the Executive order" would "accompany any such increase in expenditures, resulting in

greater value to the Government" overall, and "that any potential increase in contract prices" would likely "be negligible." *Id.*

Courts have sustained prior executive orders on similar grounds. For example, the order upheld in *Chao*—President George W. Bush's directive for contractors to post notices of labor rights—reflected President Bush's judgment that "'[w]hen workers are better informed of their rights, including their rights under the Federal labor laws, their productivity is enhanced.'" 325 F.3d at 366. And another order by President Bush, requiring contractors to use the E-Verify system to verify employees' ability to work legally, was sustained on the basis of his judgment that "'[c]ontractors that adopt rigorous employment eligibility confirmation policies are much less likely to face immigration enforcement actions'" and "'are therefore generally more efficient and dependable procurement sources.'" *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726, 738 (D. Md. 2009).

### B.    Plaintiffs Have Shown No Basis For Rehearing

Plaintiffs offer several arguments for rehearing. All are meritless.

1.    The panel decision is consistent with decisions of this Court and the Supreme Court holding that "statements of purpose … 'cannot override [a statute's] operative language,'" *Sturgeon v. Frost*, 587 U.S. 28, 57 (2019), or

supply operative authority that an agency otherwise lacks. The panel did not treat the Procurement Act's statement of purpose, 40 U.S.C. § 101, as a source of operative authority. Rather, it explained that "§ 121(a) contains the [Act's] substantive grant of authority." Op. 7. The statement of purpose *limits* the President's authority under § 121(a), because § 121(a) specifies that directives "must be consistent with" the statement of purpose, among other provisions of the subtitle. This Court held as much in *Louisiana*, "agree[ing]" with the government "that the statement of purpose acts as a set of guide-lines within which" directives "must reside." 55 F.4th at 1023 n.17.

Plaintiffs identify no contrary decision of this Court. In *Apter v. HHS*, 80 F.4th 579 (5th Cir. 2023), the Court held that FDA could not rely on a state-ment of purpose for operative authority. *Id.* at 589. But, again, that is not how the panel treated § 101. Plaintiffs' suggestion that a statute in *Apter* con-tained comparable "carry out" language is meritless; that statute, 21 U.S.C. § 393(b)(4), simply directs FDA to "carry out" its statutory powers "in con-sultation with experts … and in cooperation with consumers," among oth-ers.

In *Contender Farms, L.L.P. v. U.S. Department of Agriculture*, 779 F.3d 258 (5th Cir. 2015), and *Central Forwarding, Inc. v. ICC*, 698 F.2d 1266 (5th Cir.

1983), the Court applied the principle that "general rulemaking authority" does not "empower[] an agency—established to enforce and carry out a congressional act—to promulgate regulations which run far afield from the specific substantive provisions of the act." *Id.* at 1277; *see Contender Farms*, 779 F.3d at 273. But that principle is inapposite here for two reasons.

First, it addresses whether an agency can regulate subjects beyond the scope of the provisions it is charged with carrying out. Here, no one suggests that § 121(a) authorizes the President to issue directives regarding functions not covered by "this subtitle."

Second, the rule applied in *Contender Farms* and *Central Forwarding* reflects principles governing delegations of regulatory authority to agencies, including the principle that agencies possess such authority only to the extent Congress validly delegates it, *see, e.g., NFIB v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam); and the principle that Congress cannot delegate authority to an agency without "'lay[ing] down … an intelligible principle'" to guide the agency's discretion, *Mistretta v. United States*, 488 U.S. 361, 372 (1989). The order challenged here was not an exercise of governmental authority to regulate private conduct. It was an exercise of proprietary author-

ity, overlapping with the President's constitutional power to exercise "'administrative control'" of the Executive Branch. *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002). Even the dissenting Justices in *Gundy v. United States*, 588 U.S. 128 (2019), who would have held that the statute at issue there violated nondelegation principles, recognized that "Congress may assign the President broad authority regarding … matters where he enjoys his own inherent Article II powers." *Id.* at 170-171 (Gorsuch, J., dissenting).

Plaintiffs suggest that the panel's construction of § 121(a) would allow various intrusive directives. Pet. 8-9. But § 121(a) does not authorize the President to "[f]orc[e]" or "[c]omman[d] contractors" to do anything (Pet. 9); it simply allows the President to direct *agencies* as to the terms on which they should enter into contracts. And in any event, plaintiffs' hypothetical directives differ from the one here because they would extend well beyond specifying the terms on which particular contracts are to be performed. There is a clear difference, for example, between a directive "[c]ommanding contractors to relocate to—or away—from pro-union States" (*id.*) and a directive for agencies to include in certain contracts a provision requiring that *work on the*

*contract* be performed only in States with certain labor laws.  The latter is at least plausibly authorized by § 121(a).

2.      Plaintiffs next suggest that the panel disavowed the review of Procurement Act directives that the D.C. Circuit undertook in *Kahn* and the Fourth Circuit undertook in *Liberty Mutual Insurance Co. v. Friedman*, 639 F.2d 164 (4th Cir. 1981).  But the panel did not hold, as plaintiffs claim, that it "lack[ed] 'institutional competence' … to do the analysis that the D.C. and Fourth Circuits require" (Pet. 11).  To the contrary, the panel described the standards applied in *Kahn* and *Liberty Mutual* and concluded that the challenged directive "satisfies either" test.  Op. 10.

What the panel said it could not do was "'second-guess the'" "economics" underlying the President's "'policy choice[s].'"  Op. 16-17.  That is correct and consistent with *Kahn* and *Liberty Mutual*.  The courts in those cases did not question the President's policy choices based on their own views of economics; they deferred to the President's conclusion that the directives at issue were consistent with the goals articulated by § 101.  *See Bradford*, 101 F.4th at 721.  That is consistent with the text of § 121(a), which authorizes "policies and directives that *the President considers* necessary" (emphasis added), not just those a court determines to be necessary.

In *Kahn*, for example, the D.C. Circuit upheld an executive order directing agencies "to require that all contractors certify … compliance with" recent "wage and price standards" created to reduce inflation," 618 F.2d at 785-786—even though "there was a rather obvious case that the order might in fact increase procurement costs," *Chao*, 325 F.3d at 367—because the court deferred to the President's judgment that "if the voluntary restraint program [were] effective in slowing inflation in the economy as a whole," the government would "face lower costs in the future," 618 F.2d at 793.  And in *Liberty Mutual*, the court likewise did not second-guess the President's economics; rather, it concluded that the rationale for the President's directive could not extend to the particular company bringing an as-applied challenge.  639 F.2d at 171.

3.     Plaintiffs' contention that the panel erred in distinguishing the major questions doctrine is equally meritless.  The Tenth Circuit likewise declined to apply the doctrine, *Bradford*, 101 F.4th at 725-728, as did the Ninth Circuit in its review of the same executive order, *Nebraska*, 121 F.4th at 14.

The doctrine is inapplicable chiefly because the challenged requirement was not an exercise of "regulatory authority," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), or some other power of "'the administrative state,'"

*Biden v. Nebraska*, 600 U.S. 477, 505 (2023). It was a directive by the Chief Executive instructing agencies in the exercise of the Executive Branch's "proprietary authority." *Bradford*, 101 F.4th at 726. When the government acts "in its capacity 'as proprietor' and manager of its 'internal operation,'" it "has a much freer hand" than when it "exercise[s] its sovereign power 'to regulate.'" *NASA v. Nelson*, 562 U.S. 134, 148 (2011).

This Court rejected a similar argument in *Louisiana*, as plaintiffs note, but it did so on grounds inapplicable here. There, the Court found "the distinction between regulatory and non-regulatory power" to be "without a difference" because the executive order in question—requiring agencies to contract only with companies that required employees to be vaccinated against COVID-19—was not limited to employees working on or in connection with federal contracts; it included "employees whose sole connection to a federal contract [was] a cubicle in the same building as an employee working 'in connection with' a federal contract." 55 F.4th at 1032-1033 (footnote omitted). The Court also observed that the requirement "purport[ed] to govern the conduct of *employees*," rather than that "of *employers*," because—unlike most conditions of employment—"[a] vaccination cannot be undone at the end of the workday." *Id.* at 1030 (quotation marks omitted).

The Court recognized, however, that the government's proprietary-authority argument could "carry more weight" as to a more limited requirement. *Louisiana*, 55 F.4th at 1032-1033. The requirement here is limited in precisely the way the Court found lacking in *Louisiana*. It does not apply to all of a contractor's employees, or even to all of the hours worked by employees who work on or in connection with federal contracts. It simply requires contractors to pay the specified minimum wage for the hours that their employees spend working on or in connection with covered federal contracts. It is difficult to see how that sort of specification for the work done on government contracts could be any more "internal," *id.*, to the government's proprietary functions. Plaintiffs are therefore incorrect to suggest (Pet. 1) that the panel decision "effectively mak[es] Judge Graves's dissent from *Louisiana* the law of the Circuit."

The challenged directive is also "not a 'transformative' expansion" of the President's authority under the Procurement Act. *Nebraska*, 121 F.4th at 14; *see Bradford*, 101 F.4th at 726-727. Nor is this "a case in which the executive branch seeks to locate expansive authority in 'modest words,' 'vague terms or ancillary provisions.'" *Bradford*, 101 F.4th at 725. And the economic consequences of the challenged directive pale in comparison to those in cases

where the Supreme Court has invoked the major questions doctrine.  The number of employees expected to see a wage increase in the first year of this requirement (327,300, *see* 86 Fed. Reg. at 67,200) was roughly one-fifth of one percent of the U.S. workforce, and one-thirtieth the number of employees affected by a requirement that the Supreme Court upheld without discussing the major questions doctrine, *see Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam); *id.* at 98 (Thomas, J., dissenting) ("10 million healthcare workers").  While the challenged directive was expected to cause the transfer of approximately $1.7 billion per year from contractors to their employees, the Department of Labor's rule concluded that contractors' net costs would not necessarily increase by that amount because, the rule stated, the payment of a higher minimum wage would lead to "productivity gains" and "cost[] savings" (for example, from decreased turnover).  86 Fed. Reg. at 67,206.  And even if the requirement actually cost contractors $1.7 billion per year, that alone would not implicate the major questions doctrine.  *Cf. Nebraska*, 600 U.S. at 494 ("$430 billion"); *West Virginia*, 597 U.S. at 715 ("at least a trillion 2009 dollars"); *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) ("$50 billion").

4.     Finally, the stakes of this case do not warrant en banc review given the absence of any conflict between the panel opinion and decisions of this Court or the Supreme Court.  Plaintiffs posit hypothetical "[f]uture" directives addressing "highly charged social issues" (Pet. 14) but this Court's review of any such directives would be governed not just by the panel decision here but by *Louisiana*, which applied the major questions doctrine to reject a Procurement Act directive.  En banc review is also unnecessary to avoid "significant disruption" (*id.*).  The injunction reversed by the panel was narrow; it barred enforcement of the challenged requirement only against the plaintiff States "and their agencies," not private entities within their borders.  ROA.784.  It is therefore sensible to let "additional litigation" (Pet. 14) over plaintiffs' other claims—claims that neither the district court nor the panel resolved—play out in district court before any further review in this Court.

## CONCLUSION

The petition for rehearing should be denied.

Respectfully submitted,

ERIC D. McARTHUR
   *Deputy Assistant Attorney General**

NICHOLAS J. GANJEI
   *United States Attorney*

CHARLES W. SCARBOROUGH

 */s/ Daniel Winik*
DANIEL WINIK
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7245*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 305-8849*
   *daniel.l.winik@usdoj.gov*

---

[*] The Acting Assistant Attorney General is recused.

**CERTIFICATE OF COMPLIANCE**

This response complies with the type-volume limit of Federal Rule of Appellate Procedure 40(d)(3) because it contains 3,883 words. This response also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Book Antiqua, a proportionally spaced typeface.

*/s/ Daniel Winik*
Daniel Winik
